UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Case No. 21- 278 (BAH) |
| DANIEL HERENDEEN, | |
| Defendant. | |

**DANIEL HERENDEEN'S SENTENCING MEMORANDUM**

Daniel Herendeen has always prided himself on being civic-minded and thoughtful. He is the type of person who cleans and coats a garage floor with a non-slip epoxy for his grandfather who was struggling to walk and get into his car. (Ex. A, Switaj Letter) Mr. Herendeen is the type of person who takes out his neighbor's trash every week and shovels neighbors' walkways after a snowstorm.  He is someone who volunteers at his children's school as a coach.

Since January 6, 2021, however, Mr. Herendeen is forever publicly tied to an event that suggests he does not respect his community or country: an attack on the Capitol by people trying to stop the peaceful transfer of power. Mr. Herendeen is ashamed that he stepped foot in the Capitol that day. He calls January 6, 2021 a "black mark" on the nation's history. (Ex. B, Herendeen Letter)

Mr. Herendeen's poor decision has had significant consequences. His children are embarrassed by their father's actions and now worry that he will go to prison. His

1

small business has suffered because Facebook disabled his personal and professional accounts. And he has struggled emotionally because of the stress caused by the reduced income and notoriety. These are direct, severe consequences of his actions. Mr. Herendeen does not want to be involved in such a shameful episode again. He has completely disengaged from social media, which he now recognizes distorted his world view.

Mr. Herendeen pleaded guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), a Class A misdemeanor. The Guidelines recommend a sentence within the range of 0–6 months. A two-year period of probation, community service, and $500 will achieve the goals of a sentence: to punish, to deter, to incapacitate, and to rehabilitate. *See* 18 U.S.C. § 3553(a); *Tapia v. United States*, 564 U.S. 319, 325 (2011) (describing the factors in 18 U.S.C. § 3553(a)). Such a sentence will not create unwarranted disparities between Mr. Herendeen and other people who, like him, did not engage in any assaultive conduct or property damage, were in the building for less than 20 minutes, and have shown unequivocal remorse.

## A. Mr. Herendeen's Background: Early Tragedy, Hard Work, and Commitment to Family

Daniel Herendeen was born in Indiana. His parents were married, but they divorced when Mr. Herendeen was only seven or eight years old. Although his siblings stayed with their mother in Michigan, Mr. Herendeen chose to live with his father in Indiana. Shortly after the divorce, while still adjusting to a life without the full

family, Mr. Herendeen's father tragically died in a car accident. Eight-year-old Herendeen could not remain alone in Indiana, so he relocated to Michigan to live with his mother and siblings. Overnight, he was taken away from his father's side of the family, his school, and his friends.

Mr. Herendeen's mother re-married, but that relationship did not bring the family happiness or stability. His stepfather was physically abusive and a negative influence. Despite these early struggles, Mr. Herendeen graduated from high school.

In 2001, Mr. Herendeen became a union member of the Labors Local 1076 and has been an active member ever since. As a labor foreman, Mr. Herendeen works in various auto plants.

Despite his union membership and hard work ethic, he has gone through periods of time without work. He has taken steps to supplement his income during these periods of economic instability. In 2009, when the Great Recession was hitting Michigan particularly hard, Mr. Herendeen was drawn to service work. He chose to enroll in Macomb Community College to become a firefighter and emergency medical technician. He exceled in these courses, earned a degree, and was honored for superior academic performance. In 2018, Mr. Herendeen founded a small business, Epoxy Guys, installing epoxy flooring.

Fortunately, in recent years, there has been an increase in the demand for union workers in Michigan. Mr. Herendeen never misses a chance to work. (Ex. C, Kish Letter) He has recently been working exceptionally long hours at a plant based

in Hamtramck, Michigan. Sometimes he puts in 18 hours of work a day. This is demanding physical labor, which takes a toll on his back.

When Mr. Herendeen is not working, he spends time with his three children. The eldest is currently in college, but Mr. Herendeen is the sole provider and caretaker for his two minor children. Although the children's mother has been involved in their lives periodically, she has not had custody of the children for a few years. Mr. Herendeen would love for his child's mother to be more involved in the kids' lives, but right now, he is their source of financial and emotional support. As a dad, he takes pride in coaching his kids' sports teams, taking the kids and their friends on camping trips, and hosting movie nights at home.

Mr. Herendeen acknowledges that he does not have a spotless criminal record. But he has never been convicted of a felony offense.

### B. Mr. Herendeen's Role in the Offense

Mr. Herendeen never considered himself a politico. He was busy with work and childcare. But Donald Trump's message about supporting middle-class families and promoting the Midwestern industrial base, which had been in decline for many years and was particularly hard-hit by the 2008 recession, spoke to Mr. Herendeen and many of his friends.

In the lead up to the 2020 election, Mr. Herendeen read numerous stories on Facebook about people who were planning to rig the election in favor of Democrats. When Mr. Herendeen went to bed on election night, Mr. Trump was leading. But

4

when he woke up, the tides had turned. He and his friends read and shared stories on Facebook about voting irregularities. Mr. Herendeen believed those stories.

When Donald Trump announced plans for the "Stop the Steal" rally, Mr. Herendeen and his friends wanted to go. These rallies had always been fun, high-energy events, and his friends wanted to show their support for Mr. Trump and have a good time. After all, Mr. Trump asked for two things: his vote and to attend the rally. Those promoting the rally promised to reveal shocking, new information that would change everything. Mr. Herendeen had two weeks off after working hard through the holidays, and he thought the rally would be fun and provide a great chance to get out of Michigan. He had never been to Washington, D.C., and so he hoped to spend some time in the city to see the landmarks and learn more about American history. He also wanted to hear and see the big unveiling that had been promised.

Mr. Herendeen contacted Robert Schornack, who was a friend of Mr. Herendeen's younger brother. They made a loose plan to go to the rally. Their advance planning was minimal; they did not even know where they would stay until arriving in D.C. Before leaving, Mr. Herendeen promised Mr. Schronack's wife that he would make sure Bobby would return home safely.

In the lead up to the rally, many people in Mr. Herendeen's Facebook newsfeed were posting about the possibility that Antifa would be at the rally to agitate the crowd and start violence. Mr. Herendeen had read on Facebook about reported Antifa-

instigated violence in Portland, Oregon, and at the Black Lives Matter protests in Washington during the summer of 2020. His friends expressed worry that he would face violence in D.C. He thought it would be wise to have protection from Antifa-led violence, pepper spray, and smoke bombs. His concerned friends offered to let him borrow a bullet-proof vest. Mr. Herendeen borrowed a radio, as well, because he thought that cell phones would not be effective means of communication at such a large rally.

Before leaving for D.C., Mr. Herendeen also bought knives and bear spray ("Antifa spray") at a local sporting goods store. He checked to make sure the knives were small enough to carry legally. He bought these things for self-protection, not to use offensively. In the end, Mr. Herendeen never used these items and returned them unopened to the store after returning to Michigan. He did not bring the knives to D.C. He is not even sure if he had the bear spray with him at the rally because he left one of his two bags at the hotel.[1]

On the morning of January 6, 2020, Mr. Herendeen and Mr. Schornack met up with two police officers from Tennessee, one of whom was a friend from high school. The four men took photos near the Washington Monument and listened to the

---

[1] Mr. Herendeen believes that he left the bear spray at the hotel. He had with him a backpack, and he remembers removing his jacket and putting it into the backpack. The bear spray cannister was quite large, and so he would have struggled to put the jacket in the backpack if the bear spray was inside. Nonetheless, Mr. Herendeen cannot say with certainty that these items were not in the backpack he wore to the rally. What is certain is that he never took them out or used them in any way. He returned the unopened bear spray to the store.

speeches at the rally. They had no plans to go to the Capitol until Donald Trump said that they should go there to "make your voices heard." Mr. Herendeen thought they would walk to the Capitol and chant outside, so when the crowd started walking, he did, too.

The foursome quickly separated from each other in the crowd. The two men from Tennessee never made it to the Capitol because one of them had an injured leg. None of the men could use their cell phones.

Mr. Herendeen walked with Mr. Schornack until they were about 75 yards from the Capitol. Mr. Herendeen tried to find higher ground to look for his friend, but he was lost in a sea of red hats and American flags. Mr. Herendeen continued up the stairs to look for his friend. Not seeing Mr. Schornack, Mr. Herendeen made the terrible choice to enter the Capitol.

At approximately 2:21 pm, Mr. Herendeen walked through the Senate Wing doors. He did use any force to enter. He followed the crowd down the hall towards the Crypt. Mr. Herendeen continued into the Crypt, where a mass of people chanted, "USA!"

It was a bizarre experience, and Mr. Herendeen decided to film what he saw. The whole mess reminded him of the film, "White House Down," where the invaders yell, "They're in the basement!" When Mr. Herendeen saw people going up the stairs, he quoted the movie. He had no idea whether there was, in fact, a basement in the Capitol.

Mr. Herendeen followed the crowd until he saw police officers trying to stop people from moving past the Crypt. He asked another person who was there to stop yelling at a police officer and tried to stop others from getting close to the police officers inside.

Unable to find Mr. Schornack, and realizing the gravity of the situation, Mr. Herendeen turned around and went back to the Senate Wing doors. Along the way, he saw two men in an office and told them to get out of there. Another man was lying on the ground with pepper spray in his eyes. Because Mr. Herendeen is an EMT, he asked the man if he was ok and offered to flush his eyes with water.

By this time, he arrived back at the Senate Wing doors, the police had barricaded the entrance. They instructed everyone to exit through a window that had been broken before. Mr. Herendeen followed those directions and left the building at approximately 2:37 pm. He was in the Capitol approximately 17 minutes.

Mr. Herendeen walked back to the Washington Monument, where he ordered a ride to the hotel. Along the way, he was finally able to reconnect with the friends from Tennessee. When Mr. Schornack returned to the hotel, the two packed up their belongings and drove back to Michigan.

Since January 6, 2021, Mr. Herendeen has not celebrated the attack on the Capitol. In fact, he has disengaged from social media and politics entirely. He does not follow Mr. Trump on social media; he does not care what the former president has to say. Mr. Herendeen feels betrayed, abandoned, and frustrated by those who spread misinformation. During his interview with the U.S. House Select Committee to

8

Investigate the Attack on the Capitol, when asked to reflect on January 6 and the political activism that lead up to it, he said, "It's like a ride I didn't like when I got off it."

Some of Mr. Herendeen's friends continue to discuss politics. He has decided that avoiding those conversations is the best course for him. Fed up with politics, he even chose not to vote in the most recent election.

Mr. Herendeen has always acknowledged that he should not have entered the Capitol. He spoke candidly with the FBI about his conduct. On March 16, 2022, he met with the House Special Committee, as well, where he again expressed remorse for his actions. Mr. Herendeen accepts full responsibility for his conduct. He has no tolerance for those who committed violent acts against police.

### C. Probation is an Appropriate Sentence for Mr. Herendeen

A sentence must be "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to achieve the objectives of sentencing—"retribution, deterrence, incapacitation, and rehabilitation," *Tapia*, 564 U.S. at 325 (summarizing 18 U.S.C. § 3553(a)(2)). The Guidelines recommend a sentence between 0–6 months. Any period of incarceration is greater than necessary to achieve the objectives of punishment and could undermine many of § 3553(a)'s goals. Mr. Herendeen asks this Court to follow the recommendation of the U.S. Probation Department and impose a probationary sentence.

Mr. Herendeen has acknowledged that his decision to enter the Capitol was wrong. He deeply regrets that choice and acknowledges that the events of January 6, 2021, were serious. If he could take it back, he would. Mr. Herendeen has tried to atone for his conduct and help the House Special Committee understand the circumstances that caused the attack.

Time in prison will not further the goals of specific deterrence. Research consistently shows that the certainty of being caught for wrongdoing more effectively deters crime than punishment—particularly imprisonment.[2]   Investigators in this case quickly identified Mr. Herendeen as one of the hundreds of people who entered the Capitol on January 6, 2021. He was promptly arrested and charged. By acting so quickly to identify those who trespassed at the Capitol, the FBI and the government have already deterred Mr. Herendeen personally with their investigation and swift action. These investigators have also demonstrated to others that those who trespass at the Capitol will be investigated quickly.

After the charges were filed, Mr. Herendeen's face and name were splashed across the internet in articles announcing his arrest and charges.[3] Some of these

[2] Nat'l Inst. Justice, *Five Things About Deterrence* (May 2016), available at https://perma.cc/L8J6-KJG7.

[3] *See, e.g.*, Malachi Barrett, *FBI: Trump-supporting friends donned tactical gear, took photos inside U.S. Capitol at Jan. 6 riot*, MLive (Mar. 18, 2021), available at https://perma.cc/VXF4-D9WR; *Two Macomb County men charged in Capitol Riot caught on video & took selfies, feds say*, Fox2 Detroit (Mar. 18, 2021), available at https://perma.cc/ZKY2-97EV.

articles linked Mr. Herendeen to white supremacy, even though he has never been involved in white supremacist groups or supported white supremacist views.[4] The publicity and the suggestion of involvement with radical groups has been deeply embarrassing and distressing for Mr. Herendeen. His children share that embarrassment, which compounds his shame.

After Mr. Herendeen was charged in this case, Facebook removed his personal profile and the profile of his business. Facebook was Epoxy Guys' only means of advertising. The loss of that profile has substantially impacted his business. Mr. Herendeen estimates that his earnings this year are $12,000 less than last year and that approximately 50% of his business came from Facebook. This has been a considerable consequence of his decision to enter the Capitol on January 6, 2021.

There is no need to incarcerate Mr. Herendeen to protect the public. Although Mr. Herendeen does not have a spotless criminal record, he is not a dangerous man. He has never been convicted of a felony offense. Until recently, his most recent conviction was from an incident that occurred more than 10 years ago. (PSR ¶ 43)

A term of imprisonment will undermine rather than advance the goals of rehabilitation. Research consistently shows that incarceration is not an effective way

---

[4] *See* Chad Selweski, *Capitol Riot Arrests Underscore Macomb's White Supremacy Problem* (Dec. 26, 2021), available at https://perma.cc/8AHZ-A44G.

to change behavior and, more often, has a criminogenic effect. The most recent, thorough meta-analysis concludes that incarceration has no effect on recidivism.[5]

Of the sentencing factors to consider, retribution is what remains. Vengeance may feel good in the moment, but it rarely heals. There are better ways than prison to heal. Mr. Herendeen has already agreed to pay $500 restitution towards repairing the Capitol. Requiring that Mr. Herendeen give back to the community through service is another way this Court's sentence can encourage reconciliation.

### D. A Probationary Sentence Will Avoid Unwarranted Sentence Disparities

Mr. Herendeen was in the Capitol a short period of time. He committed no acts of violence. He did not destroy property. And he did not travel far into the building. A probationary sentence in this case would be consistent with the sentences imposed for similar conduct.

Typically, comparing co-defendants' conduct is one way to avoid unwarranted disparities. When this Court sentenced Robert Schornack, it imposed a sentence of 36 months' probation, which includes 30 days of intermittent incarceration, and 2 months' home detention. Although Mr. Schornack and Mr. Herendeen traveled to D.C. together, their conduct inside the Capitol was markedly different. While in the Capitol, they were not together. Mr. Schornack traveled deeper into the Capitol than Mr. Herendeen—all the way to Emancipation Hall. Mr. Schornack stole an American

---

[5] *See* Damon M. Petrich, Travis C. Pratt, Cheryl Lero Johnson, & Francis T. Cullen, *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, 50 Crime & Justice (Sept. 22, 2021).

flag from inside the Capitol and raised it above his head as he exited the building. Mr. Herendeen did nothing of the sort.

Post-attack conduct also distinguishes the two men. Mr. Schornack sent messages celebrating the event to friends and family. Although Mr. Herendeen posted one video that he took inside the Capitol, he did not celebrate the event.

A probationary sentence will not create unwarranted disparities in cases where the defendants' conduct was also non-violent. Although in most similar cases, the government offered the defendants a plea to a Class B misdemeanor, it is difficult to discern the difference between the conduct of those cases and Mr. Herendeen's.

Like others who received probationary sentences, Mr. Herendeen was in the Capitol for less than 20 minutes and did not travel far. For example, in *United States v. Douglas Wangler & Bruce Harrison*, No. 21-CR-365 (DLF), Judge Friedrich imposed a sentence of 24 months' probation, 60 hours of community service, and $500 restitution. Messrs. Wangle and Harrison entered the Capitol, walked into the Crypt, and took photos and a video, including one where they pumped their fists. They left after approximately 20 minutes inside. (R. 34, Statement of Offense). Consider the case of Eliel Rosa, who was also in the Capitol for approximately 20 minutes. *United States v. Eliel Rosa*, No. 21-CR-68 (TNM), R. 60, Statement of Offense. Despite hearing bangs and smelling pepper spray, Mr. Rosa walked into the Capitol and continued through the Rotunda, Sanctuary Hall, and the House Chamber. Judge

McFadden sentenced Mr. Rosa to 12 months' probation, 100 hours of community service, and $500 restitution.

Mr. Herendeen did not show disrespect for the building or police while inside the Capitol, like some people who were sentenced to terms of probation. In *United States v. Jacob Hiles*, No. 21-CR-155 (ABJ), Judge Jackson imposed a sentence of 24 months' probation, 60 hours of community service, and $500 restitution. Mr. Hiles marched to and entered the Capitol wearing goggles with him to protect himself from tear gas. He posted videos and photos of himself on Facebook, including one where he and his cousin were smoking in the Capitol. (R. 24, Statement of Offense) Jeffrey Witcher received a sentence of 12 months' probation with 60 hours of community service. He entered the Capitol early in the attack and traveled to multiple locations. While inside, he yelled at law enforcement officers, "Our House! Don't be a traitor! Fulfill your constitutional duties, man. Do or die! Be with us!" *United States v. Jeffrey Witcher*, No. 21-CR-235 (RC), R. 20, Statement of Offense.

Mr. Herendeen did not celebrate the attack on the Capitol or call for a resolution, like two people who were sentenced to 24 months' probation. In *United States v. Joshua & Jessica Bustle*, No. 21-CR-238 (TFH), the Bustles pleaded guilty to parading. They were in the Capitol approximately 20 minutes, in the Rotunda, carrying signs protesting the government's vaccination efforts. Mrs. Bustle posted on Facebook during the riot, and then subsequently called for a revolution. (R. 25, Statement of Offense). Judge Hogan sentenced Mr. Bustle to 24 months' probation with one month of home detention, 40 hours of community service, and $500

restitution. Mrs. Bustle was sentenced to 24 months' probation with 2 months' home detention, 40 hours of community service, and $500 restitution.

In fact, Mr. Herendeen's conduct is less egregious than two people who were sentenced to 18 months' probation. After climbing a wall, being maced, and crawling through a broken window, Amy and John Schubert were in the Capitol approximately 40 minutes. While inside, they traveled to the Rotunda, through adjacent hallways, and even entered at least one Congressional meeting room. *United States v. Amy Schubert & John Schubert*, No. 21-CR-588 (ABJ), R. 17, Statement of Offense. In addition to the probationary sentence, Judge Jackson ordered Amy and John to pay $2,000 and $1,500 fines respectively and to complete 100 hours of community service.

In short, an 18-month probation sentence will not create unwarranted disparities between defendants who were in the Capitol less than 20 minutes, did not behave violently, did not celebrate the attack.

## CONCLUSION

Mr. Herendeen deeply regrets his decision to enter the Capitol. He has done his best to provide the FBI and the Select Committee with as much information as possible. He has already suffered significant consequences as a result of his conduct. A sentence of 18 months' probation, 100 hours of community service, $500 restitution, and a $25 special assessment fee is sufficient but not greater than necessary to achieve the goals of punishment.

Respectfully Submitted,

15

**FEDERAL COMMUNITY DEFENDER**

<u>s/ Colleen P. Fitzharris</u>
Attorney for Daniel Herendeen
613 Abbott St. Ste. 500
Detroit, MI  48226
313-967-5868
E-mail: colleen_fitzharris@fd.org

Date:  March 18, 2022

## **CERTIFICATE OF SERVICE**

I certify that the foregoing document was filed using the CM/ECF system which will notify all parties of record.

s/Colleen P. Fitzharris