# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00278-2 (BAH)** |
| **v.** | : | |
| | : | |
| **DANIEL HERENDEEN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Daniel Herendeen to 28 days' incarceration, three years' probation, 60 hours of community service, $500 in restitution, and the mandatory $25 special assessment.

## I.     Introduction

The defendant Daniel Herendeen, a 44-year-old construction worker from Michigan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than one million dollars' of property damage.

Herendeen pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, a Class A misdemeanor. As explained herein, a sentence of 28 days' incarceration and three years' probation is appropriate because (1) he expected to meet violence at the Capitol before he even left Michigan and told a confidential source, "If I die, I die saving the nation;" (2) consistent with that expectation, he planned to take a gun and other tactical gear, but instead took black-tinted goggles, a flak jacket, tactical vest, a

canister of bear spray, and a face covering depicting an American flag with him to Washington, D.C.; (3) at the U.S. Capitol Building on January 6, 2021, he wore the goggles, flak jacket, and tactical vest and carried the bear spray inside a black military-style backpack; (4) he entered the Capitol Building through the Senate Wing Door approximately seven minutes after the initial breach of the Capitol at that location; (5) he took photos and videos of himself and other rioters inside the Crypt of the Capitol Building and posted them on Facebook; and (6) attempted to profit from his participation in the riot by offering to sell photos of himself in the Capitol for further distribution. These factors demonstrate the severity of Herendeen's conduct on January 6 and, but for the fact that Herendeen is the sole custodial parent of two teenagers, one with significant health problems that he is actively involved in treating, the Government would be recommending a lengthier period of incarceration.

The Court must also consider that Herendeen's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the Congressional certification vote of the 2020 Presidential election.  But for his actions alongside so many others, the riot likely would have failed. Here, the combination of Herendeen's preparation for January 6, participation in a riot that actually succeeded in halting the Congressional certification, his celebration and endorsement of the activities that occurred on that day, and the potential for future illegal activity renders the recommended sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 55 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

*Herendeen's Role in the January 6, 2021 Attack on the Capitol*

On December 30, 2020, Herendeen engaged in the following conversation on Facebook with Robert Schornak (charged as a codefendant in this case) regarding their plans to attend the "Stop the Steal" rally:

Schornak:     Cant stay home, I would not be able to live w myself

Herendeen:     That's how I feel. I'm supposed to go with Bill Kozlowski, but it sounds like he might back out. I heard it might be hard to get to DC. I go regardless.

Schornak:     Hard, nothing easy ever is worth doing.

Schornak:     Just call me bro.

Herendeen:     Good point! Wanna make a plan? I have next two weeks off work. Just worked every day from Thanksgiving till this Thursday.

Afterward, Herendeen made plans to travel to Washington, D.C. Herendeen contemplated taking a gun with him to Washington, D.C., but instead packed black-tinted goggles, a flak jacket, tactical vest, a canister of bear spray, and a face covering depicting an American flag and Schornak packed a military-style vest, helmet and a bullhorn.

On January 5, 2021, Herendeen and Schornak traveled together from Michigan to Washington, D.C. with the aforementioned items.

On January 6, 2021, as depicted in Image 1, Herendeen (circled in blue) posed for a photograph wearing a distinctive black and white baseball-style cap with a Bass Pro Shop logo

appearing on the cap and a dark-colored jacket in Washington, D.C. Co-defendant Schornak appears on the far left of the same photograph.

Image 1



By approximately 2:00 p.m., members of a mob on the West Front of the U.S. Capitol Building had removed and pushed aside barriers that were intended to restrict their access and entry to the Capitol Building. At approximately 2:03 p.m., police in riot gear engaged with members of a mob, some of whom were assaulting officers, on the West Front of the U.S. Capitol Building. The United States Capitol Police had also set up amplification equipment that repeatedly broadcast an order commanding the crowd to disperse. In conjunction with that amplified recording, police officers deployed crowd control munitions ("flash bangs") against the mob. Image 2, taken a short time after Image 1, shows what the West Plaza looked like at approximately 2:23 p.m. on January 6, 2021.

Image 2



Herendeen and Schornak became separated in the mob on the West Front of the Capitol and did not reunite until they left the Capitol Building.

The West Front of the U.S. Capitol Building was first breached at approximately 2:13 p.m., when one or more rioters smashed out the windows adjacent to the Senate Wing doors with a riot shield and a rioter jumped through a window over broken glass as shown in Image 3. To get to the Senate Wing doors and windows at that time, the rioters would have had to previously breach the line that police officers had tried to maintain on the West Front of the Capitol to restrict access and entry to the Capitol Building.

Image 3



Herendeen was a member of a mob that entered the Capitol Building through the Senate

Wing door at approximately 2:20 p.m., as shown below in Images 4-6 and captured on

surveillance video in Government's Exhibit 1.

Image 4



Image 5



Image 6



By approximately 2:22 p.m., Herendeen had traveled with other rioters to the Crypt

Lobby North area, and was captured on surveillance video as depicted in Government Exhibit 3

and Image 7.

Image 7



Wednesday, January 06, 2021 2:22:45 PM

While in the Crypt Lobby, Herendeen recorded a video that he posted on Facebook. Government Exhibit 4 is the Facebook video. In the video, Herendeen panned the camera to display a large group of people cheering and shouting at police officers. After panning the camera back to himself, Herendeen removed his hat in an apparent salute to the crowd. Images 8 and 9 are screenshots taken from the video.

Images 8 and 9



The images of Herendeen inside the Crypt reveal that he removed the jacket that he wore into the Capitol and that he was visibly wearing the tactical vest and goggles that he brought with him from Michigan.

Another video recording made by Herendeen captured his voice saying, "They're in the basement, we need to go to the basement." The government has no evidence that Herendeen traveled to the basement or directed other rioters to travel to the basement or any other location in search of members of Congress.

At approximately 2:36 p.m., Herendeen returned to the lobby adjacent to the Senate Wing doors and windows and exited through a window at the direction of police officers. Government Exhibit 2 is surveillance video showing Herendeen's exit from the Capitol and Image 10 is a screenshot taken from the video.

Image 10



The government does not have evidence that Herendeen personally engaged in any destructive or violent activity while inside the Capitol Building or that he precluded others from engaging in destructive or violent activity.

*Herendeen's Interview*

Herendeen and his attorney agreed to an interview on September 17, 2021. He initially minimized the evidence that he planned for violence in Washington, D.C., by stating that he decided to attend the President Trump's "Stop the Steal" rally because he thought it would be "like a party." At this point in the interview, Herendeen was shown the photographs that he posted to Facebook, shown above as Images 8 and 9, and the other photograph of him wearing the tactical gear, shown above as Image 1. Herendeen then admitted that he packed bear spray, flak jacket, tactical vest, and mask. He stated that he did not take a gun with him to the rally.

Herendeen stated that he only intended to use the tactical gear and spray if he encountered members of Antifa and needed to defend himself.

Herendeen acknowledged that he walked up a flight of stairs and entered the Capitol through an open door. He started taking video on his cell phone when he was in the Crypt. He recalled saying "*they're in the basement*," from the movie White House Down, referring to the

location of members of Congress.  Herendeen claimed that he meant nothing by the statement and did not go looking for members of Congress.

Herendeen claimed that he stopped some rioters from entering a room and assisted a man who had been tear gassed, before he decided to exit the Capitol. The government does not have evidence that confirms or denies these claims.

After exiting the Capitol, Herendeen also admitted that he attempted to sell the video that he recorded in the Capitol to a member of the media for publication.

*The Charges and Herendeen's Plea*

On April 2, 2021, a federal grand jury returned a five-count indictment charging Schornak and Herendeen with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).[1]

On December 17, 2021, Herendeen pled guilty to Count Two of the Indictment, which charged him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

---

[1] On November 12, 2021, Schornak pled guilty to Count Two of the Indictment. On February 18th, the Court imposed a sentence of 28 days intermittent confinement of two periods of 14 days each; two months' home detention, three years' probation and $500 restitution. The Court did not impose community service. The Court expressed its interest in imposing a period of probation that would ensure court supervision of the defendant that included the next Presidential election in 2024.

### III.     Statutory Penalties

Herendeen now faces sentencing for Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Herendeen faces up to one year of imprisonment, a fine of up to $100,000, and a term of supervised release of not more than one year. Herendeen must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol, and Herendeen agreed to pay restitution in the amount of $500. That restitution should be paid to the Clerk of the Court, who will forward the payments to the Architect of the Capitol as indicated in the Presentence Investigation Report ("PSR"). PSR at ¶ 104.

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the offense to which Herendeen pled guilty is a Class A misdemeanor, the Sentencing Guidelines are applicable. In cases where the Guidelines are applicable, the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Schornak's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 31-39.

However, the PSR incorrectly suggests that the applicable specific offense characteristic under U.S.S.G. §2B2.3(b)(1)(A)(i) is applicable because the trespass occurred "at a secure government facility." As indicated in Herendeen's plea agreement, the trespass occurred "in restricted area." Accordingly, the applicable specific offense characteristic is U.S.S.G. §2B2.3(b)(1)(A)(vii), which refers to a trespass occurring "at any restricted building or grounds. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

The Probation Office calculated Herendeen's criminal history as category I, which is not disputed. PSR at ¶ 44. Accordingly, the Probation Office calculated Herendeen's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 84. Herendeen's plea agreement contains an agreed-upon Guidelines calculation that mirrors the Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the

capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (quoting Rita, 551 U.S. at 347 – 350). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. <u>See</u> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected

to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50. Under § 3553(a), "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 28 days' incarceration, three years' probation, 60 hours of community service, $500 in restitution, and the mandatory $25 special assessment..

### A.    The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history and defies comparison to other mass criminal events. It represented a grave threat to our democratic norms. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police officers and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, this Court should assess Herendeen's individual conduct in the light of the spectrum of the rioters' conduct on January 6. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Herendeen personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Herendeen's part is therefore not a mitigating factor in this case.

Here, Herendeen's criminal conduct included aggravating features which raise significant concern. Prior to January 6, 2021, Herendeen demonstrated preparation to engage in violence by

planning to take a weapon and tactical gear to Washington, D.C.; he ultimately did take the tactical gear and bear spray. Although he did not take the gun with him to the Capitol, the planning that Herendeen engaged in is demonstrative of the mindset that he had when he wore the tactical gear to the Capitol and entered the Capitol in search of a battle. And, prior to the entering the Capitol and while inside, Herendeen admitted that he witnessed rioters aggressively shouting at police.

Due to the sheer number of the rioters and chaos on the West Front of the Capitol, Herendeen got separated from Schornak and did not reunite with Schornak until after he left the Capitol. He entered the Capitol through the Senate Wing doors within approximately 10 minutes after the first breach of the Capitol. When he entered through the Senate Wing doors, the doors and adjacent windows were visibly broken and glass was on the floor and an alarm was audibly sounding.

After his entry to the Capitol, Herendeen immediately traveled into the Crypt. While there, Herendeen was apparently looking for Members of Congress, as he acknowledged when he told FBI agents that he referred to a scene in the *White House Down* movie where paramilitary insurgents captured the White House and, when looking for the President and Vice-President, said, "*they're in the basement."* During that admittedly brief video, Herendeen displayed a celebratory mood and sense of accomplishment in entering the Capitol during a riot by removing his face mask to display an enthusiastic facial expression.

Although Herendeen has accepted responsibility by pleading guilty, he has not expressed more than a minimal amount of remorse.

Accordingly, the nature and the circumstances of this offense establish the clear need for the recommended sentence.

### B.    Herendeen's History and Characteristics

As set forth in the PSR, Herendeen is a 44-year-old man who was born in Fort Wayne, Indiana, but has spent the majority of his life in Michigan. PSR at ¶¶ 52, 54, 57. He has sole custody of his two children, ages 14 and 16 years old. PSR at ¶ 56.

Herendeen graduated from high school and is a trained fire fighter. PSR ¶¶ 68-71. He has been a member of the Laborer's Union since 2001 and has been employed in the construction business since at least 2010. ¶¶ PSR 73-77.

According to the PSR, Herendeen did not provide the required documentation relating to his assets, liabilities, and monthly cash in-flows and out-flows, which compelled the Probation Office to conduct independent research through commercial government tracking sources to complete a financial analysis. PSR ¶¶ 78-82.

Herendeen has a criminal history score of 1, resulting from a 2012 conviction for Driving Impaired. In that case, Herendeen was sentenced to one day in jail, 12 months' probation and ordered to pay a fine. PSR ¶¶ 41-44.

Herendeen disclaimed having a history of alcohol or drug use to the Probation Office, PSR ¶ 65, but he does have a prescription for medical marijuana, PSR ¶ 60. Furthermore, on November 17, 2021, he was arrested and charged with possession of less than 25 grams of a controlled substance; that case is pending. PSR ¶ 49. This Court addressed Herendeen's arrest at a revocation of bail hearing on November 22, 2021, at which time Herendeen agreed to pursue drug treatment.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. Many who participated in the riot intended to delay or even prevent one of the

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

most important democratic processes we have: the peaceful transfer of Presidential power.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### Specific Deterrence

Herendeen's actions – before and during the riot – demonstrate the need for specific deterrence. As stated above, prior to January 6, Herendeen armed himself for possible violence. He did indeed join in the riot and made a video recording of the "storming" of the Capitol from inside the Crypt. He demonstrated no real recognition of wrongdoing until he pled guilty and accepted responsibility.

E.      **The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the entirety of the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[4] "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth).

In previous sentencings of January 6 defendants, the government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct

---

[3] Attached to this Sentencing Memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  The table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit

serious consideration of institutional incarceration. While those who trespassed, but engaged in

less serious aggravating factors, deserve a sentence more in line with minor incarceration or

home detention.

Avoiding unwarranted disparities requires the Court to consider not only a defendant's

"records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression

of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350,

1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who,

unlike the defendant in *Hemphill*, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in

assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United

States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103,

114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant

distinguishing features, including the historic assault on the seat of legislative branch of federal

government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer

of Presidential power, the use of violence by a substantial number of rioters against law

enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol

breach offenses is an appropriate group for purposes of measuring disparity of any future

sentence.

The aggravating factors are (1) he expected to meet violence at the Capitol before he

even left Michigan and told a confidential source, "If I die, I die saving the nation;" (2)

consistent with that expectation, he planned to take a gun and other tactical gear, but instead took

black-tinted goggles, a flak jacket, tactical vest, a canister of bear spray, and a face covering depicting an American flag with him to Washington, D.C.; (3) at the U.S. Capitol Building on January 6, 2021, he wore the goggles, flak jacket, and tactical vest and carried the bear spray inside a black military-style backpack; (4) he entered the Capitol Building through the Senate Wing Door approximately seven minutes after the initial breach of the Capitol at that location; (5) he took photos and videos of himself and other rioters inside the Crypt of the Capitol Building and posted them on Facebook; and (6) attempted to profit from his participation in the riot by offering to sell photos of himself in the Capitol for further distribution. Moreover, Herendeen admitted that he witnessed rioters aggressively shouting at police officers. This indicates that he was near violent conduct where the police needed to use crowd-control measures and the police had to divert from their duties to engage with the rioters.

While no previously sentenced case contains the specific mix of aggravating and mitigating factors present here, the Court may consider prior sentences imposed on January 6 defendants who, like Herendeen, pleaded guilty to violating 18 U.S.C. 1752(a)(1).

In *U.S. v. Robert Schornak*, 1:21-cr-278-1 (BAH), as this Court is aware, like Herendeen, Schornak came to Washington, D.C prepared to engage in violence and with tactical gear and a bullhorn. Like Herendeen, Schornak entered the Capitol Building through the Senate Wing doors approximately 10 minutes after they were breached. While Herendeen posted images of himself and other rioters on social media while he was inside the Capitol, on a video stated that members of Congress were in the basement, and attempted to sell his videos, Schornak stole a flag, removed it from the Capitol, and handed it to rioters who stood atop scaffolding with the intent to rally other rioters. This Court sentenced Schornak to 28 days of incarceration to be served in 14 day increments, two months' home detention, 36 months' probation, and $500 restitution.

Their criminal conduct is equally egregious and is justification for Herendeen's overall sentence to mirror that of Schornak.

In ***U.S. v. Annie Howell***, 1:21-cr-217 (TFH), the defendant cheered on rioters while outside the Capitol, then entered the Capitol at 4:50 p.m. While inside the Capitol, she entered into a conference room. She also took pictures and videos while inside the Capitol and posted them on social media. She was sentenced to 60 days of incarceration to be served in 10 day increments, 36 months' probation, 60 hours' community service, and $500 restitution.

In ***U.S. v. James Bonet***, 1:21-cr-121 (EGS), the defendant entered the Capitol at 3:09 p.m. and boasted about it. He entered into Senator Merkley's office and smoked marijuana. He was sentenced to three months' incarceration, three months' probation, 200 hours' community service, and ordered to pay $500 restitution.

In ***U.S. v. Dana Joe Winn***, 1:21-cr-139 (TNM), the defendant expressed prior intent to stop the vote to certify the election, demonstrated a prior awareness of the potential for violence, and posted video to social media. He was sentenced to 10 days of incarceration (weekends), 12 months of probation, 100 hours of community service, and $500 restitution.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and

will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In all, after a review of the sentencings in these analogous cases and the applicable Section 3553(a) factors, the government believes that Herendeen should be sentenced to 28 days' incarceration and three years' probation for his role in the Capitol riot and that this sentence would not present an unwarranted sentencing disparity.

## VI.   Conclusion

For all of the reasons set forth above, the government recommends a sentence 28 days' incarceration, three years' probation, 60 hours of community service, $500 restitution, and the mandatory $25 special assessment. Such a sentence would protect the community, promote respect for the law, and deter future crime, and be "sufficient but not greater than necessary" to accomplish the goals of 18 U.S.C. § 3553(a)(3).

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By:     /s/ Anita Eve
ANITA EVE
PA Bar No. 45519
Assistant United States Attorney (Detailee)
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Anita.eve@usdoj.gov
(215) 764-2177