UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-278
vs.                              )
                                 )
DANIEL HERENDEEN,                )  April 1, 2022
                                 )  11:36 a.m.
            Defendant.           )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

**<u>APPEARANCES</u>:**


FOR THE GOVERNMENT: ANITA EVE
                    U.S. Attorney's Office/PA
                    615 Chestnut Street
                    Philadelphia, PA 19106
                    (215) 861-8577
                    Email: anita.eve@usdoj.gov


FOR THE DEFENDANT:  COLLEEN PECHMAN FITZHARRIS
                    Federal Community Defender
                    Eastern District of Michigan
                    613 Abbott Street
                    Detroit, MI 48226
                    (313) 967-5866
                    Email: colleen_fitzharris@fd.org


ALSO PRESENT:       CARMEN NEWTON, Probation Officer
                    CHRISTINE SCHUCK, Pretrial Agent


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter


Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1     THE COURTROOM DEPUTY:  Matter before the Court,

2 Criminal Case No. 21-278, United States of America versus

3 Daniel Herendeen.

4     Your Honor, for the record, Probation Officer

5 Ms. Newton and Pretrial Agent Christine Schuck are connected

6 via telephone and video.

7     THE COURT:  You may be seated.

8     THE COURTROOM DEPUTY:  Counsel, please state your

9 names for the record, starting with the government.

10     MS. EVE:  Your Honor, would you like me to use

11 this microphone?

12     THE COURT:  You can step forward to the podium.

13 And if -- are you vaccinated and boosted?

14     MS. EVE:  I'm boosted.

15     THE COURT:  Then, when you are speaking, you can

16 take your mask off.  If you are unvaccinated, you are going

17 to have to keep it on.

18     MS. EVE:  Well, I got all of the shots that were

19 available.

20     Anita Eve, on behalf of the United States.

21     THE COURT:  All right.  Thank you.

22     MS. FITZHARRIS:  Good morning, Your Honor.

23 Colleen Fitzharris, on behalf of Daniel Herendeen.  He's

24 seated to my left -- or my right, sorry.

```
1              THE COURT:  All right.  Thank you.

2         Good -- it's still morning.

3         Good morning, Mr. Herendeen.

4              THE DEFENDANT:  Good morning.

5              THE COURT:  All right.  We're here this morning

6    for the sentencing of the defendant, Daniel Herendeen, who

7    pleaded guilty to Count 2 of the indictment against him for

8    entering, remaining in a restricted building or grounds in

9    violation of 18 U.S.C. Section 1752(a)(1), which is a

10   Class A misdemeanor.

11             This sentencing hearing is being held in person,

12   but the public access line is being made available for

13   persons to listen to these proceedings remotely.

14             Anyone listening to the sentencing hearing over

15   the public teleconference line is reminded that, under my

16   Standing Order 20-20, recording and rebroadcasting of court

17   proceedings, including those held by videoconference, is

18   strictly prohibited.  Violation of these prohibitions may

19   result in sanctions, including removal of court-issued media

20   credentials, restricted or denial of entry to future

21   hearings, or any other sanctions deemed necessary by the

22   presiding judge.

23             All right.  As I do at all sentencing hearings, I

24   review what I have reviewed, in connection with the

25   sentencing this morning, to make sure that everybody has all
```

1   of the same documents, and I haven't missed anything.

2           So I have reviewed the probation office's

3   presentence investigation report docketed at ECF 73; the

4   sentencing recommendation by the probation office docketed

5   at ECF 74.

6           I have also reviewed the government's original

7   sentencing memo docketed at ECF 79, which was replaced by an

8   amended sentencing memorandum docketed at ECF 80; and the

9   government's supplemental filing with certain corrections

10  docketed at ECF 82.

11          I have also reviewed the five videos listed in the

12  government's reports itemizing the video evidence in this

13  case docketed at ECF 50 and, as supplemented for sentencing,

14  with the government's report docketed at ECF 83.

15          I have also received and reviewed the sentencing

16  memoranda submitted on behalf of the defendant docketed at

17  ECF 77; along with the defendant's letter to me, and a

18  letter from his grandfather, his mother, and current

19  stepfather docketed at ECF Nos. 77-2, -3, and -4; and a

20  sealed supplemental sentencing memorandum submitted by the

21  defendant docketed at ECF 78.

22          Does the government have all of these documents?

23          MS. EVE:  Yes, Your Honor.

24          THE COURT:  And does the defense?

25          MS. FITZHARRIS:  Yes, Your Honor.

1        I believe I submitted one additional letter that

2     the Court did not reference, but perhaps would --

3            THE COURT:  Which letter is it?

4            MS. FITZHARRIS:  It's a letter from Mr. Koslofsky

5     [sic], who is his friend.  I filed it as a notice of

6     supplemental exhibit.

7            THE COURT:  Could you look at the docket?  I have

8     not seen that; that's why I do this.

9            Do you have an extra copy?

10           MS. FITZHARRIS:  I'm sorry, Your Honor.  I printed

11     the original memo, but not the letter.  I apologize.

12           THE COURT:  Do you know what the docket number is?

13     And when did you file it?

14           MS. FITZHARRIS:  I filed it -- I filed it on

15     March 21st.  So it should be Docket 81, I believe.

16           THE COURTROOM DEPUTY:  Here it is.

17           THE COURT:  All right.  Okay.  So my law clerk

18     will get a copy of that.  That's why I do that, because

19     every once in a while something slips through the cracks.

20     There have been so many supplementals in this case.

21           Yes.  Could you print it out, Ms. Gumiel?

22           THE COURTROOM DEPUTY:  Yes.

23           THE COURT:  Okay.  So, Mr. Herendeen, please stand

24     just right where you are.

25           So I like to tell defendants how my sentencing

1    hearings proceed so you know what's coming up -- you and

2    your family members, if you have family members here.

3            My sentencing hearings proceed in four steps.

4            At the first step, I determine whether the

5    government or you or your counsel have any objections to the

6    factual or other portions of the presentence investigation

7    report; and, if there are objections or corrections that

8    need to be made, I resolve those objections.

9            At the second step -- at the second step, I have

10   to determine how the federal guidelines apply to your case.

11   This is a Class A misdemeanor, the federal sentencing

12   guidelines apply to Class A misdemeanors.  So based on your

13   criminal history and your offense conduct, I determine how

14   the guidelines apply and what the advisory sentencing range

15   is that applies in your case.

16           The third step is to hear from the government,

17   then from your counsel and then, lastly, from you if you

18   wish to address me directly.  I have reviewed your letter.

19   But if you want to speak to me orally, that's your time to

20   do that.

21           And then the last step is where I will explain the

22   sentence I am about to impose, and impose sentence.

23           Do you have any questions about what's going to be

24   happening during the hearing?

25           THE DEFENDANT:  No, Your Honor.

1          THE COURT:  All right.  Okay.  So let's start with

2    the first step -- you may be seated.

3          The final presentence investigation report and the

4    sentencing recommendation were filed in this matter on

5    February 23, 2022.  And I understand from the PSR that the

6    government has no objections regarding any of the factual or

7    other determinations set out in the PSR; is that correct?

8          MS. EVE:  That's correct, Your Honor.

9          THE COURT:  All right.  And I see that -- okay.

10   Well, I mean, the government raises some objection to the

11   specific offense characteristic which the government says

12   incorrectly suggests a two-level increase applies because

13   the trespass occurred at a secured government facility.  But

14   I think that must have been corrected because paragraph 32

15   of the PSR doesn't use the phrase "secured government

16   facility," and appears to be correct to me.

17         So is the objection the government seems to impose

18   in its amended sentencing memo docketed at ECF 80, at 13 --

19   is that objection correct?  Because the PSR appears to be

20   correct to me.

21         MS. EVE:  The PSR is correct, Your Honor.

22         THE COURT:  All right.  Thank you.  I just wanted

23   to clarify that for the record.

24         And, Ms. Fitzharris, have you and your client read

25   and discussed the presentence investigation report?

1     MS. FITZHARRIS:  Yes, Your Honor.  We have.

2     THE COURT:  And I understand that the defendant

3 has no objections to any of the factual or other statements

4 in the final PSR?

5     MS. FITZHARRIS:  That's correct.

6     THE COURT:  All right.  Thank you.

7     Mr. Herendeen, can you stand just right where you

8 are.

9     Are you fully satisfied with your attorney in this

10 case?

11     THE DEFENDANT:  Very much so, Your Honor.

12     THE COURT:  And do you feel that you have had

13 enough time to talk to Ms. Fitzharris about the probation

14 department's presentence investigation report and all of the

15 other papers submitted in connection with your sentencing?

16     THE DEFENDANT:  Yes, Your Honor.

17     THE COURT:  All right.  Thank you.  You may be

18 seated.

19     All right.  Let me -- I actually have a couple

20 corrections I want to make to the presentence investigation

21 report.  Starting on paragraph 26, which states that the

22 codefendant, Robert Schornak, was sentenced to 36 months of

23 probation to include 30 days of intermittent confinement --

24 that needs to be corrected to:  Mr. Schornak was sentenced

25 to 36 months of probation, with special conditions of two

1    periods of 14 days of confinement, for a total of 28 days of

2    intermittent confinement, plus two months of home detention,

3    and restitution of $500.

4            Any objection to making that correction, from the

5    government?

6            MS. EVE:  No, Your Honor.

7            THE COURT:  And from the defense?

8            MS. FITZHARRIS:  No, Your Honor.

9            THE COURT:  And then the presentence investigation

10   report, at paragraph 67, says that the defendant's recent

11   arrest for possession of cocaine is pending.  And according

12   to the defendant's memo docketed at ECF 78, at page 3,

13   note 1, that case has been dismissed.

14           So does this paragraph 67 need to be updated?

15           MS. FITZHARRIS:  Yes, Your Honor.  I apologize.

16           At the time of this report, it had not yet been

17   dismissed.  But Mr. Herendeen successfully completed the

18   diversionary probation period, and it has been dismissed and

19   sealed.

20           THE COURT:  Okay.  And do you know the date it was

21   dismissed?

22           MS. FITZHARRIS:  I do not know, Your Honor.

23           THE COURT:  Okay.  But it was --

24           MS. FITZHARRIS:  March 22nd of 2022.

25           THE COURT:  Okay.  Does the government have any

 1    objection to correcting that information in paragraph 67?

 2           MS. EVE:  No, Your Honor.

 3           THE COURT:  All right.  So with those two

 4    corrections -- and hearing no objection by either side --

 5    the Court will accept the factual portions of the

 6    presentence report.  And with those two corrections to

 7    paragraphs 26 and 67 just noted, I will accept the PSR as my

 8    findings of fact at sentencing as supplemented by review of

 9    the video exhibits in this case.

10           Okay.  We're now at step two of the sentencing

11    hearing where I determine how the guidelines apply in this

12    case.

13           The parties haven't objected to the guideline

14    determination set out in the presentence investigation

15    report.  And I determine that the guidelines apply in this

16    case as follows:

17           With respect to the criminal history, the

18    presentence investigation found Mr. Herendeen has three

19    prior criminal convictions; two DUI offenses, one when he

20    was age 17 and one when he was age 34; and a disorderly

21    person offense when he was also age -- a long time ago, when

22    he was age 21.  Of these convictions, only his more recent

23    DUI offense in 2011 counts towards his criminal history

24    score, and is assigned one point.  And, therefore, his

25    Criminal History Score is 1, and his Criminal History

1    Category is 1.

2              The guideline at Section 2B2.3 applies to the

3    defendant's conviction under 18 U.S.C. Section 1752(a)(1)

4    for entering and remaining in a restricted building or

5    grounds.  And this guideline starts with a base offense

6    level of 4, to which two offense levels are added because

7    the trespass in the offense conduct occurred at a restricted

8    building or grounds under the guideline at

9    2B2.3(b)(1)(A)(vii); and two offense levels are subtracted

10   for Defendant's acceptance of responsibility under the

11   guideline at 3E1.1(a), resulting in a total offense level of

12   4 which, in combination with this Criminal History Category

13   of 1, results in an advisory sentencing range of zero to 6

14   months' imprisonment or up to 3 years' probation.

15             Any period of imprisonment may be followed by up

16   to 1 year of supervised release, which is also not only the

17   guideline limit but also the statutory maximum; a fine range

18   of $500 to $9500; and a special assessment of $25 for the

19   single count of conviction for a Class A misdemeanor.

20             Are there any objections, for the record, to the

21   guideline determination from the government?

22             MS. EVE:  No, Your Honor.

23             THE COURT:  And from the defense?

24             MS. FITZHARRIS:  No, Your Honor.

25             THE COURT:  All right.  So now I'm going to turn

1    to the third step of the hearing where the parties are

2    invited to address and supplement their briefing on

3    application of the factors set out in Section 3553(a) of

4    Title 18.

5              Here I have, again, divergent sentencing

6    recommendations.  The government recommends 28 days'

7    incarceration within the advisory guideline range of zero to

8    6 months, 3 years' probation, plus 60 hours of community

9    service.  The defense, on the other hand, requests

10   18 months' probation only, plus 100 hours of community

11   service.  And the probation office recommends the same,

12   18 months' probation.

13             So I will begin with the government.

14             MS. EVE:  Thank you, Your Honor.

15             As the Court has acknowledged, there were five

16   videos that were presented to the Court for its

17   consideration.  I would like to start with the last -- I

18   would like to start with the last video which I think is

19   particularly egregious.

20             The video is a self -- self-produced video

21   recorded by Mr. Herendeen on January 6th when he was inside

22   the Capitol.  The video lasts approximately 30 seconds.  And

23   at, approximately, the 8-second mark of the video a voice is

24   heard saying:  Downstairs in the fucking basement.

25             As the video progressed, the same voice was

1    observed saying:  They're in the basement, we got to go

2    there, that's where they're all hiding.  That's where

3    they're at.  They're in the fucking basement.

4        Your Honor, this was a direct reference to members

5    of Congress who had been -- who had to evacuate from the

6    building or barricade themselves.  The fact that Defendant

7    made this statement is probably the most aggravating factor

8    that he engaged in on that date; and it's something that

9    we'd ask the Court to start with in terms of determining a

10   sentence for this defendant.

11       The other -- the other factors in this case which

12   are of particular note is that the defendant entered into

13   the Capitol through the Senate wing door approximately 7

14   minutes after it was breached.  The breach occurred at

15   2:13 p.m.; the defendant entered through the broken Senate

16   wing door at 2:20 p.m.  He then headed from that Senate wing

17   door to the Crypt.  And in search of what?  We don't know,

18   unless we can take into consideration the video that the

19   defendant made.

20       The other video that the defendant made was while

21   he was also inside the Capitol Building.  And in that video,

22   which is Government's Exhibit No. 4, the defendant pans the

23   crowd inside the room that he was in.  And there were

24   people -- not the defendant --

25       (Screeching sound, interruption.)

```
 1              THE COURT:  Okay.  That's the public access line.

 2              Okay.  If it happens again, we're going to have to

 3     turn the public access line off because it's going to be

 4     interfering.  It's a very weird thing.  Just in the last

 5     week or two our public access line through AT&T is creating

 6     this weird buzz periodically.  It had -- for two and a half

 7     years -- two years of the pandemic it hasn't happened.  It's

 8     a weird thing that's happening not just in this courtroom

 9     but in other courtrooms.  And if it happens one more time

10     we're going to have to turn off the public access line

11     because it's too disruptive.

12              MS. EVE:  Okay.  I had one of those Urkel moments

13     where I'd say:  Did I do that?

14              THE COURT:  Yeah.  I know.  Okay.  It was none of

15     us; it's AT&T.

16              MS. EVE:  Okay.  Good.

17              In this -- in this Facebook video, as I indicated,

18     the defendant pans the crowd, and there are individuals who

19     are shouting at police officers.  And the defendant -- he's

20     not going to try to help the police officers; he is just

21     taking this for his own enjoyment, and then he puts it on

22     Facebook.  It's another aggravating factor --

23              (Screeching sound, interruption.)

24              THE COURT:  Let's turn it off.

25              Okay.  It's now going to be off.  It won't happen
```

 1    again.  Sorry about that.

 2              MS. EVE:  That's okay, Your Honor.

 3              But the defendant is in the midst of people who

 4    are taunting police officers who are doing their job.  The

 5    defendant came equipped to Washington, D.C. with a flak

 6    jacket, a tactical vest.  And before he leaves Michigan,

 7    where he's from, makes the statement that -- just one

 8    moment -- you know:  If I die, I'm doing this for my nation.

 9    I'm saving my country.  And he came prepared with -- as I

10    indicated, military-style attire, the jacket and the vest.

11    He also had the bear spray.

12              THE COURT:  But what is it that is particularly

13    threatening about a flak jacket and this other jacket?

14              MS. EVE:  Well, it's a preparation for violence,

15    Your Honor.  You know, if you are just coming here to

16    support the former president, if you are here -- if you are

17    coming to Washington to make a statement, just to stand out

18    in front of the Capitol or to talk to Congressmen to get

19    them to -- Congressmen or women to get them to change

20    their -- their opinion in terms of certifying the election,

21    you don't need a flak jacket.  You don't need --

22              THE COURT:  Well, what makes a "flak jacket" a

23    flak jacket?

24              MS. EVE:  I think it has certain protection.  It's

25    thick, I know -- I know that.  And it's something that

1    people don't normally wear if they're just walking down the

2    streets of Washington, D.C.  It's something that is sold at,

3    like, an Army Navy store.  It doesn't have the same level of

4    protection as the bulletproof vests or the vest that the

5    defendant wore.

6            THE COURT:  And the vest he was wearing, in

7    addition to the flak jacket, was a bulletproof vest?

8            MS. EVE:  That's my understanding, Your Honor.

9            THE COURT:  All right.

10           MS. EVE:  So my point --

11           THE COURT:  One of the factual -- it seems like an

12   important fact, as part of the preplanning here, the

13   defendant bought bear spray.  And the government says that

14   he had the bear spray with him in his backpack when he came

15   to the Capitol.  The defense seems to suggest maybe he

16   didn't.

17           Do you have any information about that?

18           MS. EVE:  Your Honor, that is a -- we know that he

19   brought bear spray to Washington, D.C.; he did not use the

20   bear spray.  I have notes that indicated to me -- these are

21   notes from either the previous counsel who had this case or

22   from the agents that I have spoken with; they said to me

23   that the bear spray was in the backpack.

24           Before this Court proceeded today, I spoke to

25   defense counsel; and she stated that she wasn't sure whether

1        it was in the backpack or not.

2                So it's a question, whether he brought that with

3        him to the Capitol; although, it is something that he did

4        bring with him to Washington, D.C.

5                THE COURT:  Well, the government's sentencing memo

6        says that he told the FBI in an interview that he brought it.

7                MS. EVE:  Well --

8                THE COURT:  Isn't that right?

9                MS. EVE:  That's -- that was my understanding,

10       Your Honor.  That was something that was told to me by the

11       agents.  Ms. Fitzharris was there when there was the

12       conversation that the defendant engaged in with the -- with

13       the agents; and she has a different understanding.

14               THE COURT:  All right.  Well, that's a pretty

15       important fact, what he brought with him to the Capitol.

16               MS. EVE:  I agree, Your Honor.

17               THE COURT:  So did the FBI do 302s?  And do the

18       302s reflect what he said?  302s are usually prepared pretty

19       close to the date of the interview.

20               MS. EVE:  Your Honor, one of the difficulties in

21       this case is that --

22               THE COURT:  Because it says, on page 10 of your

23       memo --

24               MS. EVE:  Yes, Your Honor.

25               THE COURT:  -- Herendeen and his attorney agreed

1      to an interview on September 17, 2021.

2              And he goes on to say he initially minimized the

3      evidence that he planned for violence.  And then the last

4      sentence is:  Herendeen then admitted that he packed bear

5      spray, flak jacket, tactical vest, and mask.  He stated he

6      did not take a gun with him to the rally.  He stated he only

7      intended to use the tactical gear and spray if he

8      encountered members of Antifa and needed to defend

9      himself -- which all suggests that he had the bear spray

10     with him in his backpack when he went to the Capitol.

11             So I was quite surprised to see the defense memo

12     raising a question about that.

13             MS. EVE:  I agree, Your Honor.

14             And let me -- let me state my position and the

15     reason why I am a little bit uncomfortable.

16             After the government submitted their sentencing

17     memorandum, Ms. Fitzharris contacted me; and she -- she

18     indicated that it was an off-the-record proffer.  I haven't

19     done any off-the-record proffers in any of my Capitol riot

20     cases because what we are giving the defendant is an

21     opportunity to plead to one count.

22             And so even though there is a 302, the government

23     is limited in what it can -- in what it has represented.

24     And that's the reason why the government submitted the

25     supplement to its amended sentencing memorandum.  And I

1    indicated in there, in one of the paragraphs, that certain

2    information that was included in the government's sentencing

3    memorandum was presented by the defense in that

4    off-the-record proffer.

5                THE COURT:  Well, it seems like it would be pretty

6    clear what's happening at a proffer.  Okay.

7                So what -- I am not sure what you are saying.  Do

8    you agree that it was an off-the-record proffer, or you

9    don't?

10               MS. EVE:  I went back, after I spoke to

11   Ms. Fitzharris, and I found the proffer letter; and, indeed,

12   it was an off-the-record proffer.  So the defense intended

13   for none of the information that they disclosed that day to

14   be used against the defendant.  And what I had done in the

15   government's sentencing memorandum is bring to light what it

16   is the defendant had said during that off-the-record

17   proffer.

18               THE COURT:  So there is nothing -- okay.  I'm just

19   looking at the government's supplement to the sentencing

20   memorandum --

21               MS. EVE:  Yes, Your Honor.

22               THE COURT:  -- and I see nothing in that

23   supplement that mentions the bear spray.  So are you saying

24   that your government's supplement to the amended sentencing

25   memo should have also said -- like you say -- you know,

1    should also have said:  Don't consider the bear spray in the

2    backpack?

3              MS. EVE:  No, Your Honor.  I am not saying that to

4    the Court.

5              There was a conversation that the defendant had

6    with an individual prior to coming to the Capitol.  And he

7    indicated to this person that he had the -- he called it

8    "Antifa spray"; but given the picture, it's bear spray.  So

9    there were photographs that the government had; and so the

10   Court can consider the bear spray as evidence against the

11   defendant.

12             THE COURT:  And that he had the bear spray at the

13   Capitol with him that day?

14             MS. EVE:  Not that he had it at the Capitol with

15   him that day.  We know that it is something that he brought

16   with him to Washington, D.C.

17             I have spoken to Ms. Fitzharris with regard to

18   that -- the Court's specific question -- and I have been

19   advised the defendant is unable to say whether he took it

20   with him to the Capitol or not.

21             THE COURT:  And am I supposed to disregard all of

22   the information provided in that proffer -- in the interview

23   that the government put in its sentencing memo then?

24             MS. EVE:  That is at the request of the defense,

25   Your Honor.

1          THE COURT:  Well, the defense can make all sorts

2     of arguments to you.  If they're right, I would presume that

3     the government would agree or disagree.  And if you disagree

4     with the argument, tell me.

5          I mean, I am getting very frustrated with the

6     government just saying:  Yeah, the defense makes that

7     argument; take it like you want.

8          What -- I need to know the government's position.

9          MS. EVE:  Your Honor, given the fact that the --

10          THE COURT:  It's very significant whether --

11          MS. EVE:  I'm sorry.

12          THE COURT:  It's very significant in evaluating

13     offense conduct on January 6th whether a defendant had

14     preplanning.  This defendant clearly did preplanning; that

15     included buying bear spray, and bringing a knife and

16     tools -- preparation for violence.

17          It is also important what the defendant actually

18     executed in terms of the preplanning, in terms of what that

19     defendant actually brought in preparation for violence at

20     the Capitol on January 6th.  So it is important to know

21     whether the defendant brought bear spray to the Capitol or

22     not.

23          And you are telling me that the government's

24     position is the defense says:  No one knows?  He doesn't

25     know?  He doesn't remember.

1          MS. EVE:  I can't speak for the defense, Your

2     Honor.  When I spoke with Ms. Fitzharris with regard to the

3     bear spray, I was informed the defendant doesn't know

4     whether he brought the bear spray to the Capitol.

5          THE COURT:  And any admissions he may have made

6     that he did bring the bear spray to the Capitol are off

7     limits because the defense says it was made at a proffer

8     session that nothing said can be used against him?

9          MS. EVE:  That's correct, Your Honor.

10          THE COURT:  And you have confirmed that --

11          MS. EVE:  That it was an off-the-record proffer?

12          THE COURT:  -- it was at a proffer session where --

13          MS. EVE:  Yes.  Yes.

14          THE COURT:  -- nothing he said can be used against

15     him?

16          MS. EVE:  Yes.

17          THE COURT:  And so everything in your -- page 10

18     of your government's memo talking about this interview that

19     Herendeen and his attorney agreed to on September 17,

20     2021 -- are you basically saying that that whole paragraph,

21     down to the second paragraph where he says, "Herendeen

22     stated that he only intended to use the tactical gear and

23     spray if he encountered members of Antifa and needed to

24     defend himself" -- all of that I am not permitted to

25     consider?  I should just strike it out of the government's

1    memo?

2              And despite the fact that the government has three

3    different submissions, including one amended memo, this

4    should have been yet another amendment made to the

5    government's memo?  Is that what you are telling me?

6              MS. EVE:  Yes, Your Honor.

7              THE COURT:  Okay.

8              MS. EVE:  Sadly.

9              THE COURT:  All right.  So I am -- everything

10   about Herendeen's interview -- so everything on Herendeen's

11   interview?  So that whole section should be omitted?

12             MS. EVE:  Your Honor, let me --

13             THE COURT:  Everything about the interview,

14   including where he claimed he stopped some rioters from

15   entering a room and assisted a man who had been tear gassed

16   before he decided to exit the Capitol -- that was all under

17   a proffer agreement, so I can just delete everything under

18   the caption "Herendeen's Interview"?

19             MS. EVE:  No, Your Honor.  I wouldn't go that far.

20             Well, the easiest thing for the Court to do is to

21   ignore everything under "Herendeen's Interview"; I don't

22   want to parse anything.

23             THE COURT:  That's what I'm asking.

24             MS. EVE:  Yes, Your Honor.

25             THE COURT:  Okay.  Fine; it can all be out.

1          MS. EVE:  Yes.

2          THE COURT:  All right.  Okay.  And when you

3     were making -- you said something about having -- the

4     government had photographs of the bear spray so you could

5     tell that what he called "Antifa spray" was bear spray.

6          MS. EVE:  Yes, Your Honor.

7          THE COURT:  What photographs are those?  And what

8     are you talking about?

9          MS. EVE:  Those were not submitted to the Court,

10    Your Honor, because they -- we weren't -- I was going to.

11    But given my conversation with Ms. Fitzharris, we did not

12    include that because we couldn't prove to the Court that he

13    actually had that with him at the Capitol.  It goes to him

14    planning, but not to his conduct on January 6th at the

15    Capitol.

16         THE COURT:  And the photographs are subject to the

17    proffer agreement, too, and can't be used against him?

18         MS. EVE:  Oh.  No, no.  No.  Absolutely not, Your

19    Honor.  They could be.

20         But I guess the problem is, it's like -- okay.

21    I'm juggling with:  What did he have with him on

22    January 6th?  I know he planned on bringing the bear spray.

23    Can I -- can I submit to the Court --

24         THE COURT:  Let's start with the beginning of the

25    story.

1          Where did you get the photographs?  Where did the

2     government get the photographs?

3          MS. EVE:  There is a source who provided that,

4     those photographs.

5          THE COURT:  Okay.  So a source provided

6     photographs of this defendant.  On the days preceding

7     January 6th or after January 6th?

8          MS. EVE:  Preceding January 6th.  These are the

9     items that Herendeen planned -- that Herendeen showed me

10    that he plans to take to the Capitol, and included amongst

11    them was the bear spray.

12         THE COURT:  I see.  Okay.

13         And those photographs have never been shared with

14    the Court for me to rely on for review --

15         MS. EVE:  That's correct, Your Honor.

16         THE COURT:  Okay.  And does it make a difference

17    in the government's recommendation?

18         MS. EVE:  It does not.

19         THE COURT:  And why doesn't it?  Because bringing

20    bear spray to the Capitol is a pretty significant factor in

21    determining whether or not a defendant should be given a

22    period of incarceration.  And if you are telling me that I

23    can't rely on it, then the government shouldn't be able to

24    rely on it either.

25         So if all I've got is a defendant who came with a

1    backpack and a flak jacket, why -- and no bear spray -- and

2    everybody agrees he didn't use the bear spray -- why doesn't

3    that change the government's sentencing recommendation in

4    this case --

5              MS. EVE:  Our sentencing recommendation is --

6              THE COURT:  -- since your sentencing

7    recommendation was clearly based on the Herendeen interview?

8              It was in the government's memo where he said he

9    had it in his backpack prepared to use on January 6.  But

10   you are saying you can't rely on it anymore than I can rely

11   on it, so how can that not affect the government's

12   sentencing recommendation in this case.

13             MS. EVE:  Your Honor, that was just one factor

14   that we were relying on.  And one of the things that I

15   pointed out when I began this sentencing argument was the

16   video that the defendant recorded where he is telling a

17   crowd that has stormed into the United States Capitol

18   Building, made reference to the fact that members of

19   Congress -- he doesn't say, "Members of Congress," but he

20   clearly says, "They're in the basement."

21             This mob that is in the Capitol is in earshot of

22   this defendant making that statement.  And even though he

23   doesn't direct anybody:  Hey, this is the way to the

24   basement or anything -- but he does make that statement, and

25   that statement was recorded.

1          And that's the reason why I began my sentencing

2     argument raising that as the most important factor in this

3     case, and one of the reasons -- the primary reason why the

4     government made the recommendation that he [sic] did.

5          If we were relying on the bear spray, we don't

6     have -- the defendant didn't use the bear spray; didn't show

7     it.  There are no images of the defendant inside the Capitol

8     Building holding a can of bear spray, let alone using it.

9     So while --

10          THE COURT:  Okay.  Let me go back to the footage.

11          In all of the CCTV footage -- videos, the

12     defendant appears to be holding his phone out in front of

13     him.  It looks like he was recording as many minutes as he

14     could when he was inside of the Capitol -- it was such an

15     exciting event; and, yet, the only videos taken by the

16     defendant provided to the Court are a short Facebook post

17     and the video talking about the basement, Exhibits 4 and 5.

18          Is there more video from the defendant's phone

19     that was turned over to the FBI, or is that it?

20          MS. EVE:  Your Honor, in terms of going -- I went

21     through the entire evidence in this case; and the only

22     videos that I was able to locate are the Facebook video,

23     that's Government Exhibit No. 4, and the cellphone video

24     which is Government Exhibit No. 5.

25          THE COURT:  And so was the defendant's phone

1    examined in connection with this case?

2              MS. EVE:  I can't answer that, Your Honor.

3              I know that some of these -- some of the phones

4    that have been seized during the course of this

5    investigation -- just in terms of a large number of them --

6    the cellphone extractions still haven't been caught up with.

7              I know in another case that's --

8              THE COURT:  But you don't even know if the

9    defendant's phone was turned over in connection with this

10   case -- or do you know?

11             MS. EVE:  I don't know.

12             THE COURT:  And is there even a limited

13   cooperation term in the plea agreement in this case?  And is

14   that -- was he required to produce his recordings in his

15   phone in connection with the plea agreement in this case?

16             MS. EVE:  That was not made a requirement, Your

17   Honor.

18             THE COURT:  So when I see in the CCTV footage of

19   him holding -- recording everything that was going on, he

20   was given a plea in this case and didn't even -- might not

21   have even turned it all over.

22             MS. EVE:  That's -- that's a fair statement, Your

23   Honor.

24             MS. FITZHARRIS:  Your Honor, I don't know if you

25   need to hear from me at this point --

1          THE COURT:  Well, if you have --

2          MS. FITZHARRIS:  -- I do have things --

3          THE COURT:  Can you shed light on that?

4          MS. FITZHARRIS:  Yes.  Yes, Your Honor.

5          Mr. Herendeen's cell phone was seized and

6    analyzed.  And I have reviewed the Cellebrite report and all

7    of the videos that were produced to me.  And so -- and in

8    terms of access to his social media accounts, that was a

9    provision of the plea agreement.

10         THE COURT:  Okay.  Thank you.

11         MS. FITZHARRIS:  And he has -- and he has provided

12   the FBI with all information about -- his social media

13   account that he had.

14         THE COURT:  Okay.  Thank you.

15         All right.  All right.  Proceed.

16         MS. EVE:  Your Honor, I -- I would like to answer

17   more questions that the Court has, but I feel like I have

18   created more questions than I have been able to --

19         THE COURT:  Well, when I see CCTV footage of a

20   defendant who seems to be recording the whole time and I

21   only get two very short videos, I wonder:  What happened to

22   the rest of it?  And so it was just -- you know, it was just

23   sort of an obvious question based on the evidence that I

24   have reviewed.

25         And, to me, bringing bear spray to the Capitol is

1    a very significant fact.  And the fact that I am learning at

2    the sentencing hearing that all of that information provided

3    in the government's sentencing memo is not something I

4    should rely on is not appreciated, to put it bluntly.

5              MS. EVE:  I accept that.

6              THE COURT:  So let me just review a couple other

7    things here.

8              So the government provided this helpful chart --

9    that grows by the day -- about other sentences imposed on

10   January 6th cases.  And the chart, as of the time I got it

11   from the government, showed 12 cases involving a conviction

12   under 1752(a)(1), the same statute of conviction here.  And

13   out of those 12 cases on the chart, it appeared that eight

14   of the defendants were given some period of incarceration;

15   three had only probation, and one defendant had received a

16   fine.

17             So given that 8 defendants out of 12 or --

18   including a defendant I just sentenced this morning -- 9 out

19   of 13 as of today, even in my court, have received some term

20   of imprisonment, is it the government's position that some

21   period of incarceration would not be an unwarranted

22   sentencing disparity for a defendant whose offense of

23   conviction is 1752(a)(1)?

24             MS. EVE:  Yes, Your Honor.

25             THE COURT:  So the defense memo -- recognizing

1     that the majority of defendants convicted of this Class A

2     misdemeanor have received a term of imprisonment -- has

3     compared Mr. Herendeen's case not to the Class A misdemeanor

4     defendants, but to the Class B defendants -- those

5     defendants who have been extended plea offers by the

6     government to plead to the parading, demonstrating,

7     picketing petty offense under 40 U.S.C. 5104(e)(2)(G).  And

8     the defendant points out that:  It is difficult to discern

9     the difference between the conduct of those cases -- petty

10    offense cases -- and Mr. Herendeen's.

11          And so what is the government's response to that

12    criticism, that it's hard to tell the difference in conduct

13    that the government finds -- warrants a Class A misdemeanor

14    plea offer versus a petty offense plea offer, which does

15    make a difference in the 3553(a)(6) analysis of avoiding

16    unwarranted sentencing disparities?

17          So, of course, the defendant's position is:  Don't

18    look to the other Class A misdemeanor convictions; look to

19    the petty offense convictions where a lot more probationary

20    sentences have been awarded or given -- imposed -- because

21    that's where my guy sits.

22          So what is the articulable principle the

23    government is using to look at conduct and say:  This

24    warrants a petty offense plea offer versus a Class A plea

25    offer, like in this case?

1          MS. EVE:  Your Honor, we begin with the negotiated

2     plea, which was to 1752(a)(1), as opposed to one of the 5104

3     Class B misdemeanors that the Court has referenced.  And we

4     start with the statute that the defendant pled guilty to,

5     and then look to how this Court and other courts have

6     treated similarly situated defendants; and that's what you

7     saw in the table that you have referenced.

8          But the Court asked:  Well, what distinguishes the

9     1752 defendant from the 5104 defendant; am I correct?

10         THE COURT:  Yes.  I mean, based on the defendant's

11    memo, at page 3, which says that:  It's difficult to discern

12    the difference between the conduct of those cases and

13    Mr. Herendeen's.  And I want to hear the government's

14    response to that.

15         MS. EVE:  Your Honor, I -- I come back to the fact

16    that there was a plea that was negotiated.  It wasn't --

17    he -- he didn't plead guilty to the 5104; he pled guilty to

18    the 1752.  And at the time of the --

19         THE COURT:  Well, I think the government decides

20    what plea offer is warranted in a case.

21         So it's the government's decision whether to offer

22    a plea offer or just go to trial, whether it's the

23    government's -- or to require the defendant, if the

24    defendant wants a disposition short of trial just to eat the

25    indictment, so to speak, or the information.  So it's the

1   government that is making the initial decision:  We think --

2   based on what we have seen of this offense conduct -- it

3   warrants a petty offense plea or this conduct warrants a

4   Class A misdemeanor plea.

5       And the defense is raising a legitimate issue of

6   an observation that it's difficult to discern the difference

7   between the conduct where the government says:  Give this

8   person a petty offense plea offer or give this person a

9   Class A misdemeanor plea offer.

10      And my question is pretty simple, which is:  What

11  is the articulable principle, if there is one, for how the

12  government is saying:  This conduct yields a petty offense

13  plea offer versus this conduct yields a Class A plea offer?

14      MS. EVE:  Your Honor --

15      THE COURT:  Because it does make a difference in

16  terms of the 3553(a)(6) analysis of avoiding unwarranted

17  sentence disparities.  And the ultimate argument by the

18  defense is:  We don't care what the 1752(a)(1) Class A

19  misdemeanor defendants have been getting because this

20  defendant should have been -- should be considered in the

21  context of the petty offense defendants who have mostly

22  gotten probation.

23      MS. EVE:  Well, Your Honor, there was an

24  evaluation done of this defendant, and it was -- and the

25  plea came after the off-the-record proffer.  It was done

1    based on the evidence, including the videos that I've

2    highlighted to the Court.  And the determination was made --

3    based on all of that information -- that 1752 was the

4    appropriate offer for the plea that was made to this

5    defendant.

6              THE COURT:  Based on the fact that he brought bear

7    spray also to the Capitol?

8              MS. EVE:  Well -- yes.

9              THE COURT:  And now, that fact -- based on the

10   government's position asserted here -- that can't be relied

11   on.

12             MS. EVE:  Not from the government, Your Honor.

13   And, of course, the Court can ask the defendant:  Did you

14   bring bear spray to the -- to the Capitol?

15             I am saying that the government is precluded from

16   presenting that evidence to the Court.  We know that he made

17   plans to bring the bear spray.

18             And what the government is precluded from doing --

19   and the defense is making an argument here that:  Well, he

20   doesn't know whether he brought it to the Capitol.  He

21   brought the backpack.  He brought the jacket.  He brought

22   the vest.  But we don't know whether he brought the bear

23   spray.

24             It's a quandary.  But I'm presenting the -- all of

25   this information was considered by the prosecutor.

1            THE COURT:  It's actually not a quandary.  I think

2      it's -- it's based on the government's position that I have

3      to admit all of that Herendeen interview from the

4      government's memo -- I can't rely on that.

5            MS. EVE:  No, we cannot, Your Honor.

6            THE COURT:  Can you answer the original question?

7            MS. EVE:  Your Honor, there was an eval- --

8            THE COURT:  It's difficult to discern the

9      difference between the conduct of those cases -- meaning,

10     petty offense cases -- and Mr. Herendeen's, i.e., Class A

11     misdemeanor cases.

12            So I ask again.  Can you articulate a principle

13     for why the government is deciding on petty offense plea

14     offers versus Class A misdemeanor plea offers?

15            MS. EVE:  Your Honor, there is an evaluation of

16     the evidence done by supervisors and recommendations that

17     are given to the prosecutors to present to the Court.

18            And in this particular case, the video about

19     making reference to the location of the Congressmen seemed

20     to be one of the -- what's the overwhelming factor in their

21     determination as to why this Class A misdemeanor case should

22     be treated differently than the Class B misdemeanor cases.

23            THE COURT:  Okay.  All right.

24            And just for purposes of the record, by my review

25     of the difference between the original sentencing memo and

1    the amended sentencing memo, the only difference is some

2    typographical corrections; is that correct?

3              MS. EVE:  That is correct.

4              THE COURT:  Okay.  So for purposes of this, I am

5    not citing or relying at all on the original sentencing memo

6    in this case, only the government's amended sentencing memo

7    with its additional redactions of the Herendeen interview on

8    those pages -- pages 10 to 11 -- as a result of the

9    revelations at the hearing today.  So I am only relying on

10   that and the government's corrections.

11             And the government, in its amended sentencing

12   memo, stated that the defendant, "Has not expressed more

13   than a minimal amount of remorse."  And the government did

14   correct that statement in its supplemental filing; that he

15   has, indeed, shown remorse.

16             And what was the basis of that change?

17             MS. EVE:  My -- a conversation with

18   Ms. Fitzharris; she spoke to the former prosecutor.

19   Whereas, I was -- made that representation based on my

20   conversation with the agents.

21             THE COURT:  I see.

22             And so the reason I asked that question is because

23   the defendant has met with the House Select Committee

24   investigating the Capitol attack.

25             And as I have expressed before, I think trying to

1    cooperate with the congressional committee trying to

2    understand why what occurred on January 6th did -- is a

3    factor that demonstrates remorse, acceptance of

4    responsibility, and actually taking an affirmative step to

5    help remedy what occurred that day.

6           So was the fact that the defendant has met with

7    the House Select Committee investigating the Capitol attack

8    one of the reasons that the government corrected its

9    statement that he -- and stated, in its supplemental filing,

10   that he has indeed shown remorse?

11          MS. EVE:  No, Your Honor, that was not -- not at

12   all.  We don't have -- the prosecution team does not have

13   access to any information the defendant would have testified

14   to before -- or given to the January 6th committee.

15          THE COURT:  So it's hard for -- it's difficult for

16   the government to make an evaluation of whether he lied to

17   them or whether he told the truth to them or whether he said

18   much of anything to them; is that right?

19          MS. EVE:  Rather than it being "difficult," I

20   just -- I am incapable.

21          THE COURT:  Okay.  So one of the things I look at

22   in these cases, in terms of evaluating acceptance of

23   responsibility, is how promptly a defendant enters a plea in

24   the case.

25          And in this case, the government first extended a

1    plea offer on May 21, 2021, according to one of the

2    government's status reports docketed at ECF 27; and the plea

3    offer was accepted on December 16, 2021.  So the plea offer

4    was outstanding about seven months.

5              Is it the view of the government that this

6    defendant entered a prompt plea?

7              MS. EVE:  No, Your Honor.

8              THE COURT:  And is that -- how does the government

9    believe that should be taken into account in evaluating

10   remorse or acceptance of responsibility?

11             MS. EVE:  Your Honor, I -- what I do know is that,

12   as the Court has indicated, a plea offer was made.

13             A significant amount -- a lot of time passed

14   between the time that the plea offer was made and the time

15   that it was accepted.  And I know that the government met

16   with the defendant -- I think it was in September -- late

17   September or October, for the -- for purposes of the

18   interview and cannot explain what took the defendant to the

19   point of late December before the plea was accepted.

20             THE COURT:  All right.  Anything further?

21             MS. EVE:  No, Your Honor.

22             THE COURT:  All right.  I'll hear from

23   Ms. Fitzharris.  Just give me a second to read this

24   supplemental letter.

25             All right.  Please proceed.

1          MS. FITZHARRIS:  Thank you, Your Honor.

2          Mr. Herendeen would prefer to be -- for people to

3     remember him as a good dad.  He's joined today by his three

4     children; he cares for them very deeply.  He'd prefer to be

5     remembered as a kind neighbor -- somebody who looks out for

6     their well-being, tries to lend a helping hand.  And he'd

7     prefer to be remembered as somebody who really does care for

8     his family and his country.

9          He is, unfortunately, forever -- because of

10    decisions he made -- tied to a moment in history that he

11    calls a "black mark" on our nation's history; he is deeply

12    ashamed of it.

13          And I would say that -- I think one of the things

14    that we talk about often at sentencing are consequences.

15    And I know there is a significant concern in these cases for

16    making sure that people who participated in this

17    once-in-our-nation's-history event --

18          THE COURT:  One hopes.

19          MS. FITZHARRIS:  One hopes.

20          -- suffer consequences.  And Mr. Herendeen has

21    already suffered very significant consequences.

22          The notoriety of the case has caused a lot of

23    personal stress for him.  There's been local reporting in

24    the news about his participation, including some incorrect

25    suggestions of involvement or association with white

1    supremacists groups.  He has been incred- -- has felt such

2    stress over the past year.  And I have now represented

3    Mr. Herendeen for almost -- for over a year; and he has

4    really struggled.

5         And one of the things that I think is rather

6    remarkable about Mr. Herendeen is that it took some time for

7    him to recognize how stressed -- stressful he [sic] was, and

8    the -- the stress of this pending case and the impact it was

9    having on him, and the impact it was having on his

10   children -- to try to seek help; and he did.

11        In the fall he asked me for referrals to

12   therapists.  He asked his pretrial officer for referrals to

13   a therapist.  And he has, since then, been going to therapy

14   to work through how to manage the stress -- the shame of

15   being associated with this event, with January 6th, how to

16   manage the difficulty of parenting high school children; and

17   a lot of the challenges that I have disclosed to the Court

18   but I don't want to talk very publicly about.  But it's

19   something that I think -- if there is a silver lining for

20   him -- a positive in this -- in this sense.

21        But the shame and the stress and the -- and the

22   turmoil that it caused him to be -- to know that he was

23   involved in this black mark on our nation's history is a

24   significant consequence.

25        He has also suffered financial loss as a result of

1    his involvement.  His small business is down about --

2              THE COURT:  Well, let me ask.  Because -- you

3    know, every criminal defendant has stress from a criminal

4    case and being involved in the criminal justice system; that

5    doesn't move me, I'm sorry.

6              This is a defendant who has been on pretrial

7    release as opposed to sitting in pretrial detention.  This

8    is a defendant who, even under the best of circumstances, is

9    not facing a lifetime in prison; he is facing one year.  I

10   see defendants with far more serious penalties confronting

11   them who are entitled to feel a lot more stress than this

12   defendant.  So stress doesn't move me.

13             What I am concerned about for defendants who came

14   on January 6 -- not only went to a rally; perfectly

15   appropriate, First Amendment protected, fine -- but then

16   followed a crowd, broke into the Capitol Building because of

17   belief in conspiracy theories and the big lie that there was

18   a stolen election.  What I am concerned about is:  Do they

19   still believe that?

20             Because I have to assess the risk that this man

21   might still believe that -- might still be susceptible to

22   conspiracy theories spouted by all sorts of people,

23   including politicians who have been elected to office.  But

24   every American has a duty to separate truth from fiction

25   when it comes to the actions they're taking.  So let's get

1    down to brass tacks.

2              MS. FITZHARRIS:  All right.

3              THE COURT:  This defendant believed that there was

4    a stolen election.  He told another person, "If I die, I die

5    saving the nation."  He thought this was such a serious

6    problem, he believed these lies.  He thought this was so

7    serious, he said he was willing to die to save the nation.

8              So has that changed?  What's his belief system

9    now?

10             MS. FITZHARRIS:  Yes, Your Honor; it has changed.

11             At the time that -- in January of 2021, and before

12   that -- the years before it -- probably from 2016 until the

13   election, Mr. Herendeen had been following the President in

14   a lot of -- President Trump, and a lot of supporters on

15   Facebook.

16             When we met with the House Select Committee, he

17   talked about how he was getting a lot of news from Facebook.

18   It was -- it was constant in his feed; stories about people

19   planning to steal the election, people -- a lot of -- you

20   know, it seemed to him -- because that was the news he was

21   consuming -- credible stories about attempted -- you know,

22   attempts to rig the votes.  And when he went to bed on the

23   night of the election, Donald Trump was leading in the

24   polls; and when he woke up, that changed.  And when he

25   logged into Facebook and read through the feed, it -- there

1    were all of these conspiracies that -- to him, it seemed

2    potentially credible.

3            And what he has done since then I think is

4    important to remember, a couple -- very important:  He's

5    completely disengaged from social media entirely.  He does

6    not have a Facebook account anymore.  He does not have any

7    social media accounts at all.  He has no interest in hearing

8    what Donald Trump has to say -- or any of the politicians

9    have to say about it.  He was -- he is disgusted by it.

10           He told the House Select Committee that he felt

11   abandoned, frustrated, misled by all the people who were

12   promoting on Facebook that there would be a big reveal that

13   would, once and for all, prove that the election was stolen

14   and it would change things.  There would be some big

15   unveiling, that is why he went.

16           The comment he made about, "If I die, I die saving

17   the nation" -- even the person who reported it to the FBI

18   believed he said it as a joke.  But there was at the time --

19   based on what he was seeing on Facebook -- a lot of concern

20   about Antifa violence; and lots and lots of posts about

21   Antifa being involved in -- you know, in violence in

22   Portland, Oregon during the Black Lives Matter protest.

23           And, listen, I -- my personal views, I thought --

24   I think that's kind of -- it's farfetched.  It's crazy; but

25   that was the media world he was living in.

1       And I think it's very important when you ask:  Why

2   isn't this going to happen again?  Why has -- is

3   Mr. Herendeen in a different position now?

4       He's recognized that all of that social media,

5   conspiracy theories -- it's toxic.  It was -- it didn't make

6   him happy.  And he chooses now not to engage with it.

7       He still has friends who -- who support Donald

8   Trump; and they want to talk to him about it, and he doesn't

9   want to.  It -- it's not of interest to him at all.

10      When the House Select Committee asked if he, you

11  know, cares what Donald Trump has to say, he said:  No, I

12  don't.  And I think that's very important because -- and he

13  sees this, and he -- what happened on January 6th and the --

14  the violence against the police, it's -- he's disgusted by

15  it.

16      I mean, one of the things that I think is notable

17  in what he said to the Court is that he -- he can't imagine,

18  given the -- I understand what the Court is saying about

19  "stress" -- the stress he feels about this case.  But

20  the trauma of the police officers having to experience that

21  degree of violence -- I think Mr. Herendeen's ability to

22  recognize how this impacted the people who were trying to

23  protect the Capitol is very significant.

24      I think Mr. Herendeen's decision to meet with the

25  House Select Committee is also very important, and it's --

1    as well as the FBI.  And we can talk -- there are a few

2    things I want to talk about that I want to clarify.  But I

3    think Mr. Herendeen has actually said from the beginning

4    he's happy to talk about it because he is not -- it's not

5    something he wants to have happen again at all.

6         And one of the things -- and I put this in the

7    memorandum, but it kind of stuck with me when the House

8    Select Committee asked him again about how he feels about

9    Donald Trump.  He said, you know:  It was a ride that I

10   didn't realize I didn't like until I got off of it.  He's

11   off it, and he doesn't want to get back on.  And that is

12   very important when we think about whether he has already

13   been deterred, whether he is someone who the Court needs to

14   protect the public from, you know, engaging in this behavior

15   again.  All of that is very critical.

16        And with respect to, you know, the Antifa stuff --

17   it is very easy for me to raise my eyebrows and be

18   concerned; you know, kind of brush it off.  And I listened

19   to Mr. Ohm at Mr. Schornak's sentencing talk about it.  And

20   I know Mr. Ohm is representing significantly more people

21   charged in these cases than I am; but it is apparent that

22   there was a very strong belief that there was going to be

23   violence.

24        And Mr. Herendeen thought -- I mean, he was

25   concerned about -- you know, he had heard -- he had never

1    been to Washington, D.C. before.  He heard about the D.C.

2    sniper.  He was in -- totally involved in this kind of toxic

3    Facebook world; and that's why he brought the vest.  That's

4    why he brought the bear spray, which he called "Antifa

5    spray"; the knives, which he ultimately decided --

6              THE COURT:  And this flak vest is a bulletproof

7    vest?

8              MS. FITZHARRIS:  No.  He did not bring a

9    bulletproof vest.  It is like a -- it's a soft vest that he

10   had on, not like a -- it doesn't have the armor -- the,

11   like, plates in it that some bulletproof vests would.  But

12   he did -- he did wear it because of concern about violence

13   against Trump supporters.

14             With respect to the bear spray, I think there is a

15   lot of confusion because Mr. Herendeen packed two backpacks

16   when he came to D.C.  And before going to the rally he left

17   one backpack in his car; and he had one on his back, which

18   you can see in his videos.  He does not remember if he put

19   the bear spray in the one he took with him.  And the fact

20   that he was able to take off his coat at one point and put

21   it inside the backpack suggests maybe he didn't.  But he --

22   he can't say with certainty -- and he has never said with

23   certainty on one day versus another -- that he brought the

24   bear spray to the Capitol; he just doesn't know.  He is not

25   trying to be evasive, he just doesn't know.

1           THE COURT:  So the redacted part of the

2    government's memo under the subtitle "Herendeen Interview,"

3    where it says expressly he admitted he brought the bear

4    spray to the Capitol was incorrect?

5           MS. FITZHARRIS:  That's correct.

6           I was at that interview, Your Honor; Ms. Eve was

7    not.

8           I think it's -- and sometimes, you know, I

9    think -- in terms of being precise about the questions --

10   you know, I went -- I actually brought my notes from that

11   interview just to double-check today and make sure.  And,

12   you know, I think there can be confusion about what you

13   brought to Washington versus what you brought to the

14   Capital; and sometimes there can be imprecision in -- in

15   answering and questioning.

16          So I think -- I don't want the Court to think

17   Mr. Herendeen is being intentionally evasive or not

18   accepting responsibility.  He accepts responsibility for

19   bringing the bear spray to Washington, D.C.; that was wrong,

20   he knows that.

21          I also want to address, you know, the plea offer,

22   in terms of quick acceptance of responsibility.  The offer

23   that the government extended to Mr. Herendeen in May of 2021

24   was a plea to the felony.  And it had a number of

25   guidelines -- stipulations that, frankly, I had -- I don't

1    think apply; but, at the end of the day, it was a felony

2    plea.  The --

3              THE COURT:  So the plea offer changed?

4              MS. FITZHARRIS:  The plea offer changed.

5              And with respect to -- you know, there was a bit

6    of time between the offer to the misdemeanor plea and his

7    acceptance; and a lot of that had to do with stuff in his

8    personal life that I was alluding to earlier -- the stress

9    he was feeling; and just feeling like -- I mean, like he was

10   on the verge of a mental breakdown.  And so making a

11   consequential decision like that was just very difficult.

12   And that -- that explains the gap at least there.  And I --

13   I think it's important for the Court to recognize that.

14             In terms of what Mr. Herendeen did, the video -- I

15   know that the Court talked about his phone being out.  The

16   video of him -- "They're in the basement" -- it was an

17   incredibly terrible thing to say, a poor choice.

18   Mr. Herendeen will tell you that himself -- to say "They're

19   in the basement."  In the moment it did remind him of *White

20   House Down*.  The stairs that he was walking by don't

21   actually have stairs to a basement.  He wasn't sure if there

22   was a basement.  It was one of these -- it was -- there is

23   not really a great excuse for it, and I am not going to make

24   one.

25             THE COURT:  Well, it is a chilling video --

1        MS. FITZHARRIS:  It is chilling.

2        THE COURT:  -- because everybody in that crowd is

3    looking for the members of Congress.  And whether he got the

4    idea from a movie I am not familiar with, to say "They're in

5    the basement" -- I think he says the word "basement" seven

6    times in different phrasings -- talking about where they're

7    all hiding -- "In the fucking basement"; and it was an

8    aggressive, angry mob looking for elected members of

9    Congress.

10        And that -- when the government says that that was

11    part of the factors for why they decided that this was not a

12    mere petty offense -- parading, demonstrating, and picketing

13    of people who wander around, look around, and then leave --

14    that this was a much more intentional action within the

15    Capitol, it's hard for me to say the government has somehow

16    misevaluated that video.  It is a chilling video.

17        MS. FITZHARRIS:  If -- if Mr. Herendeen were

18    trying to present himself as a -- as a hero by that, I mean,

19    it's a poor choice because the villains in *White House Down*

20    are the ones saying it.  It's not -- it's not something --

21    it's not necessarily conduct he would emulate or want to

22    emulate.

23        I think Mr. Herendeen, like a lot of people -- and

24    I am sure a lot of lawyers have talked about getting swept

25    up in the moment, you know.  And at least his comments --

1    you know, there weren't stairs to the basement.  I think,

2    you know, in some ways it kind of meant nothing, right?  And

3    there are a lot of people who posture, right? -- who make it

4    seem like they're doing more than they were.

5          But I think what is significant about

6    Mr. Herendeen is that the only video that was -- came from

7    Facebook.  So the -- "They're in the basement," came from

8    his phone, not Facebook.  He did not post that on Facebook;

9    and I think that's something the Court should consider.

10         He did post one video on Facebook very -- you

11   know, very soon after he left the Capitol.  Other people

12   commented positive things on the post; he didn't say

13   anything, and he took it down.  And he hasn't been on

14   Facebook in over a year, and I think he's better for it.

15         I understand that there is a strong sense -- you

16   know, this case -- it's interesting.  It's caused me to

17   think back to my criminal law class -- first year in law

18   school -- and some of the highly theoretical things that we

19   think about in sentencing; and I remember when we talked

20   about deterrence.

21         There was a judge who sentenced a man to stand on

22   the corner outside a sandwich shop wearing a sign on him

23   that said, "I stole a sandwich from this store."  And it

24   was, you know, this kind of idea that there are other ways

25   to deter, and there are other -- other than time in custody.

1    And there is a reason why I think the notoriety of the case

2    and the public shame of this case, the swift detection and

3    prosecution is -- goes a very long way to deterring people

4    from engaging in this behavior again.

5          I know that the FBI and the Department of Justice

6    have acted very quickly, and they have charged hundreds of

7    people -- everyone they could find -- who entered the

8    Capitol.  And that in itself -- and I think research into

9    deterrence theory shows that goes a very long way to

10   deterring people more than time in prison.

11         And, you know, I understand my friends and family,

12   frankly, who say to me:  You know, I want everybody

13   punished -- and I do get that.  But I think punishment is

14   not just time in jail or prison, and it comes with knowing

15   that you were part of a horrible event and being put out in

16   front of the public square, basically, and have to admit

17   that -- that goes a long way.

18         THE COURT:  So let me just ask you a couple of

19   questions --

20         MS. FITZHARRIS:  Sure.

21         THE COURT:  -- about your sealed filing.

22         The defendant -- based on what the PSR says --

23   where the defendant lives in Michigan, he's sort of

24   surrounded, also, in Michigan with his extended family; is

25   that right?

1          MS. FITZHARRIS:  That's correct.

2          THE COURT:  Including the mother of his minor

3     children?

4          MS. FITZHARRIS:  Yes.

5          THE COURT:  And you do focus in your briefing on

6     the fact that he is the custodian -- the legal custodian of

7     his minor teenagers, and make a very strong plea about him

8     being able to stay home for their care.

9          But in this case, for this offense conduct, this

10    is not offense conduct that took place when the defendant

11    took a mere walk around the block and committed some

12    criminal offense conduct; he traveled all the way here.  So

13    it's hard for me to reconcile this need for him to be with

14    his minor children when he actually traveled all the way to

15    the nation's capital to engage in the offense conduct.  So

16    how am I supposed to reconcile that?

17         MS. FITZHARRIS:  Yes, Your Honor.

18         He left on January 5th, and he returned to

19    Michigan on January 6th.  He does have a relationship with

20    his children's mother; she is not -- she is in their lives,

21    but not the most -- you know, the most reliable parent.  So

22    she watched them for that period of time and -- you know, it

23    was relatively short.

24         Before then -- you know, he does have to do work

25    sometimes out of state; so just before January 6th he was in

```
1    Alabama for a month.  He said he brought his son down there,

2    actually, to -- he is a proud union worker -- and to show

3    his son, you know, what it was like to work in the plants.

4    And he had been just working really hard and was hoping --

5    hoping to take a trip; and that would be, frankly, more fun

6    than it was because I think it ended up being -- he would

7    say not -- not fun at all.

8              THE COURT:  All right.

9              MS. FITZHARRIS:  Does the Court have any -- have

10   any other questions?

11             THE COURT:  No, I don't.

12             MS. FITZHARRIS:  Thank you, Your Honor.

13             THE COURT:  I will hear from Mr. Herendeen now if

14   you wish to supplement your letter to me, Mr. Herendeen.

15             THE DEFENDANT:  Good morning -- or afternoon,

16   Your Honor.

17             You have my letter.  It's basically the same.

18             I feel for everyone that was on the wrong side --

19   the opposite side of the people attacking the Congress

20   members, the police that were protecting the Capitol, what

21   they are still going through, what their families are going

22   through, what I have put my children through and my family

23   through.  It's something that I just won't absolutely ever

24   be involved in again.  And it's a sad day for the nation,

25   really.  And I -- I didn't want to see that happen.
```

1           It was a black mark on the nation, like I've been

2    saying.  It's a sad, sad day.  I didn't intend to go there

3    for that; and I won't be involved in any politics like that

4    ever again.  I just ask for the forgiveness from the Court

5    and Congress, and everyone involved.

6           THE COURT:  All right.  Thank you, Mr. Herendeen.

7           THE DEFENDANT:  Thank you, Your Honor.

8           THE COURT:  All right.  Actually, Mr. Herendeen

9    and Ms. Fitzharris, why don't you come stand...

10          I am going to explain the sentence I am about to

11   impose, and impose sentence.

12          So after considering the parties' sentencing

13   memoranda, the probation department's presentence

14   investigation report and recommendation, hearing argument,

15   reviewing all of the briefing, supplemental briefing, sealed

16   filings, I must consider the relevant factors that Congress

17   has required me to consider and are set out in 18 U.S.C.

18   Section 3553(a) to ensure I impose a sentence that is

19   sufficient but not greater than necessary to comply with the

20   purposes of sentencing.

21          The purposes of sentencing include:  The need for

22   the sentence imposed to reflect the seriousness of the

23   offense -- and this was a very serious offense; promote

24   respect for the law -- because what happened on January 6th

25   showed complete disrespect for our fundamental

1   constitutional law; to provide just punishment for the

2   offense; deter criminal conduct; protect the public from

3   future crimes by you, Mr. Herendeen; and promote

4   rehabilitation.

5           So I must -- pursuant to 18 U.S.C. Section

6   3553(a), in addition to the guidelines and policy statements

7   I have already considered, I have to consider the nature and

8   circumstances of the offense; your history and

9   characteristics, Mr. Herendeen; the types of sentences

10  available; the need to avoid unwarranted sentence

11  disparities among defendants with similar records found

12  guilty of similar conduct, and the need to provide

13  restitution to any victims of the offense.

14          And I am going to start here with restitution.

15          The plea agreement provides for a restitution

16  payment of $500, which this Court finds is the best

17  available estimate of damage done to identifiable victims --

18  here, the Architect of the Capitol -- on the limited record

19  presented in this case.  Since the only record I have in

20  this case is an estimate of damages to the Capitol of -- a

21  little bit -- like $1.5 million that was created over a year

22  ago, and the government hasn't supplemented that amount in

23  any way -- so I will order that amount pursuant to 18 U.S.C.

24  Section 3663(a)(1)(A).

25          I also find that:  Determining complex issues of

1    fact related to the cause or amount of the victim's losses

2    would complicate or prolong the sentencing process to a

3    degree that the need to provide restitution to any victim is

4    outweighed by the burden of the sentencing process -- which

5    is a finding required under the Mandatory Victims

6    Restitution Act, at 18 U.S.C. Section 3663A(c)(3)(B) -- so

7    that the mandatory restitution provisions of that statute do

8    not apply, and the Court need not endeavor to fix the

9    restitution amount more precisely than the $500 amount

10   agreed upon by the parties.

11        Regarding the nature and circumstances of the

12   offense, Mr. Herendeen's been convicted of entering and

13   remaining in a restricted building or grounds in violation

14   of 18 U.S.C. Section 1752(a)(1), which is a Class A

15   misdemeanor.

16        And as I said at the sentencing hearing for

17   Mr. Schornak -- this defendant's codefendant -- conviction

18   of a trespass offense does not fully capture the

19   significance of what happened on January 6th because the

20   events of that day, even for participants like Mr. Herendeen

21   who did not engage in overt direct violence against police

22   officers or other people, were not a garden-variety episode

23   of unlawful entry or even merely being unlawfully present in

24   a sensitive place -- like the Capitol where the Vice

25   President was present and members of Congress were meeting

1     to perform their constitutionally mandated task.

2             Mr. Herendeen's criminal conduct helped facilitate

3     a riot that overwhelmed law enforcement and succeeded in

4     disrupting the proceedings of Congress.  He traveled all the

5     way from Michigan -- leaving his two teenage kids there --

6     and came equipped with bear spray, goggles, flak jacket, and

7     a tactical vest, and possibly contemplated bringing a knife.

8     He then joined the mob, and knew that following them inside

9     the Capitol was unlawful.

10            This was not a spur-of-the-moment decision.  A

11    week beforehand, on December 30, 2020, Mr. Herendeen and his

12    codefendant, Mr. Schornak, exchanged Facebook messages where

13    this defendant mentioned that -- even though he had heard it

14    might be hard to get to D.C., "I go regardless."  He also

15    asked, "Wanna make a plan?"  I have next two weeks off of work.

16            And make a plan, they did.

17            When the defendant entered the Capitol, after the

18    former President's exhortation to take the fight to

19    Congress, he did so with most of the equipment he brought to

20    D.C.  He brought the goggles, wore the jacket and the

21    tactical vest.  He had brought to D.C. the bear spray,

22    apparently, that -- it's unclear whether he actually brought

23    it to the Capitol; but having brought it here, he was

24    prepared for violence.

25            There is a short video on Facebook showing a very

1       large crowd inside the Capitol, and general chaos.  And this

2       defendant took off his hat, tipped it to the crowd in a

3       gesture of support -- so, clearly, certainly at the moment

4       he took pride in participating in this breach of the Capitol.

5               Now, in another video that the defendant

6       recorded -- and there is no evidence that he posted this or

7       sent it to anyone -- he is heard saying, in a few different

8       phrasings, the need to get to the basement, saying, "That's

9       where they are all hiding."  The defendant says this was

10      lifted from some movie reference.  But in the context, as I

11      have already said in my interchange with defense counsel,

12      this was a very chilling video.  It's a crowd of people

13      chanting in the background, "Stop the steal."  Some asking,

14      Where are they at? -- seemingly referring to finding the

15      members of Congress.  And in this context, the threatening

16      character of the defendant's suggestion to look in the

17      basement is unmistakable -- to find the members of Congress.

18              In assessing this defendant's overall role in the

19      mob attack on the Capitol on January 6th, I look at some of

20      these factors:  That he did engage in preplanning, and he --

21      not only for the trip, but for potential violence to be

22      encountered during that trip.  He secured gear, including

23      this tactical vest and bear spray.  And whether or not he

24      took the bear spray into the Capitol with him, he brought it

25      to Washington, D.C. to be prepared for violence when he was

here.

Timingwise, he was in the Capitol Building one time for about 16 minutes; but he was among the first wave of the rioters to force their way into the Capitol Building.

As the government has said, the first breach of the west front of the Capitol occurred at about 2:13 p.m., and the defendant marched into the building about seven minutes later, at 2:20 p.m. -- at almost the very moment when the Senate Chamber was being evacuated; that's very close in time.  So this defendant was sort of -- in order to be -- get into the Capitol so quickly after it was breached, had to have been somewhat of an aggressive participant to be there.

And then, when he was inside the Capitol, there is a brief appearance of the defendant in the Crypt.  There is no evidence he entered any private offices or spaces, or the Senate or House Chambers; and he didn't physically attack any police officer or any other person.  He also doesn't appear to have damaged or stolen any property inside the Capitol.  He didn't carry posters or anything else to try and incite people while he was inside the Capitol.  Although he did post one video from inside the Capitol, that was a limited -- limited video, without much other social media postings after January 6th.

He did then, close -- just before sentencing, very

1    close to the sentencing, he did sit down with investigators

2    for the House Select Committee.  He also did sit down with

3    law enforcement in connection with his plea; and he did

4    provide his phone -- according to the defense counsel -- for

5    forensic examination.

6           So it does appear that, after some long months

7    after his arrest, he has turned a corner in terms of

8    understanding the significance of his activity on

9    January 6th, and sought to figure out what to do to remedy

10   that in a concrete way by talking to the House Select

11   Committee which is trying to understand the full scope of

12   what happened that day and how it happened.

13          So, in sum, the nature and circumstances of the

14   offense and the need for the sentence to reflect the

15   seriousness of the offense and promote respect for the law

16   would generally favor a custodial sentence.

17          The particular circumstances of the defendant's

18   conduct of not physically engaging in violence, stealing, or

19   destroying items inside the Capitol Building put him in a

20   less-troublesome category than some other rioters that day.

21   But the Court does find that coming equipped with --

22   preplanning with gear to engage in violence at the Capitol,

23   and compounded by the disturbing video taken while he was

24   inside the Capitol referencing "the basement," with a clear

25   allusion to the likely hiding places of members of Congress,

1      is one that requires a significant penalty in this case.

2             Regarding his history and characteristics, he has

3      a few adult criminal convictions, but all of which are over

4      20 years -- 20 years ago.  He did have a DUI that's more

5      recent for which he received a day in jail, in addition to

6      12 months' probation.  And since that time he has crossed

7      paths with the criminal justice system twice.  In 2019 he

8      was arrested, though ultimately not prosecuted.  He was

9      arrested while on pretrial release in this matter for a drug

10     possession offense which has now been dismissed.

11            He has three children; and it is a sign of support

12     that all three of his children came here today.  The

13     defendant has been employed regularly, and fairly

14     consistently.

15            And I am -- have taken account of the very

16     thoughtful letter where the defendant apologized to everyone

17     who was working in the Capitol representing the American

18     people, the heroes protecting the Capitol, and the American

19     people watching -- and I quote from the defendant's letter.

20     I appreciate that he recognizes that the events of that day

21     are a black spot on the nation's history.

22            I have looked at all of the letters submitted on

23     his behalf, including the one that I have read while on the

24     bench from Mr. Koslofsky talking about his work ethic, his

25     devotion to his children, and his general helpful demeanor

1    toward his family and neighbors.  And it is quite

2    unfortunate that those were traits and behaviors that seemed

3    absent on January 6.

4         The need for the sentence imposed to deter

5    criminal behavior, protect the public from further crimes of

6    the defendant are critical considerations for every

7    sentencing judge.  And the seriousness of the conduct we

8    witnessed on January 6th highlights the need for deterrence

9    and the form of sentence sufficient to deter this defendant

10   and others from engaging in this kind of conduct in the

11   future.

12        I appreciate that the defendant says that he was

13   caught up in the social media echo chamber of conspiracy

14   theories leading up to the 2020 election where other

15   Americans are demonized as enemies somehow and people who

16   are protesting against police brutality are somehow less

17   than Americans, and other misinformation about the stealing

18   of the presidential election in 2020.

19        And it is -- the biggest surprise to me in all of

20   these January 6th cases is the fact that there are so many

21   uncritical thinkers who just believe what they see or hear

22   from politicians.  But as a sentencing judge, being a crowd

23   follower doesn't immunize you from criminal liability; it

24   just doesn't.  There are consequences to going along with

25   the crowd.  You know, mothers saying to children across for

1    ages, you know:  Don't follow somebody over the cliff just

2    because they're going over the cliff.  It applies here.

3    Unfortunately, people like Mr. Herendeen who are following

4    people over a cliff are going to pay the consequences.

5         What concerns me in this case that, I think,

6    warrants a sentence of more than just simply probation is

7    the preplanning -- and the preplanning that involved

8    bringing bear spray to the Capitol, and then compounded by

9    the action in the Capitol -- unlike others I have seen who

10   just wandered around and looked -- of actually talking about

11   trying to find members of Congress.

12        Regarding the types of sentences available, he was

13   convicted of a Class A misdemeanor, which provides a maximum

14   term of imprisonment of one year, which -- if a term of

15   imprisonment is applied, needs to be followed by only a

16   maximum of one year of supervised release or up to five

17   years' probation, with the guideline range of only up to

18   three years out of the five.

19        Regarding the need to avoid unwarranted disparity,

20   the Court recognizes that both probationary and custodial

21   sentences have been imposed on January 6th defendants

22   convicted of the same Class A misdemeanor as this defendant.

23   And most of those defendants -- the majority of the

24   January 6th defendants convicted of a Class A misdemeanor

25   are sentenced to some period of incarceration.  Some of it

1    is straight periods of incarceration and some of it is

2    intermittent confinement in connection with -- as a special

3    condition of probation.

4         The defendant's codefendant, Mr. Schornak, does

5    serve as a useful comparator here.  And defense counsel's

6    analysis of the differences between that case and this one,

7    I thought, was very helpful and was a careful and probative

8    analysis.  The Court did sentence Mr. Schornak to 36 months'

9    probation, including two 14-day periods of intermittent

10   incarceration, totaling a total of 28 days, and 2 months of

11   home detention.

12        The two defendants' conduct is similar in some

13   respects since both were in the Capitol a relatively short

14   time:  16 minutes for this defendant, 12 minutes for

15   Mr. Schornak.  Both came equipped with some measure of

16   tactical gear.  Neither engaged in violence, although they

17   said they were prepared to do so if the circumstances

18   warranted.

19        In my view, Mr. Schornak did engage in more

20   egregious conduct while he was unlawfully inside the

21   Capitol.  He not only went deeper into the building,

22   including Emancipation Hall; he also stole an American flag,

23   took it outside, hoisted it up to incite and invigorate

24   other rioters on scaffolding to be displayed from above --

25   in essence, turning this symbol -- the flag -- a symbol of

1    this country -- against itself as a rallying cry for all of

2    these other people amassed there.

3            The defendant, by comparison, didn't steal

4    anything, didn't engage in conduct to rally or prolong the

5    riot.  He entered the Crypt.  He posted the short Facebook

6    video; he recorded at least one other cell phone video; and

7    he exited through a window to which the police were

8    directing rioters as a means to leave.

9            His preplanning and bringing bear spray to

10   Washington, D.C. -- whether he actually took it into the

11   Capitol -- this was preplanning that was serious and

12   alarming.  And also alarming was the interest he took in

13   finding members of Congress in the basement of the Capitol.

14           It is an important mitigating factor for this

15   defendant, as I found for Mr. Schornak, that he is trying to

16   remedy his conduct on that day by being interviewed by the

17   January 6 committee on the House.  And I do think that

18   this -- sitting down for interviews with the House Select

19   Committee -- deserves some recognition at sentencing in

20   assessing the defendant's remorse, his acceptance of

21   responsibility, and taking steps to help that investigating

22   committee.

23           So based on my consideration of these and other

24   factors, I will now state the sentence to be imposed.

25           Pursuant to the Sentencing Reform Act of 1984 and

1    in consideration of the provisions of 18 U.S.C. Section

2    3553, it is the judgment of the Court that you, Daniel

3    Herendeen, are hereby sentenced to a term of 36 months,

4    which is 3 years of probation, on Count 2 of the indictment,

5    with special conditions of a total of 14 days of

6    intermittent confinement to be served in two increments of 7

7    days each, and 2 months of home detention.

8              You are ordered to pay a special assessment of $25

9    in accordance with 18 U.S.C. Section 3013.

10             You are also ordered to make restitution to the

11   Architect of the Capitol in the amount of $500.  Restitution

12   payments shall be made to:  The Clerk of the Court for the

13   U.S. District Court, District of Columbia, for disbursement

14   to the following victim:  The Architect of the Capitol,

15   Office of the Chief Financial Officer, the attention of

16   Kathy Sherrill, CPA, Ford House Office Building, Room

17   H2-205B, Washington, D.C. 20515, in the amount of the loss:

18   $500.

19             While on supervision, you shall abide by the

20   following mandatory conditions as well as the standard

21   conditions of supervision which are imposed to establish the

22   basic expectations for your conduct while on supervision.

23             The mandatory conditions include:

24             One, you must not commit another federal, state,

25   or local crime.

 1           Two, you must not unlawfully possess a controlled

 2    substance -- that includes marijuana.

 3           You must refrain from any unlawful use of a

 4    controlled substance.  You must submit to one drug test

 5    within 15 days of placement on supervision, and at least two

 6    periodic drug tests thereafter as determined by the Court.

 7           You must make restitution in accordance with your

 8    plea agreement and 18 U.S.C. Section 3663.

 9           You shall comply with the following special

10    conditions:

11           Pursuant to 18 U.S.C. Section 3563(b)(10), you

12    must serve a total of 14 days of intermittent confinement.

13    The intermittent confinement shall be served in two periods

14    of 7 days each within your first year of probation at a

15    facility designated by the Bureau of Prisons.  You must

16    follow the rules and regulations of the facility in which

17    you are designated.

18           You must submit to home detention for a period of

19    two months as soon as practical and comply with the location

20    monitoring program requirement as directed by the U.S.

21    Probation Office.  You will be restricted to your residence

22    at all times except for employment, education, religious

23    services, medical, substance abuse and mental health

24    treatment, court-ordered obligations, and any other such

25    times specifically authorized by the U.S. Probation Office.

1          The location-monitoring technology is at the

2     discretion of the U.S. Probation Office, and you must pay

3     the cost of monitoring.

4          You must provide the probation officer access to

5     any requested financial information and authorize the

6     release of any financial information.  The probation office

7     may share financial information with the U.S. Attorney's

8     Office.

9          Having assessed the defendant's ability to pay,

10    payment of the total criminal monetary penalties is due as

11    follows:  Payment in equal monthly installments of $100 to

12    commence 30 days after the date of this judgment.

13         The Court has determined that you do not have the

14    ability to pay interest and therefore waives any interest or

15    penalties that may accrue on the balance.

16         Financial obligations are immediately payable to:

17    The Clerk of the Court for the U.S. District Court, 333

18    Constitution Avenue Northwest, Washington, D.C. 20001.

19    Within 30 days of any change of address, you shall notify

20    the Clerk of the Court of the change until such time as the

21    financial obligation is paid in full.

22         The probation office shall release the presentence

23    investigation report to all appropriate agencies, which

24    includes the U.S. Probation Office in the approved district

25    of residence, in order to execute the sentence of the Court.

1          Pursuant to 18 U.S.C. Section 3742, you have a

2     right to appeal the sentence imposed by this Court if the

3     period of imprisonment is longer than the statutory maximum.

4     If you choose to appeal, you must file any appeal within 14

5     days after the Court enters judgment.

6          As defined in 28 U.S.C. Section 2255, you also

7     have the right to challenge the conviction entered or

8     sentence imposed if new and currently unavailable

9     information becomes available to you or on a claim that you

10    received ineffective assistance of counsel in entering a

11    plea of guilty to the offense of conviction or in connection

12    with sentencing.  If you are unable to afford the cost of an

13    appeal, you may request permission from the Court to file an

14    appeal without cost to you.

15         Are there any objections to the sentence imposed

16    that are not already noted on the record from the government?

17         MS. EVE:  No, Your Honor.

18         THE COURT:  And from defense?

19         MS. FITZHARRIS:  Your Honor, the only issue I

20    would like to address is the standard condition about

21    possession of controlled substances.  As a condition of

22    Mr. Herendeen's pretrial release, there is a similar

23    condition.  The Court amended the conditions to allow him to

24    use medical marijuana in accordance with Michigan law; he

25    has a medical marijuana card.  And so I would ask that the

1    Court --

2            THE COURT:  I will make that amendment.  Thank you

3    for the reminder about that.

4            MS. FITZHARRIS:  Thank you.

5            THE COURT:  Okay.  You may be seated.

6            Does the government have a motion to dismiss the

7    open counts, 1, 3, 4, and 5?

8            MS. EVE:  Yes, Your Honor.

9            The government moves to dismiss those counts.

10           THE COURT:  And that motion is granted.

11           Is there anything else to address today from the

12   government?

13           MS. EVE:  Your Honor, I just want to make sure

14   that I wrote things down properly.

15           The Court did not impose a fine?

16           THE COURT:  I did not.

17           MS. EVE:  And the Court also did not impose the

18   hours of community service?

19           THE COURT:  I did not.

20           MS. EVE:  Thank you.

21           THE COURT:  Anything further from the defense?

22           MS. FITZHARRIS:  No.  Thank you very much,

23   Your Honor.

24           THE COURT:  All right.  You are all excused.

25           You are all excused.  I have got another case.

1            (Whereupon, the proceeding concludes, 1:19 p.m.)

2                  **<u>CERTIFICATE</u>**

3

4         I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

5 certify that the foregoing constitutes a true and accurate

6 transcript of my stenographic notes, and is a full, true,

7 and complete transcript of the proceedings to the best of my

8 ability.

9

10        This certificate shall be considered null and void

11 if the transcript is disassembled and/or photocopied in any

12 manner by any party without authorization of the signatory

13 below.

14

15    Dated this 9th day of June, 2022

16

17    <u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
      Official Court Reporter

18

19

20

21

22

23

24

25

## $

**$100** [1] - 68:11
**$25** [2] - 11:18, 66:8
**$500** [6] - 9:3, 11:18, 55:16, 56:9, 66:11, 66:18
**$9500** [1] - 11:18

## /

**/s** [1] - 71:16

## 1

**1** [7] - 1:5, 9:13, 10:25, 11:1, 11:13, 11:16, 70:7
**1.5** [1] - 55:21
**10** [3] - 17:22, 22:17, 36:8
**100** [1] - 12:10
**11** [1] - 36:8
**11:36** [1] - 1:5
**12** [5] - 30:11, 30:13, 30:17, 61:6, 64:14
**13** [2] - 7:18, 30:19
**14** [4] - 9:1, 66:5, 67:12, 69:4
**14-day** [1] - 64:9
**15** [1] - 67:5
**16** [3] - 38:3, 59:3, 64:14
**17** [3] - 10:20, 18:1, 22:19
**1752** [2] - 32:9, 32:18, 34:3
**1752a)(1** [7] - 3:9, 11:3, 30:12, 30:23, 32:2, 33:18, 56:14
**18** [15] - 3:9, 11:3, 12:4, 12:10, 12:12, 54:17, 55:5, 55:23, 56:6, 56:14, 66:1, 66:9, 67:8, 67:11, 69:1
**19106** [1] - 1:13
**1984** [1] - 65:25
**1:19** [1] - 71:1

## 2

**2** [4] - 3:7, 64:10, 66:4, 66:7
**20** [2] - 61:4
**20-20** [1] - 3:16
**20001** [1] - 68:18

**2011** [1] - 10:23
**2016** [1] - 42:12
**2019** [1] - 61:7
**2020** [3] - 57:11, 62:14, 62:18
**2021** [6] - 18:1, 22:20, 38:1, 38:3, 42:11, 47:23
**2022** [4] - 1:5, 7:5, 9:24, 71:15
**20515** [1] - 66:17
**21** [2] - 10:22, 38:1
**21-278** [2] - 1:3, 2:3
**215** [1] - 1:13
**21st** [1] - 5:15
**2255** [1] - 69:6
**22nd** [1] - 9:24
**23** [1] - 7:5
**26** [2] - 8:21, 10:7
**27** [1] - 38:2
**28** [4] - 9:1, 12:6, 64:10, 69:6
**2:13** [2] - 13:15, 59:6
**2:20** [2] - 13:16, 59:8
**2B2.3** [1] - 11:2
**2B2.3(b)(1)(A)(vii** [1] - 11:9

## 3

**3** [7] - 4:19, 9:12, 11:14, 12:8, 32:11, 66:4, 70:7
**30** [5] - 8:23, 12:22, 57:11, 68:12, 68:19
**3013** [1] - 66:9
**302** [1] - 18:22
**302s** [3] - 17:17, 17:18
**313** [1] - 1:18
**32** [1] - 7:14
**333** [1] - 68:17
**34** [1] - 10:20
**3553** [1] - 66:2
**3553(a** [3] - 12:3, 54:18, 55:6
**3553(a)(6** [2] - 31:15, 33:16
**3563(b)(10** [1] - 67:11
**36** [4] - 8:22, 8:25, 64:8, 66:3
**3663** [1] - 67:8
**3663(a)(1)(A)** [1] - 55:24
**3663A(c)(3)(B** [1] - 56:6
**3742** [1] - 69:1
**3E1.1(a** [1] - 11:11

## 4

**4** [7] - 4:19, 11:6, 11:12, 13:22, 27:17, 27:23, 70:7
**40** [1] - 31:7
**48226** [1] - 1:17

## 5

**5** [3] - 27:17, 27:24, 70:7
**50** [1] - 4:13
**5104** [3] - 32:2, 32:9, 32:17
**5104(e)(2)(G)** [1] - 31:7
**5th** [1] - 52:18

## 6

**6** [6] - 11:13, 12:8, 26:9, 41:14, 62:3, 65:17
**60** [1] - 12:8
**613** [1] - 1:17
**615** [1] - 1:12
**67** [4] - 9:10, 9:14, 10:1, 10:7
**6th** [24] - 12:21, 21:13, 21:20, 24:14, 24:22, 25:7, 25:8, 30:10, 37:2, 37:14, 40:15, 44:13, 52:19, 52:25, 54:24, 56:19, 58:19, 59:24, 60:9, 62:8, 62:20, 63:21, 63:24

## 7

**7** [3] - 13:13, 66:6, 67:14
**73** [1] - 4:3
**74** [1] - 4:5
**77** [1] - 4:17
**77-2** [1] - 4:19
**78** [2] - 4:21, 9:12
**79** [1] - 4:7

## 8

**8** [1] - 30:17
**8-second** [1] - 12:23
**80** [2] - 4:8, 7:18
**81** [1] - 5:15
**82** [1] - 4:10

**83** [1] - 4:14
**861-8577** [1] - 1:13

## 9

**9** [1] - 30:18
**967-5866** [1] - 1:18
**9th** [1] - 71:15

## A

**a.m** [1] - 1:5
**abandoned** [1] - 43:11
**Abbott** [1] - 1:17
**abide** [1] - 66:19
**ability** [4] - 44:21, 68:9, 68:14, 71:8
**able** [5] - 25:23, 27:22, 29:18, 46:20, 52:8
**absent** [1] - 62:3
**absolutely** [2] - 24:18, 53:23
**abuse** [1] - 67:23
**accept** [3] - 10:5, 10:7, 30:5
**acceptance** [7] - 11:10, 37:3, 37:22, 38:10, 47:22, 48:7, 65:20
**accepted** [3] - 38:3, 38:15, 38:19
**accepting** [1] - 47:18
**accepts** [1] - 47:18
**access** [8] - 3:12, 14:1, 14:3, 14:5, 14:10, 29:8, 37:13, 68:4
**accordance** [3] - 66:9, 67:7, 69:24
**according** [3] - 9:11, 38:1, 60:4
**account** [4] - 29:13, 38:9, 43:6, 61:15
**accounts** [2] - 29:8, 43:7
**accrue** [1] - 68:15
**accurate** [1] - 71:5
**acknowledged** [1] - 12:15
**Act** [2] - 56:6, 65:25
**acted** [1] - 51:6
**Action** [1] - 1:3
**action** [2] - 49:14, 63:9
**actions** [1] - 41:25
**activity** [1] - 60:8
**added** [1] - 11:6
**addition** [3] - 16:7,

55:6, 61:5
**additional** [2] - 5:1, 36:7
**address** [6] - 6:18, 12:2, 47:21, 68:19, 69:20, 70:11
**admissions** [1] - 22:5
**admit** [2] - 35:3, 51:16
**admitted** [2] - 18:4, 47:3
**adult** [1] - 61:3
**advised** [1] - 20:19
**advisory** [5] - 6:14, 11:13, 12:7
**affect** [1] - 26:11
**afford** [1] - 69:2
**afternoon** [1] - 53:15
**age** [4] - 10:20, 10:21, 10:22
**agencies** [1] - 68:23
**Agent** [2] - 1:20, 2:6
**agents** [4] - 16:22, 17:11, 17:13, 36:20
**ages** [1] - 63:1
**aggravating** [2] - 13:7, 14:22
**aggressive** [2] - 49:8, 59:12
**ago** [3] - 10:21, 55:22, 61:4
**agree** [4] - 17:16, 18:13, 19:8, 21:3
**agreed** [3] - 17:25, 22:19, 56:10
**agreement** [7] - 23:17, 24:17, 28:13, 28:15, 29:9, 55:15, 67:8
**agrees** [1] - 26:2
**aided** [1] - 1:24
**Alabama** [1] - 53:1
**alarming** [2] - 65:12
**allow** [1] - 69:23
**alluding** [1] - 48:8
**allusion** [1] - 60:25
**almost** [2] - 40:3, 59:8
**alone** [1] - 27:8
**ALSO** [1] - 1:20
**amassed** [1] - 65:2
**amended** [9] - 4:8, 7:18, 18:25, 19:24, 23:3, 36:1, 36:6, 36:11, 69:23
**amendment** [2] - 23:4, 70:2
**Amendment** [1] - 41:15
**America** [1] - 2:3
**AMERICA** [1] - 1:3
**American** [4] - 41:24, 61:17, 61:18, 64:22

**Americans** [2] - 62:15, 62:17
**amount** [9] - 36:13, 38:13, 55:22, 55:23, 56:1, 56:9, 66:11, 66:17
**analysis** [4] - 31:15, 33:16, 64:6, 64:8
**analyzed** [1] - 29:6
**angry** [1] - 49:8
**Anita** [1] - 2:21
**ANITA** [1] - 1:11
**anita.eve@usdoj. gov** [1] - 1:14
**answer** [3] - 28:2, 29:16, 35:6
**answering** [1] - 47:15
**Antifa** [8] - 18:8, 20:8, 22:23, 24:5, 43:20, 43:21, 45:16, 46:4
**apologize** [2] - 5:11, 9:15
**apologized** [1] - 61:16
**apparent** [1] - 45:21
**appeal** [5] - 69:2, 69:4, 69:13, 69:14
**appear** [2] - 59:19, 60:6
**appearance** [1] - 59:15
**APPEARANCES** [1] - 1:10
**appeared** [1] - 30:13
**application** [1] - 12:3
**applied** [1] - 63:15
**applies** [4] - 6:15, 7:12, 11:2, 63:2
**apply** [7] - 6:10, 6:12, 6:14, 10:11, 10:15, 48:1, 56:8
**appreciate** [2] - 61:20, 62:12
**appreciated** [1] - 30:4
**appropriate** [3] - 34:4, 41:15, 68:23
**approved** [1] - 68:24
**April** [1] - 1:5
**Architect** [3] - 55:18, 66:11, 66:14
**argument** [7] - 21:4, 21:7, 26:15, 27:2, 33:17, 34:19, 54:14
**arguments** [1] - 21:2
**armor** [1] - 46:10
**Army** [1] - 16:3
**arrest** [2] - 9:11, 60:7
**arrested** [2] - 61:8, 61:9
**articulable** [2] - 31:22, 33:11

**articulate** [1] - 35:12
**ashamed** [1] - 39:12
**asserted** [1] - 34:10
**assess** [1] - 41:20
**assessed** [1] - 68:9
**assessing** [2] - 58:18, 65:20
**assessment** [2] - 11:18, 66:8
**assigned** [1] - 10:24
**assistance** [1] - 69:10
**assisted** [1] - 23:15
**associated** [1] - 40:15
**association** [1] - 39:25
**AT&T** [2] - 14:5, 14:15
**attack** [4] - 36:24, 37:7, 58:19, 59:17
**attacking** [1] - 53:19
**attempted** [1] - 42:21
**attempts** [1] - 42:22
**attention** [1] - 66:15
**attire** [1] - 15:10
**attorney** [3] - 8:9, 17:25, 22:19
**Attorney's** [2] - 1:12, 68:7
**authorization** [1] - 71:12
**authorize** [1] - 68:5
**authorized** [1] - 67:25
**available** [6] - 2:20, 3:12, 55:10, 55:17, 63:12, 69:9
**Avenue** [1] - 68:18
**avoid** [2] - 55:10, 63:19
**avoiding** [2] - 31:15, 33:16
**awarded** [1] - 31:20

**B**

**background** [1] - 58:13
**backpack** [10] - 16:14, 16:23, 17:1, 18:10, 20:2, 26:1, 26:9, 34:21, 46:17, 46:21
**backpacks** [1] - 46:15
**balance** [1] - 68:15
**barricade** [1] - 13:6
**base** [1] - 11:5
**based** [14] - 6:12, 26:7, 29:23, 32:10, 33:2, 34:1, 34:3, 34:6, 34:9, 35:2, 36:19, 43:19, 51:22, 65:23

**basement** [19] - 12:24, 13:1, 13:3, 26:20, 26:24, 27:17, 48:16, 48:19, 48:21, 48:22, 49:5, 49:7, 50:1, 50:7, 58:8, 58:17, 60:24, 65:13
**basic** [1] - 66:22
**basis** [1] - 36:16
**bear** [45] - 15:11, 16:13, 16:14, 16:19, 16:20, 16:23, 18:4, 18:9, 19:23, 20:1, 20:8, 20:10, 20:12, 21:15, 21:21, 22:3, 22:4, 22:6, 24:4, 24:5, 24:22, 25:11, 25:20, 26:1, 26:2, 27:5, 27:6, 27:8, 29:25, 34:6, 34:14, 34:17, 34:22, 46:4, 46:14, 46:19, 46:24, 47:3, 47:19, 57:6, 57:21, 58:23, 58:24, 63:8, 65:9
**becomes** [1] - 69:9
**bed** [1] - 42:22
**BEFORE** [1] - 1:8
**beforehand** [1] - 57:11
**began** [2] - 26:15, 27:1
**begin** [2] - 12:13, 32:1
**beginning** [2] - 24:24, 45:3
**behalf** [4] - 2:21, 2:24, 4:16, 61:23
**behavior** [3] - 45:14, 51:4, 62:5
**behaviors** [1] - 62:2
**belief** [3] - 41:17, 42:8, 45:22
**below** [1] - 71:13
**bench** [1] - 61:24
**BERYL** [1] - 1:8
**best** [3] - 41:8, 55:16, 71:7
**better** [1] - 50:14
**between** [8] - 31:9, 32:12, 33:7, 35:9, 35:25, 38:14, 48:6, 64:6
**big** [3] - 41:17, 43:12, 43:14
**biggest** [1] - 62:19
**bit** [3] - 18:15, 48:5, 55:21
**black** [4] - 39:11, 40:23, 54:1, 61:21
**Black** [1] - 43:22
**block** [1] - 52:11
**bluntly** [1] - 30:4

**boosted** [2] - 2:14, 2:15
**bought** [1] - 16:13
**brass** [1] - 42:1
**breach** [3] - 13:14, 58:4, 59:5
**breached** [2] - 13:14, 59:11
**breakdown** [1] - 48:10
**brief** [1] - 59:15
**briefing** [4] - 12:2, 52:5, 54:15
**bring** [6] - 17:4, 19:15, 22:6, 34:14, 34:17, 46:8
**bringing** [8] - 21:15, 24:22, 55:19, 29:25, 47:19, 57:7, 63:8, 65:9
**broke** [1] - 41:16
**broken** [1] - 13:15
**brought** [28] - 16:19, 17:2, 17:6, 17:15, 20:15, 21:19, 21:21, 22:4, 34:6, 34:20, 34:21, 34:22, 46:3, 46:4, 46:23, 47:3, 47:10, 47:13, 53:1, 57:19, 57:20, 57:21, 57:22, 57:23, 58:24
**brush** [1] - 45:18
**brutality** [1] - 62:16
**Building** [8] - 13:21, 26:18, 27:8, 41:16, 59:2, 59:4, 60:19, 66:16
**building** [7] - 3:8, 11:4, 11:8, 13:6, 56:13, 59:7, 64:21
**bulletproof** [5] - 16:4, 16:7, 46:6, 46:9, 46:11
**burden** [1] - 56:4
**Bureau** [1] - 67:15
**business** [1] - 41:1
**buying** [1] - 21:15
**buzz** [1] - 14:6

**C**

**cannot** [2] - 35:5, 38:18
**Capital** [1] - 47:14
**capital** [1] - 52:15
**Capitol** [71] - 12:22, 13:13, 13:21, 15:18, 16:15, 17:3, 17:15, 18:10, 18:19, 20:6, 20:13, 20:14, 20:20,

21:20, 21:21, 22:4, 22:6, 23:16, 24:13, 24:15, 25:10, 25:20, 26:17, 26:21, 27:7, 27:14, 29:25, 34:7, 34:14, 34:20, 36:24, 37:7, 41:16, 44:23, 46:24, 47:4, 49:15, 50:11, 51:8, 53:20, 55:18, 55:20, 56:24, 57:9, 57:17, 57:23, 58:1, 58:4, 58:19, 58:24, 59:2, 59:4, 59:6, 59:11, 59:14, 59:20, 59:21, 59:22, 60:19, 60:22, 60:24, 61:17, 61:18, 63:8, 63:9, 64:13, 64:21, 65:11, 65:13, 66:11, 66:14
**caption** [1] - 23:18
**capture** [1] - 56:18
**car** [1] - 46:17
**card** [1] - 69:25
**care** [3] - 33:18, 39:7, 52:8
**careful** [1] - 64:7
**cares** [2] - 39:4, 44:11
**cARMEN** [1] - 1:20
**carry** [1] - 59:20
**case** [44] - 4:13, 5:20, 6:10, 6:15, 8:10, 9:13, 10:9, 10:12, 10:16, 13:11, 16:21, 17:21, 26:4, 26:12, 27:3, 27:21, 28:1, 28:7, 28:10, 28:13, 28:15, 28:20, 31:3, 31:25, 32:20, 35:18, 35:21, 36:6, 37:24, 37:25, 39:22, 40:8, 41:4, 44:19, 50:16, 51:1, 51:2, 52:9, 55:19, 55:20, 61:1, 63:5, 64:6, 70:25
**Case** [1] - 2:3
**cases** [15] - 18:20, 30:10, 30:11, 30:13, 31:9, 31:10, 32:12, 35:9, 35:10, 35:11, 35:22, 37:22, 39:15, 45:21, 62:20
**Category** [2] - 11:1, 11:12
**category** [1] - 60:20
**caught** [2] - 28:6, 62:13
**caused** [3] - 39:22, 40:22, 50:16
**CCTV** [3] - 27:11,

28:18, 29:19
**cell** [2] - 29:5, 65:6
**Cellebrite** [1] - 29:6
**cellphone** [2] - 27:23, 28:6
**certain** [3] - 4:9, 15:24, 19:1
**certainly** [1] - 58:3
**certainty** [2] - 46:22, 46:23
**CERTIFICATE** [1] - 71:2
**certificate** [1] - 71:10
**certify** [1] - 71:5
**certifying** [1] - 15:20
**challenge** [1] - 69:7
**challenges** [1] - 40:17
**Chamber** [1] - 59:9
**chamber** [1] - 62:13
**Chambers** [1] - 59:17
**change** [6] - 15:19, 26:3, 36:16, 43:14, 68:19, 68:20
**changed** [5] - 42:8, 42:10, 42:24, 48:3, 48:4
**chanting** [1] - 58:13
**chaos** [1] - 58:1
**character** [1] - 58:16
**characteristic** [1] - 7:11
**characteristics** [2] - 55:9, 61:2
**charged** [2] - 45:21, 51:6
**chart** [3] - 30:8, 30:10, 30:13
**check** [1] - 47:11
**Chestnut** [1] - 1:12
**Chief** [1] - 66:15
**CHIEF** [1] - 1:9
**children** [10] - 39:4, 40:10, 40:16, 52:3, 52:14, 53:22, 61:11, 61:12, 61:25, 62:25
**children's** [1] - 52:20
**chilling** [4] - 48:25, 49:1, 49:16, 58:12
**choice** [2] - 48:17, 49:19
**choose** [1] - 69:4
**chooses** [1] - 44:6
**CHRISTINE** [1] - 1:20
**Christine** [1] - 2:6
**circumstances** [6] - 41:8, 55:8, 56:11, 60:13, 60:17, 64:17
**citing** [1] - 36:5
**claim** [1] - 69:9
**claimed** [1] - 23:14

**clarify** [2] - 7:23, 45:2
**Class** [23] - 3:10, 6:11, 6:12, 11:19, 31:1, 31:3, 31:4, 31:13, 31:18, 31:24, 32:3, 33:4, 33:9, 33:13, 33:18, 35:10, 35:14, 35:21, 35:22, 56:14, 63:13, 63:22, 63:24
**class** [1] - 50:17
**clear** [2] - 19:6, 60:24
**clearly** [4] - 21:14, 26:7, 26:20, 58:3
**clerk** [1] - 5:17
**Clerk** [3] - 66:12, 68:17, 68:20
**client** [1] - 7:24
**cliff** [3] - 63:1, 63:2, 63:4
**close** [4] - 17:19, 59:10, 59:25, 60:1
**coat** [1] - 46:20
**cocaine** [1] - 9:11
**codefendant** [4] - 8:22, 56:17, 57:12, 64:4
**COLLEEN** [1] - 1:15
**Colleen** [1] - 2:24
**colleen_fitzharris@ fd.org** [1] - 1:18
**Columbia** [1] - 66:13
**COLUMBIA** [1] - 1:1
**combination** [1] - 11:12
**coming** [5] - 6:1, 15:15, 15:17, 20:6, 60:21
**commence** [1] - 68:12
**comment** [1] - 43:16
**commented** [1] - 50:12
**comments** [1] - 49:25
**commit** [1] - 66:24
**committed** [1] - 52:11
**Committee** [10] - 36:23, 37:7, 42:16, 43:10, 44:10, 44:25, 45:8, 60:2, 60:11, 65:19
**committee** [4] - 37:1, 37:14, 65:17, 65:22
**community** [3] - 12:8, 12:10, 70:18
**Community** [1] - 1:16
**comparator** [1] - 64:5
**compared** [1] - 31:3
**comparison** [1] - 65:3
**complete** [2] - 54:25, 71:7
**completed** [1] - 9:17

**completely** [1] - 43:5
**complex** [1] - 55:25
**complicate** [1] - 56:2
**comply** [3] - 54:19, 67:9, 67:19
**compounded** [2] - 60:23, 63:8
**computer** [1] - 1:24
**computer-aided** [1] - 1:24
**concern** [2] - 39:15, 43:19, 46:12
**concerned** [4] - 41:13, 41:18, 45:18, 45:25
**concerns** [1] - 63:5
**concludes** [1] - 71:1
**concrete** [1] - 60:10
**condition** [4] - 64:3, 69:20, 69:21, 69:23
**conditions** [7] - 8:25, 66:5, 66:20, 66:21, 66:23, 67:10, 69:23
**conduct** [30] - 6:13, 11:7, 21:13, 24:14, 31:9, 31:12, 31:23, 32:12, 33:2, 33:3, 33:7, 33:12, 33:13, 35:9, 49:21, 52:9, 52:10, 52:12, 52:15, 55:2, 55:12, 57:2, 60:18, 62:7, 62:10, 64:12, 64:20, 65:4, 65:16, 66:22
**confinement** [7] - 8:23, 9:1, 9:2, 64:2, 66:6, 67:12, 67:13
**confirmed** [1] - 22:10
**confronting** [1] - 41:10
**confusion** [2] - 46:15, 47:12
**Congress** [16] - 13:5, 26:19, 49:3, 49:9, 53:19, 54:5, 54:16, 56:25, 57:4, 57:19, 58:15, 58:17, 60:25, 63:11, 65:13
**congressional** [1] - 37:1
**Congressmen** [3] - 15:18, 15:19, 35:19
**connected** [1] - 2:6
**connection** [8] - 3:24, 8:15, 28:1, 28:9, 28:15, 60:3, 64:2, 69:11
**consequence** [1] - 40:24
**consequences** [5] - 39:14, 39:20, 39:21,

62:24, 63:4
**consequential** [1] - 48:11
**consider** [7] - 20:1, 20:10, 22:25, 50:9, 54:16, 54:17, 55:7
**consideration** [4] - 12:17, 13:18, 65:23, 66:1
**considerations** [1] - 62:6
**considered** [4] - 33:20, 34:25, 55:7, 71:10
**considering** [1] - 54:12
**consistently** [1] - 61:14
**conspiracies** [1] - 43:1
**conspiracy** [4] - 41:17, 41:22, 44:5, 62:13
**constant** [1] - 42:18
**constitutes** [1] - 71:5
**Constitution** [1] - 68:18
**constitutional** [1] - 55:1
**constitutionally** [1] - 57:1
**consuming** [1] - 42:21
**contacted** [1] - 18:17
**contemplated** [1] - 57:7
**context** [3] - 33:21, 58:10, 58:15
**controlled** [3] - 67:1, 67:4, 69:21
**conversation** [5] - 17:12, 20:5, 24:11, 36:17, 36:20
**convicted** [5] - 31:1, 56:12, 63:13, 63:22, 63:24
**conviction** [8] - 11:3, 11:19, 30:11, 30:12, 30:23, 56:17, 69:7, 69:11
**convictions** [5] - 10:19, 10:22, 31:18, 31:19, 61:3
**cooperate** [1] - 37:1
**cooperation** [1] - 28:13
**copy** [2] - 5:9, 5:18
**corner** [2] - 50:22, 60:7
**correct** [15] - 7:7, 7:8, 7:16, 7:19, 7:20,

7:21, 8:5, 22:9, 25:15, 32:9, 36:2, 36:3, 36:14, 47:5, 52:1
**corrected** [3] - 7:14, 8:24, 37:8
**correcting** [1] - 10:1
**correction** [1] - 9:4
**corrections** [7] - 4:9, 6:7, 8:20, 10:4, 10:6, 36:2, 36:10
**cost** [3] - 68:3, 69:12, 69:14
**counsel** [8] - 2:9, 6:5, 6:17, 16:21, 16:25, 58:11, 60:4, 69:10
**counsel's** [1] - 64:5
**count** [2] - 11:19, 18:21
**Count** [2] - 3:7, 66:4
**country** [2] - 15:9, 39:8, 65:1
**counts** [1] - 10:23, 70:7, 70:9
**couple** [4] - 8:19, 30:6, 43:4, 51:18
**course** [3] - 28:4, 31:17, 34:13
**COURT** [123] - 1:1, 1:9, 2:8, 2:13, 2:16, 2:22, 3:1, 3:5, 4:24, 5:3, 5:7, 5:12, 5:17, 5:23, 7:1, 7:9, 7:22, 8:2, 8:6, 8:12, 8:17, 9:7, 9:9, 9:20, 9:23, 9:25, 10:3, 11:23, 11:25, 14:1, 14:14, 14:24, 15:12, 15:22, 16:6, 16:9, 16:11, 17:5, 17:8, 17:14, 17:17, 17:22, 17:25, 19:5, 19:18, 19:22, 20:12, 20:21, 21:1, 21:10, 21:12, 22:5, 22:10, 22:12, 22:14, 22:17, 23:7, 23:9, 23:13, 23:23, 23:25, 24:2, 24:7, 24:16, 24:24, 25:5, 25:12, 25:16, 25:19, 26:6, 27:10, 27:25, 28:8, 28:12, 28:18, 29:1, 29:3, 29:10, 29:14, 29:19, 30:6, 30:25, 32:10, 32:19, 33:15, 34:6, 34:9, 35:1, 35:6, 35:8, 35:23, 36:4, 36:21, 37:15, 37:21, 38:8, 38:20, 38:22, 39:18, 41:2,

42:3, 46:6, 47:1,
48:3, 48:25, 49:2,
51:18, 51:21, 52:2,
52:5, 53:8, 53:11,
53:13, 54:6, 54:8,
69:18, 70:2, 70:5,
70:10, 70:16, 70:19,
70:21, 70:24
**Court** [58] - 1:22, 1:22,
2:2, 5:2, 10:5, 12:15,
12:16, 13:9, 16:24,
20:4, 20:10, 23:20,
24:9, 24:12, 24:23,
25:14, 27:16, 29:17,
32:3, 32:5, 32:8,
34:2, 34:13, 34:16,
35:17, 38:12, 40:17,
44:17, 44:18, 45:13,
47:16, 48:13, 48:15,
50:9, 53:9, 54:4,
55:16, 56:8, 60:21,
63:20, 64:8, 66:2,
66:12, 66:13, 67:6,
68:13, 68:17, 68:20,
68:25, 69:2, 69:5,
69:13, 69:23, 70:1,
70:15, 70:17, 71:17
**court** [4] - 3:16, 3:19,
30:19, 67:24
**Court's** [1] - 20:18
**court-issued** [1] - 3:19
**court-ordered** [1] -
67:24
**courtroom** [1] - 14:8
**COURTROOM** [4] -
2:2, 2:9, 5:16, 5:22
**courtrooms** [1] - 14:9
**courts** [1] - 32:5
**CPA** [1] - 66:16
**cracks** [1] - 5:19
**crazy** [1] - 43:24
**created** [2] - 29:18,
55:21
**creating** [1] - 14:5
**credentials** [1] - 3:20
**credible** [2] - 42:21,
43:2
**crime** [1] - 66:25
**crimes** [2] - 55:3, 62:5
**Criminal** [5] - 1:3, 2:3,
10:25, 11:12
**criminal** [16] - 6:13,
10:17, 10:19, 10:23,
41:3, 41:4, 50:17,
52:12, 55:2, 57:2,
61:3, 61:7, 62:5,
62:23, 68:10
**critical** [2] - 45:15,
62:6
**criticism** [1] - 31:12

**crossed** [1] - 61:6
**crowd** [10] - 13:23,
14:18, 26:17, 41:16,
49:2, 58:1, 58:2,
58:12, 62:22, 62:25
**cry** [1] - 65:1
**Crypt** [3] - 13:17,
59:15, 65:5
**current** [1] - 4:18
**custodial** [2] - 60:16,
63:20
**custodian** [1] - 52:6
**custody** [1] - 50:25

# D

**D.C** [17] - 1:6, 15:5,
16:2, 16:19, 17:4,
20:16, 46:1, 46:16,
47:19, 57:14, 57:20,
57:21, 58:25, 65:10,
66:17, 68:18
**dad** [1] - 39:3
**damage** [1] - 55:17
**damaged** [1] - 59:19
**damages** [1] - 55:20
**Daniel** [4] - 2:4, 2:24,
3:6, 66:2
**DANIEL** [1] - 1:5
**date** [4] - 9:20, 13:8,
17:19, 68:12
**Dated** [1] - 71:15
**days** [13] - 8:23, 9:1,
25:6, 64:10, 66:5,
66:7, 67:5, 67:12,
67:14, 68:12, 68:19,
69:5
**days'** [1] - 12:6
**December** [3] - 38:3,
38:19, 57:11
**decided** [3] - 23:16,
46:5, 49:11
**decides** [1] - 32:19
**deciding** [1] - 35:13
**decision** [5] - 32:21,
33:1, 44:24, 48:11,
57:10
**decisions** [1] - 39:10
**deemed** [1] - 3:21
**deeper** [1] - 64:21
**deeply** [2] - 39:4,
39:11
**defend** [2] - 18:8,
22:24
**Defendant** [2] - 1:6,
13:6
**defendant** [86] - 3:6,
4:16, 4:21, 8:2,
13:10, 13:12, 13:15,

13:19, 13:20, 13:22,
13:24, 14:18, 14:19,
15:3, 15:5, 16:5,
16:13, 17:12, 18:20,
19:14, 19:16, 20:5,
20:11, 20:19, 21:13,
21:14, 21:17, 21:19,
21:21, 22:3, 25:6,
25:21, 25:25, 26:16,
26:22, 27:6, 27:7,
27:12, 27:16, 29:20,
30:15, 30:18, 30:22,
31:8, 32:4, 32:9,
32:23, 32:24, 33:20,
33:24, 34:5, 34:13,
36:12, 36:23, 37:6,
37:13, 37:23, 38:6,
38:16, 38:18, 41:3,
41:6, 41:8, 41:12,
42:3, 51:22, 51:23,
52:10, 57:13, 57:17,
58:2, 58:5, 58:9,
59:7, 59:10, 59:15,
61:13, 61:16, 62:6,
62:9, 62:12, 63:22,
64:14, 65:3, 65:15
**DEFENDANT** [7] -
1:15, 3:4, 6:25, 8:11,
8:16, 53:15, 54:7
**Defendant's** [1] -
11:10
**defendant's** [17] -
4:17, 9:10, 9:12,
11:3, 27:18, 27:25,
28:9, 31:17, 32:10,
56:17, 58:16, 58:18,
60:17, 61:19, 64:4,
65:20, 68:9
**defendants** [16] -
5:25, 30:14, 30:17,
31:1, 31:4, 31:5,
32:6, 33:19, 33:21,
41:10, 41:13, 55:11,
63:21, 63:23, 63:24
**defendants'** [1] -
64:12
**Defender** [1] - 1:16
**defense** [24] - 4:24,
9:7, 11:23, 12:9,
16:15, 16:25, 18:11,
19:3, 19:12, 20:24,
21:1, 21:6, 21:24,
22:1, 22:7, 30:25,
33:5, 33:18, 34:19,
58:11, 60:4, 64:5,
69:18, 70:21
**defined** [1] - 69:6
**degree** [2] - 44:21,
56:3
**delete** [1] - 23:17

**demeanor** [1] - 61:25
**demonized** [1] - 62:15
**demonstrates** [1] -
37:3
**demonstrating** [2] -
31:6, 49:12
**denial** [1] - 3:20
**Department** [1] - 51:5
**department's** [2] -
8:14, 54:13
**DEPUTY** [4] - 2:2, 2:9,
5:16, 5:22
**deserves** [1] - 65:19
**designated** [2] -
67:15, 67:17
**despite** [1] - 23:2
**destroying** [1] - 60:19
**detection** [1] - 51:2
**detention** [9] - 9:2,
41:7, 64:11, 66:7,
67:18
**deter** [4] - 50:25, 55:2,
62:4, 62:9
**determination** [4] -
10:14, 11:21, 34:2,
35:21
**determinations** [1] -
7:7
**determine** [5] - 6:4,
6:10, 6:13, 10:11,
10:15
**determined** [2] - 67:6,
68:13
**determining** [3] -
13:9, 25:21, 55:25
**deterred** [1] - 45:13
**deterrence** [3] - 50:20,
51:9, 62:8
**deterring** [1] - 51:3,
51:10
**Detroit** [1] - 1:17
**devotion** [1] - 61:25
**die** [6] - 15:8, 42:4,
42:7, 43:16
**difference** [10] -
25:16, 31:9, 31:12,
31:15, 32:12, 33:6,
33:15, 35:9, 35:25,
36:1
**differences** [1] - 64:6
**different** [5] - 17:13,
23:3, 44:3, 49:6,
58:7
**differently** [1] - 35:22
**difficult** [7] - 31:8,
32:11, 33:6, 35:8,
37:15, 37:19, 48:11
**difficulties** [1] - 17:20
**difficulty** [1] - 40:16
**direct** [3] - 13:4,

26:23, 56:21
**directed** [1] - 67:20
**directing** [1] - 65:8
**directly** [1] - 6:18
**disagree** [2] - 21:3
**disassembled** [1] -
71:11
**disbursement** [1] -
66:13
**discern** [4] - 31:8,
32:11, 33:6, 35:8
**disclosed** [2] - 19:13,
40:17
**discretion** [1] - 68:2
**discussed** [1] - 7:25
**disengaged** [1] - 43:5
**disgusted** [2] - 43:9,
44:14
**dismiss** [2] - 70:6,
70:9
**dismissed** [5] - 9:13,
9:17, 9:18, 9:21,
61:10
**disorderly** [1] - 10:20
**disparities** [3] - 31:16,
33:17, 55:11
**disparity** [2] - 30:22,
63:19
**displayed** [1] - 64:24
**disposition** [1] - 32:24
**disregard** [1] - 20:21
**disrespect** [1] - 54:25
**disrupting** [1] - 57:4
**disruptive** [1] - 14:11
**distinguishes** [1] -
32:8
**DISTRICT** [3] - 1:1,
1:1, 1:9
**district** [1] - 68:24
**District** [4] - 1:16,
66:13, 68:17
**disturbing** [1] - 60:23
**divergent** [1] - 12:5
**diversionary** [1] - 9:18
**docket** [2] - 5:7, 5:12
**Docket** [1] - 5:15
**docketed** [13] - 4:3,
4:4, 4:7, 4:8, 4:10,
4:13, 4:14, 4:16,
4:19, 4:21, 7:18,
9:12, 38:2
**documents** [2] - 4:1,
4:22
**Donald** [5] - 42:23,
43:8, 44:7, 44:11,
45:9
**done** [7] - 18:19,
19:14, 33:24, 33:25,
35:16, 43:3, 55:17
**door** [3] - 13:13,

13:16, 13:17
**double** [1] - 47:11
**double-check** [1] -
47:11
**down** [10] - 16:1,
22:21, 41:1, 42:1,
50:13, 53:1, 60:1,
60:2, 65:18, 70:14
**Down** [2] - 48:20,
49:19
**Downstairs** [1] - 12:24
**drug** [3] - 61:9, 67:4,
67:6
**due** [1] - 68:10
**DUI** [3] - 10:19, 10:23,
61:4
**during** [6] - 6:24,
19:16, 28:4, 43:22,
58:22
**duty** [1] - 41:24

### E

**earshot** [1] - 26:21
**easiest** [1] - 23:20
**Eastern** [1] - 1:16
**easy** [1] - 45:17
**eat** [1] - 32:24
**ECF** [13] - 4:3, 4:5,
4:7, 4:8, 4:10, 4:13,
4:14, 4:17, 4:19,
4:21, 7:18, 9:12,
38:2
**echo** [1] - 62:13
**education** [1] - 67:22
**egregious** [2] - 12:19,
64:20
**eight** [1] - 30:13
**either** [3] - 10:4,
16:21, 25:24
**elected** [2] - 41:23,
49:8
**election** [9] - 15:20,
41:18, 42:4, 42:13,
42:19, 42:23, 43:13,
62:14, 62:18
**ELIZABETH** [1] - 71:4
**Elizabeth** [2] - 1:22,
71:16
**Email** [2] - 1:14, 1:18
**Emancipation** [1] -
64:22
**employed** [1] - 61:13
**employment** [1] -
67:22
**emulate** [2] - 49:21,
49:22
**encountered** [3] -
18:8, 22:23, 58:22

**end** [1] - 48:1
**endeavor** [1] - 56:8
**ended** [1] - 53:6
**enemies** [1] - 62:15
**enforcement** [2] -
57:3, 60:3
**engage** [7] - 44:6,
52:15, 56:21, 58:20,
60:22, 64:19, 65:4
**engaged** [3] - 13:8,
17:12, 64:16
**engaging** [4] - 45:14,
51:4, 60:18, 62:10
**enjoyment** [1] - 14:21
**ensure** [1] - 54:18
**entered** [3] - 13:12,
13:15, 38:6, 51:7,
57:17, 59:16, 65:5,
69:7
**entering** [5] - 3:8,
11:4, 23:15, 56:12,
69:10
**enters** [2] - 37:23,
69:5
**entire** [1] - 27:21
**entirely** [1] - 43:5
**entitled** [1] - 41:11
**entry** [2] - 3:20, 56:23
**episode** [1] - 56:22
**equal** [1] - 68:11
**equipment** [1] - 57:19
**equipped** [4] - 15:5,
57:6, 60:21, 64:15
**essence** [1] - 64:25
**establish** [1] - 66:21
**estimate** [2] - 55:17,
55:20
**ethic** [1] - 61:24
**evacuate** [1] - 13:5
**evacuated** [1] - 59:9
**eval** [1] - 35:7
**evaluating** [3] - 21:12,
37:22, 38:9
**evaluation** [3] - 33:24,
35:15, 37:16
**evasive** [2] - 46:25,
47:17
**EVE** [81] - 1:11, 2:11,
2:15, 2:19, 4:23, 7:8,
7:21, 9:6, 10:2,
11:22, 12:14, 14:12,
14:16, 15:2, 15:14,
15:24, 16:8, 16:10,
16:18, 17:7, 17:9,
17:16, 17:20, 17:24,
18:13, 19:10, 19:21,
20:3, 20:14, 20:24,
21:9, 21:11, 22:1,
22:9, 22:11, 22:13,
22:16, 23:6, 23:8,

23:12, 23:19, 23:24,
24:1, 24:6, 24:9,
24:18, 25:3, 25:8,
25:15, 25:18, 26:5,
26:13, 27:20, 28:2,
28:11, 28:16, 28:22,
29:16, 30:5, 30:24,
32:1, 32:15, 33:14,
33:23, 34:8, 34:12,
35:5, 35:7, 35:15,
36:3, 36:17, 37:11,
37:19, 38:7, 38:11,
38:21, 69:17, 70:8,
70:13, 70:17, 70:20
**Eve** [2] - 2:21, 47:6
**event** [4] - 27:15,
39:17, 40:15, 51:15
**events** [2] - 56:20,
61:20
**evidence** [10] - 4:12,
18:3, 20:10, 27:21,
29:23, 34:1, 34:16,
35:16, 58:6, 59:16
**examination** [1] - 60:5
**examined** [1] - 28:1
**except** [1] - 67:22
**exchanged** [1] - 57:12
**exciting** [1] - 27:15
**excuse** [1] - 48:23
**excused** [2] - 70:24,
70:25
**execute** [1] - 68:25
**executed** [1] - 21:18
**exhibit** [1] - 5:6
**Exhibit** [3] - 13:22,
27:23, 27:24
**Exhibits** [1] - 27:17
**exhibits** [1] - 10:9
**exhortation** [1] - 57:18
**exit** [1] - 23:16
**exited** [1] - 65:7
**expectations** [1] -
66:22
**experience** [1] - 44:20
**explain** [3] - 6:21,
38:18, 54:10
**explains** [1] - 48:12
**expressed** [2] - 36:12,
36:25
**expressly** [1] - 47:3
**extended** [4] - 31:5,
37:25, 47:23, 51:24
**extra** [1] - 5:9
**extractions** [1] - 28:6
**eyebrows** [1] - 45:17

### F

**Facebook** [19] - 14:17,

14:22, 27:16, 27:22,
42:15, 42:17, 42:25,
43:6, 43:12, 43:19,
46:3, 50:7, 50:8,
50:10, 50:14, 57:12,
57:25, 65:5
**facilitate** [1] - 57:2
**facility** [4] - 7:13, 7:16,
67:15, 67:16
**facing** [2] - 41:9
**fact** [17] - 10:8, 13:6,
16:12, 17:15, 21:9,
23:2, 26:18, 30:1,
32:15, 34:6, 34:9,
37:6, 46:19, 52:6,
56:1, 62:20
**factor** [8] - 13:7,
14:22, 25:20, 26:13,
27:2, 35:20, 37:3,
65:14
**factors** [6] - 12:3,
13:11, 49:11, 54:16,
58:20, 65:24
**factual** [5] - 6:6, 7:6,
8:3, 10:5, 16:11
**fair** [1] - 28:22
**fairly** [1] - 61:13
**fall** [1] - 40:11
**familiar** [1] - 49:4
**families** [1] - 53:21
**family** [7] - 6:2, 39:8,
51:11, 51:24, 53:22,
62:1
**far** [2] - 23:19, 41:10
**farfetched** [1] - 43:24
**favor** [1] - 60:16
**FBI** [7] - 17:6, 17:17,
27:19, 29:12, 43:17,
45:1, 51:5
**FCRR** [3] - 1:22, 71:4,
71:16
**February** [1] - 7:5
**Federal** [1] - 1:16
**federal** [3] - 6:10,
6:11, 66:24
**feed** [2] - 42:18, 42:25
**felony** [2] - 47:24, 48:1
**felt** [2] - 40:1, 43:10
**few** [3] - 45:1, 58:7,
61:3
**fiction** [1] - 41:24
**fight** [1] - 57:18
**figure** [1] - 60:9
**file** [3] - 5:13, 69:4,
69:13
**filed** [4] - 5:5, 5:14, 7:4
**filing** [4] - 4:9, 36:14,
37:9, 51:21
**filings** [1] - 54:16
**final** [2] - 7:3, 8:4

**Financial** [1] - 66:15
**financial** [6] - 40:25,
68:5, 68:6, 68:7,
68:16, 68:21
**findings** [1] - 10:8
**fine** [5] - 11:17, 23:25,
30:16, 41:15, 70:15
**first** [7] - 6:4, 7:2,
37:25, 50:17, 59:3,
59:5, 67:14
**First** [1] - 41:15
**Fitzharris** [12] - 2:24,
7:24, 8:13, 17:11,
18:17, 19:11, 20:17,
22:2, 24:11, 36:18,
38:23, 54:9
**FITZHARRIS** [35] -
1:15, 2:23, 4:25, 5:4,
5:10, 5:14, 8:1, 8:5,
9:8, 9:15, 9:22, 9:24,
11:24, 28:24, 29:2,
29:4, 29:11, 39:1,
39:19, 42:2, 42:10,
46:8, 47:5, 48:4,
49:1, 49:17, 51:20,
52:1, 52:4, 52:17,
53:9, 53:12, 69:19,
70:4, 70:22
**five** [4] - 4:11, 12:15,
63:16, 63:18
**fix** [1] - 56:8
**flag** [2] - 64:22, 64:25
**flak** [10] - 15:5, 15:13,
15:21, 15:22, 15:23,
16:7, 18:5, 26:1,
46:6, 57:6
**focus** [1] - 52:5
**follow** [2] - 63:1, 67:16
**followed** [3] - 11:15,
41:16, 63:15
**follower** [1] - 62:23
**following** [6] - 42:13,
57:8, 63:3, 66:14,
66:20, 67:9
**follows** [2] - 10:16,
68:11
**footage** [4] - 27:10,
27:11, 28:18, 29:19
**FOR** [3] - 1:1, 1:11,
1:15
**force** [1] - 59:4
**Ford** [1] - 66:16
**foregoing** [1] - 71:5
**forensic** [1] - 60:5
**forever** [1] - 39:9
**forgiveness** [1] - 54:4
**form** [1] - 62:9
**former** [3] - 15:16,
36:18, 57:18
**forward** [1] - 2:13

**four** [1] - 6:3
**frankly** [3] - 47:25, 51:12, 53:5
**friend** [1] - 5:5
**friends** [2] - 44:7, 51:11
**front** [4] - 15:18, 27:12, 51:16, 59:6
**frustrated** [2] - 21:5, 43:11
**fucking** [3] - 12:24, 13:3, 49:7
**full** [3] - 60:11, 68:21, 71:6
**fully** [2] - 8:9, 56:18
**fun** [2] - 53:5, 53:7
**fundamental** [1] - 54:25
**future** [3] - 3:20, 55:3, 62:11

## G

**gap** [1] - 48:12
**garden** [1] - 56:22
**garden-variety** [1] - 56:22
**gassed** [1] - 23:15
**gear** [5] - 18:7, 22:22, 58:22, 60:22, 64:16
**general** [2] - 58:1, 61:25
**generally** [1] - 60:16
**gesture** [1] - 58:3
**given** [11] - 20:8, 21:9, 24:11, 25:21, 28:20, 30:14, 30:17, 31:20, 35:17, 37:14, 44:18
**goggles** [2] - 57:6, 57:20
**GOVERNMENT** [1] - 1:11
**government** [58] - 2:10, 4:22, 6:5, 6:16, 7:6, 7:10, 7:11, 7:13, 7:15, 7:17, 9:5, 9:25, 11:21, 12:6, 12:13, 16:13, 18:16, 18:22, 18:24, 20:9, 20:23, 21:3, 21:6, 23:2, 24:4, 25:2, 25:23, 27:4, 30:8, 30:11, 31:6, 31:13, 31:23, 32:19, 33:1, 33:7, 33:12, 34:12, 34:15, 34:18, 35:13, 36:11, 36:13, 37:8, 37:16, 37:25, 38:5, 38:8, 38:15, 47:23, 49:10,

49:15, 55:22, 59:5, 69:16, 70:6, 70:9, 70:12
**Government** [2] - 27:23, 27:24
**government's** [31] - 4:6, 4:9, 4:12, 4:14, 17:5, 19:2, 19:15, 19:19, 19:24, 21:8, 21:23, 22:18, 22:25, 23:5, 25:17, 26:3, 26:8, 26:11, 30:3, 30:20, 31:11, 32:13, 32:21, 32:23, 34:10, 35:2, 35:4, 36:6, 36:10, 38:2, 47:2
**Government's** [1] - 13:22
**grandfather** [1] - 4:18
**granted** [1] - 70:10
**great** [1] - 48:23
**greater** [1] - 54:19
**grounds** [4] - 3:8, 11:5, 11:8, 56:13
**groups** [1] - 40:1
**grows** [1] - 30:9
**guess** [1] - 24:20
**guideline** [9] - 10:13, 11:2, 11:5, 11:8, 11:11, 11:17, 11:21, 12:7, 63:17
**guidelines** [7] - 6:10, 6:12, 6:14, 10:11, 10:15, 47:25, 55:6
**guilty** [6] - 3:7, 32:4, 32:17, 55:12, 69:11
**Gumiel** [1] - 5:21
**gun** [1] - 31:21
**guy** [1] - 31:21

## H

**H2-205B** [1] - 66:17
**half** [1] - 14:6
**Hall** [1] - 64:22
**hand** [2] - 12:9, 39:6
**happy** [2] - 44:6, 45:4
**hard** [6] - 31:12, 37:15, 49:15, 52:13, 53:4, 57:14
**hat** [1] - 58:2
**headed** [1] - 13:16
**health** [1] - 67:23
**hear** [6] - 6:16, 28:25, 32:13, 38:22, 53:13, 62:21
**heard** [5] - 12:24, 45:25, 46:1, 57:13, 58:7

**HEARING** [1] - 1:8
**hearing** [11] - 3:11, 3:14, 6:24, 10:4, 10:11, 12:1, 30:2, 36:9, 43:7, 54:14, 56:16
**hearings** [4] - 3:21, 3:23, 6:1, 6:3
**held** [2] - 3:11, 3:17
**help** [4] - 14:20, 37:5, 40:10, 65:21
**helped** [1] - 57:2
**helpful** [3] - 30:8, 61:25, 64:7
**helping** [1] - 39:6
**hereby** [2] - 66:3, 71:4
**Herendeen** [45] - 2:4, 2:24, 3:3, 5:6, 5:23, 8:7, 9:17, 10:18, 12:21, 17:25, 18:4, 22:19, 22:21, 25:9, 26:7, 35:3, 36:7, 39:2, 39:20, 40:3, 40:6, 42:13, 44:3, 45:3, 45:24, 46:15, 47:2, 47:17, 47:23, 48:14, 48:18, 49:17, 49:23, 50:6, 53:13, 53:14, 54:6, 54:8, 55:3, 55:9, 56:20, 57:11, 63:3, 66:3
**HERENDEEN** [1] - 1:5
**Herendeen's** [14] - 23:10, 23:18, 23:21, 29:5, 31:3, 31:10, 32:13, 35:10, 44:21, 44:24, 56:12, 57:2, 69:22
**hero** [1] - 49:18
**heroes** [1] - 61:18
**hiding** [4] - 13:2, 49:7, 58:9, 60:25
**high** [1] - 40:16
**highlighted** [1] - 34:2
**highlights** [1] - 62:8
**highly** [1] - 50:18
**himself** [4] - 18:9, 22:24, 48:18, 49:18
**History** [3] - 10:25, 11:12
**history** [10] - 6:13, 10:17, 10:23, 39:10, 39:11, 39:17, 40:23, 55:8, 61:2, 61:21
**hoisted** [1] - 64:23
**holding** [3] - 27:8, 27:12, 28:19
**home** [5] - 9:2, 52:8, 64:11, 66:7, 67:18
**Honor** [77] - 2:5, 2:11,

2:23, 4:23, 4:25, 5:10, 6:25, 7:8, 7:21, 8:1, 8:11, 8:16, 9:6, 9:8, 9:15, 9:22, 10:2, 11:22, 11:24, 12:14, 13:4, 15:2, 15:15, 16:8, 16:18, 17:10, 17:16, 17:20, 17:24, 18:13, 19:21, 20:3, 20:25, 21:9, 22:2, 22:9, 23:6, 23:12, 23:19, 23:24, 24:6, 24:10, 24:19, 25:15, 26:13, 27:20, 28:2, 28:17, 28:23, 28:24, 29:4, 29:16, 30:24, 32:1, 32:15, 33:14, 33:23, 34:12, 35:5, 35:7, 35:15, 37:11, 38:7, 38:11, 38:21, 39:1, 42:10, 47:6, 52:17, 53:12, 53:16, 54:7, 69:17, 69:19, 70:8, 70:13, 70:23
**HONORABLE** [1] - 1:8
**hopes** [2] - 39:18, 39:19
**hoping** [2] - 53:4, 53:5
**horrible** [1] - 51:15
**hours** [2] - 12:8, 12:10, 70:18
**House** [15] - 36:23, 37:7, 42:16, 43:10, 44:10, 44:25, 45:7, 48:20, 49:19, 59:17, 60:2, 60:10, 65:17, 65:18, 66:16
**HOWELL** [1] - 1:8
**hundreds** [1] - 51:6

## I

**i.e** [1] - 35:10
**idea** [2] - 49:4, 50:24
**identifiable** [1] - 55:17
**ignore** [1] - 23:21
**images** [1] - 27:7
**imagine** [1] - 44:17
**immediately** [1] - 68:16
**immunize** [1] - 62:23
**impact** [2] - 40:8, 40:9
**impacted** [1] - 44:22
**important** [13] - 16:12, 17:15, 21:17, 21:20, 27:2, 43:4, 44:1, 44:12, 44:25, 45:12, 48:13, 65:14
**impose** [8] - 6:22,

7:17, 54:11, 54:18, 70:15, 70:17
**imposed** [10] - 30:9, 31:20, 54:22, 62:4, 63:21, 65:24, 66:21, 69:2, 69:8, 69:15
**imprecision** [1] - 47:14
**imprisonment** [7] - 11:14, 11:15, 30:20, 31:2, 63:14, 63:15, 69:3
**incapable** [1] - 37:20
**incarceration** [7] - 12:7, 25:22, 30:14, 30:21, 63:25, 64:1, 64:10
**incite** [2] - 59:21, 64:23
**include** [4] - 8:23, 24:12, 54:21, 66:23
**included** [3] - 19:2, 21:15, 25:10
**includes** [2] - 67:2, 68:24
**including** [13] - 3:17, 3:19, 23:3, 23:14, 30:18, 34:1, 39:24, 41:23, 52:2, 58:22, 61:23, 64:9, 64:22
**incorrect** [2] - 39:24, 47:4
**incorrectly** [1] - 7:12
**increase** [1] - 7:12
**incred** [1] - 40:1
**incredibly** [1] - 48:17
**increments** [1] - 66:6
**indeed** [3] - 19:11, 36:15, 37:10
**indicated** [7] - 14:17, 15:10, 16:20, 18:18, 19:1, 20:7, 38:12
**indictment** [3] - 3:7, 32:25, 66:4
**individual** [1] - 20:6
**individuals** [1] - 14:18
**ineffective** [1] - 69:10
**information** [15] - 10:1, 16:17, 19:2, 19:13, 20:22, 29:12, 30:2, 32:25, 34:3, 34:25, 37:13, 68:5, 68:6, 68:7, 69:9
**informed** [1] - 22:3
**initial** [1] - 33:1
**inside** [15] - 12:21, 13:21, 13:23, 27:7, 27:14, 46:21, 57:8, 58:1, 59:14, 59:19, 59:21, 59:22, 60:19,

60:24, 64:20
**installments** [1] -
68:11
**intend** [1] - 54:2
**intended** [3] - 18:7,
19:12, 22:22
**intentional** [1] - 49:14
**intentionally** [1] -
47:17
**interchange** [1] -
58:11
**interest** [5] - 43:7,
44:9, 65:12, 68:14
**interesting** [1] - 50:16
**interfering** [1] - 14:4
**intermittent** [7] - 8:23,
9:2, 64:2, 64:9, 66:6,
67:12, 67:13
**interruption** [2] -
13:25, 14:23
**Interview** [3] - 23:18,
23:21, 47:2
**interview** [14] - 17:6,
17:19, 18:1, 20:22,
22:18, 23:10, 23:11,
23:13, 26:7, 35:3,
36:7, 38:18, 47:6,
47:11
**interviewed** [1] -
65:16
**interviews** [1] - 65:18
**investigating** [3] -
36:24, 37:7, 65:21
**investigation** [12] -
4:3, 6:6, 7:3, 7:25,
8:14, 8:20, 9:9,
10:14, 10:18, 28:5,
54:14, 68:23
**investigators** [1] -
60:1
**invigorate** [1] - 64:23
**invited** [1] - 12:2
**involved** [8] - 40:23,
41:4, 43:21, 46:2,
53:24, 54:3, 54:5,
63:7
**involvement** [2] -
39:25, 41:1
**involving** [1] - 30:11
**issue** [2] - 33:5, 69:19
**issued** [1] - 3:19
**issues** [1] - 55:25
**itemizing** [1] - 4:12
**items** [2] - 25:9, 60:19
**itself** [2] - 51:8, 65:1

### J

**jacket** [13] - 15:6,

15:10, 15:13, 15:21,
15:22, 15:23, 16:7,
18:5, 26:1, 34:21,
57:6, 57:20
**jail** [2] - 51:14, 61:5
**January** [30] - 12:21,
21:13, 21:20, 24:14,
24:22, 25:7, 25:8,
26:9, 30:10, 37:2,
37:14, 40:15, 41:14,
42:11, 44:13, 52:18,
52:19, 52:25, 54:24,
56:19, 58:19, 59:24,
60:9, 62:3, 62:8,
62:20, 63:21, 63:24,
64:13
**job** [1] - 15:4
**joined** [2] - 39:3, 57:8
**joke** [1] - 43:18
**judge** [4] - 3:22,
50:21, 62:7, 62:22
**JUDGE** [1] - 1:9
**judgment** [3] - 66:2,
68:12, 69:5
**juggling** [1] - 24:21
**June** [1] - 7:15
**Justice** [1] - 51:5
**justice** [2] - 41:4, 61:7

### K

**Kathy** [1] - 66:16
**keep** [1] - 2:18
**kids** [1] - 57:5
**kind** [8] - 39:5, 43:24,
45:7, 45:18, 46:2,
50:2, 50:24, 62:10
**knife** [2] - 21:15, 57:7
**knives** [1] - 46:5
**knowing** [1] - 51:14
**knows** [2] - 21:24,
47:20
**Koslofsky** [2] - 5:4,
61:24

### L

**large** [2] - 28:5, 58:1
**last** [5] - 6:21, 12:17,
12:18, 14:4, 18:3
**lastly** [1] - 6:17
**lasts** [1] - 12:22
**late** [2] - 38:16, 38:19
**law** [9] - 5:17, 50:17,
54:24, 55:1, 57:3,
60:3, 60:15, 69:24
**lawyers** [1] - 49:24
**leading** [1] - 42:23,

62:14
**learning** [1] - 30:1
**least** [4] - 48:12,
49:25, 65:6, 67:5
**leave** [2] - 49:13, 65:8
**leaves** [1] - 15:6
**leaving** [1] - 57:5
**left** [4] - 2:25, 46:16,
50:11, 52:18
**legal** [1] - 52:6
**legitimate** [1] - 33:5
**lend** [1] - 39:6
**less** [2] - 60:20, 62:16
**less-troublesome** [1]
- 60:20
**letter** [13] - 4:17, 4:18,
5:1, 5:3, 5:4, 5:11,
6:18, 19:11, 38:24,
53:14, 53:17, 61:16,
61:19
**letters** [1] - 61:22
**level** [4] - 7:12, 11:6,
11:11, 16:3
**levels** [2] - 11:6, 11:9
**liability** [1] - 62:23
**lie** [1] - 41:17
**lied** [1] - 37:16
**lies** [1] - 42:6
**life** [1] - 48:8
**lifetime** [1] - 41:9
**lifted** [1] - 58:10
**light** [2] - 19:15, 29:3
**likely** [1] - 60:25
**limit** [1] - 11:17
**limited** [5] - 18:23,
28:12, 55:18, 59:23
**limits** [1] - 22:7
**line** [6] - 3:12, 3:15,
14:1, 14:3, 14:5,
14:10
**lining** [1] - 40:19
**listed** [1] - 4:11
**listen** [2] - 3:13, 43:23
**listened** [1] - 45:18
**listening** [1] - 3:14
**lives** [2] - 51:23, 52:20
**Lives** [1] - 43:22
**living** [1] - 43:25
**local** [2] - 39:23, 66:25
**locate** [1] - 27:22
**location** [2] - 35:19,
67:19, 68:1
**location-monitoring**
[1] - 68:1
**logged** [1] - 42:25
**look** [9] - 5:7, 31:18,
31:23, 32:5, 37:21,
49:13, 58:16, 58:19
**looked** [2] - 61:22,

63:10
**looking** [3] - 19:19,
49:3, 49:8
**looks** [2] - 27:13, 39:5
**loss** [2] - 40:25, 66:17
**losses** [1] - 56:1
**Loth** [2] - 1:22, 71:16
**LOTH** [1] - 71:4

### M

**machine** [1] - 1:24
**majority** [2] - 31:1,
63:23
**man** [3] - 23:15, 41:20,
50:21
**manage** [2] - 40:14,
40:16
**mandated** [1] - 57:1
**Mandatory** [1] - 56:5
**mandatory** [3] - 56:7,
66:20, 66:23
**manner** [1] - 71:12
**March** [2] - 5:15, 9:24
**marched** [1] - 59:7
**marijuana** [3] - 67:2,
69:24, 69:25
**mark** [4] - 12:23,
39:11, 40:23, 54:1
**mask** [2] - 2:17, 18:5
**matter** [3] - 2:2, 7:4,
61:9
**Matter** [1] - 43:22
**maximum** [4] - 11:17,
63:13, 63:16, 69:3
**mean** [7] - 7:10, 21:5,
32:10, 44:16, 45:24,
48:9, 49:18
**meaning** [1] - 35:9
**means** [1] - 65:8
**meant** [1] - 50:2
**measure** [1] - 64:15
**media** [9] - 3:19, 29:8,
29:12, 43:5, 43:7,
43:25, 44:4, 59:23,
62:13
**medical** [3] - 67:23,
69:24, 69:25
**meet** [1] - 44:24
**meeting** [1] - 56:25
**Members** [1] - 26:19
**members** [15] - 6:2,
13:4, 18:8, 22:23,
26:18, 49:3, 49:8,
53:20, 56:25, 58:15,
58:17, 60:25, 63:11,
65:13
**memo** [24] - 4:7, 5:11,
7:18, 9:12, 17:5,

17:23, 18:11, 19:25,
20:23, 22:18, 23:1,
23:3, 23:5, 26:8,
30:3, 30:25, 32:11,
35:4, 35:25, 36:1,
36:5, 36:6, 36:12,
47:2
**memoranda** [2] - 4:16,
54:13
**memorandum** [8] -
4:8, 4:20, 18:17,
18:25, 19:3, 19:15,
19:20, 45:7
**mental** [2] - 48:10,
67:23
**mentioned** [1] - 57:13
**mentions** [1] - 19:23
**mere** [2] - 49:12,
52:11
**merely** [1] - 56:23
**messages** [1] - 57:12
**met** [4] - 36:23, 37:6,
38:15, 42:16
**MI** [1] - 1:17
**Michigan** [7] - 1:16,
15:6, 51:23, 51:24,
52:19, 57:5, 69:24
**microphone** [1] - 2:12
**midst** [1] - 15:3
**might** [4] - 28:20,
41:21, 57:14
**military** [1] - 15:10
**military-style** [1] -
15:10
**million** [1] - 55:21
**minimal** [1] - 36:13
**minimized** [1] - 18:2
**minor** [3] - 52:2, 52:7,
52:14
**minutes** [6] - 13:14,
27:13, 59:3, 59:8,
64:14
**misdemeanor** [19] -
3:10, 6:11, 11:19,
31:2, 31:3, 31:13,
31:18, 33:4, 33:9,
33:19, 35:11, 35:14,
35:21, 35:22, 48:6,
56:15, 63:13, 63:22,
63:24
**misdemeanors** [2] -
6:12, 32:3
**misevaluated** [1] -
49:16
**misinformation** [1] -
62:17
**misled** [1] - 43:11
**missed** [1] - 4:1
**mitigating** [1] - 65:14
**mob** [4] - 26:21, 49:8,

57:8, 58:19
**moment** [7] - 15:8, 39:10, 48:19, 49:25, 57:10, 58:3, 59:8
**moments** [1] - 14:12
**monetary** [1] - 68:10
**monitoring** [3] - 67:20, 68:1, 68:3
**month** [1] - 53:1
**monthly** [1] - 68:11
**months** [10] - 8:22, 8:25, 9:2, 12:8, 38:4, 60:6, 64:10, 66:3, 66:7, 67:19
**months'** [5] - 11:14, 12:10, 12:12, 61:6, 64:8
**morning** [8] - 2:23, 3:2, 3:3, 3:4, 3:5, 3:25, 30:18, 53:15
**most** [6] - 13:7, 27:2, 52:21, 57:19, 63:23
**mostly** [1] - 33:21
**mother** [3] - 4:18, 52:2, 52:20
**mothers** [1] - 62:25
**motion** [2] - 70:6, 70:10
**move** [2] - 41:5, 41:12
**moves** [1] - 70:9
**movie** [2] - 49:4, 58:10
**MS** [114] - 2:11, 2:15, 2:19, 2:23, 4:23, 4:25, 5:4, 5:10, 5:14, 7:8, 7:21, 8:1, 8:5, 9:6, 9:8, 9:15, 9:22, 9:24, 10:2, 11:22, 11:24, 12:14, 14:12, 14:16, 15:2, 15:14, 15:24, 16:8, 16:10, 16:18, 17:7, 17:9, 17:16, 17:20, 17:24, 18:13, 19:10, 19:21, 20:3, 20:14, 20:24, 21:9, 21:11, 22:1, 22:9, 22:11, 22:13, 22:16, 23:6, 23:8, 23:12, 23:19, 23:24, 24:1, 24:6, 24:9, 24:18, 25:3, 25:8, 25:15, 25:18, 26:5, 26:13, 27:20, 28:2, 28:11, 28:16, 28:22, 28:24, 29:2, 29:4, 29:11, 29:16, 30:5, 30:24, 32:1, 32:15, 33:14, 33:23, 34:8, 34:12, 35:5, 35:7, 35:15, 36:3, 36:17, 37:11, 37:19, 38:7,

38:11, 38:21, 39:1, 39:19, 42:2, 42:10, 46:8, 47:5, 48:4, 49:1, 49:17, 51:20, 52:1, 52:4, 52:17, 53:9, 53:12, 69:17, 69:19, 70:4, 70:8, 70:13, 70:17, 70:20, 70:22
**must** [14] - 7:14, 54:16, 55:5, 66:24, 67:1, 67:3, 67:4, 67:7, 67:12, 67:15, 67:18, 68:2, 68:4, 69:4

## N

**names** [1] - 2:10
**nation** [6] - 15:8, 42:5, 42:7, 43:17, 53:24, 54:1
**nation's** [5] - 39:11, 39:17, 40:23, 52:15, 61:21
**nature** [3] - 55:7, 56:11, 60:13
**Navy** [1] - 16:3
**necessarily** [1] - 49:21
**necessary** [2] - 3:21, 54:19
**need** [17] - 6:8, 9:14, 15:21, 21:8, 28:25, 52:13, 54:21, 55:10, 55:12, 56:3, 56:8, 58:8, 60:14, 62:4, 62:8, 63:19
**needed** [2] - 18:8, 22:23
**needs** [3] - 8:24, 45:13, 63:15
**negotiated** [2] - 32:1, 32:16
**neighbor** [1] - 39:5
**neighbors** [1] - 62:1
**never** [3] - 25:13, 45:25, 46:22
**new** [1] - 69:8
**news** [3] - 39:24, 42:17, 42:20
**NEWTON** [1] - 1:20
**Newton** [1] - 2:6
**next** [1] - 57:15
**night** [1] - 42:23
**none** [2] - 14:14, 19:13
**normally** [1] - 16:1
**Northwest** [1] - 68:18
**Nos** [1] - 4:19
**notable** [1] - 44:16

**note** [2] - 9:13, 13:12
**noted** [2] - 10:7, 69:16
**notes** [4] - 16:20, 16:21, 47:10, 71:6
**nothing** [5] - 19:18, 19:22, 22:8, 22:14, 50:2
**notice** [1] - 5:5
**notify** [1] - 68:19
**notoriety** [2] - 39:22, 51:1
**null** [1] - 71:10
**number** [3] - 5:12, 28:5, 47:24

## O

**objected** [1] - 10:13
**objection** [6] - 7:10, 7:17, 7:19, 9:4, 10:1, 10:4
**objections** [7] - 6:5, 6:7, 6:8, 7:6, 8:3, 11:20, 69:15
**obligation** [1] - 68:21
**obligations** [2] - 67:24, 68:16
**observation** [1] - 33:6
**observed** [1] - 13:1
**obvious** [1] - 29:23
**occurred** [6] - 7:13, 11:7, 13:14, 37:2, 37:5, 59:6
**October** [1] - 38:17
**OF** [3] - 1:1, 1:3, 1:8
**off-the-record** [8] - 18:18, 18:19, 19:4, 19:8, 19:12, 19:16, 22:11, 33:25
**offense** [39] - 6:13, 7:11, 10:21, 10:23, 11:5, 11:6, 11:7, 11:9, 11:11, 21:13, 30:22, 31:7, 31:10, 31:14, 31:19, 31:24, 33:2, 33:3, 33:8, 33:12, 33:21, 35:10, 35:13, 49:12, 52:9, 52:10, 52:12, 52:15, 54:23, 55:2, 55:8, 55:13, 56:12, 56:18, 60:14, 60:15, 61:10, 69:11
**offenses** [1] - 10:19
**offer** [22] - 31:14, 31:24, 31:25, 32:20, 32:21, 32:22, 33:8, 33:9, 33:13, 34:4, 38:1, 38:3, 38:12,

38:14, 47:21, 47:22, 48:3, 48:4, 48:6
**offers** [3] - 31:5, 35:14
**Office** [7] - 66:15, 66:16, 67:21, 67:25, 68:2, 68:8, 68:24
**office** [5] - 4:4, 12:11, 41:23, 68:6, 68:22
**office's** [1] - 4:2
**Office/PA** [1] - 1:12
**Officer** [3] - 1:20, 2:5, 66:15
**officer** [4] - 40:12, 59:18, 68:4
**officers** [5] - 14:19, 14:20, 15:4, 44:20, 56:22
**offices** [1] - 59:16
**official** [1] - 71:17
**Official** [1] - 1:22
**often** [1] - 39:14
**Ohm** [2] - 45:19, 45:20
**omitted** [1] - 23:11
**once** [3] - 5:19, 39:17, 43:13
**once-in-our-nation's-history** [1] - 39:17
**one** [48] - 5:1, 10:19, 10:20, 10:24, 14:9, 14:12, 15:7, 16:11, 17:20, 18:21, 19:1, 21:24, 23:3, 26:13, 26:14, 27:3, 30:15, 32:2, 33:11, 35:20, 37:8, 37:21, 38:1, 39:13, 39:18, 39:19, 40:5, 41:9, 44:16, 45:6, 46:17, 46:19, 46:20, 46:23, 48:22, 48:24, 50:10, 59:2, 59:22, 61:1, 61:23, 63:14, 63:16, 64:6, 65:6, 66:24, 67:4
**ones** [1] - 49:20
**open** [1] - 70:7
**opinion** [1] - 15:20
**opportunity** [1] - 18:21
**opposed** [2] - 32:2, 41:7
**opposite** [1] - 53:19
**orally** [1] - 6:19
**order** [3] - 55:23, 59:10, 68:25
**Order** [1] - 3:16
**ordered** [2] - 66:8, 66:10, 67:24
**Oregon** [1] - 43:22
**original** [5] - 4:6, 5:11, 35:6, 35:25, 36:5

**outside** [2] - 50:22, 64:23
**outstanding** [1] - 38:4
**outweighed** [1] - 56:4
**overall** [1] - 58:18
**overt** [1] - 56:21
**overwhelmed** [1] - 57:3
**overwhelming** [1] - 35:20
**own** [1] - 14:21

## P

**p.m** [5] - 13:15, 13:16, 59:6, 59:8, 71:1
**PA** [1] - 1:13
**packed** [2] - 18:4, 46:15
**page** [4] - 9:12, 17:22, 22:17, 32:11
**pages** [2] - 36:8
**paid** [1] - 68:21
**pandemic** [1] - 14:7
**pans** [1] - 13:22, 14:18
**papers** [1] - 8:15
**parading** [2] - 31:6, 49:12
**paragraph** [7] - 7:14, 8:21, 9:10, 9:14, 10:1, 22:20, 22:21
**paragraphs** [2] - 10:7, 19:1
**parent** [1] - 52:21
**parenting** [1] - 40:16
**parse** [1] - 23:22
**part** [4] - 16:12, 47:1, 49:11, 51:15
**participant** [1] - 59:12
**participants** [1] - 56:20
**participated** [1] - 39:16
**participating** [1] - 58:4
**participation** [1] - 39:24
**particular** [3] - 13:12, 35:18, 60:17
**particularly** [2] - 12:19, 15:12
**parties** [3] - 10:13, 12:1, 56:10
**parties'** [1] - 54:12
**party** [1] - 71:12
**passed** [1] - 38:13
**past** [1] - 40:2
**paths** [1] - 61:7
**pay** [5] - 63:4, 66:8,

68:2, 68:9, 68:14
**payable** [1] - 68:16
**payment** [3] - 55:16, 68:10, 68:11
**payments** [1] - 66:12
**PECHMAN** [1] - 1:15
**penalties** [3] - 41:10, 68:10, 68:15
**penalty** [1] - 61:1
**pending** [2] - 9:11, 40:8
**people** [28] - 13:24, 15:3, 16:1, 39:2, 39:16, 41:22, 42:18, 42:19, 43:11, 44:22, 45:20, 49:13, 49:23, 50:3, 50:11, 51:3, 51:7, 51:10, 53:19, 56:22, 58:12, 59:21, 61:18, 61:19, 62:15, 63:3, 63:4, 65:2
**perfectly** [1] - 41:14
**perform** [1] - 57:1
**perhaps** [1] - 5:2
**period** [9] - 9:18, 11:15, 25:22, 30:14, 30:21, 52:22, 63:25, 67:18, 69:3
**periodic** [1] - 67:6
**periodically** [1] - 14:6
**periods** [4] - 9:1, 64:1, 64:9, 67:13
**permission** [1] - 69:13
**permitted** [1] - 22:24
**person** [8] - 3:11, 10:21, 20:7, 33:8, 42:4, 43:17, 59:18
**personal** [3] - 39:23, 43:23, 48:8
**persons** [1] - 3:13
**petty** [12] - 31:7, 31:9, 31:14, 31:19, 31:24, 33:3, 33:8, 33:12, 33:21, 35:10, 35:13, 49:12
**Philadelphia** [1] - 1:13
**phone** [10] - 27:12, 27:18, 27:25, 28:9, 28:15, 29:5, 48:15, 50:8, 60:4, 65:6
**phones** [1] - 28:3
**photocopied** [1] - 71:11
**photographs** [9] - 20:9, 24:4, 24:7, 24:16, 25:1, 25:2, 25:4, 25:6, 25:13
**phrase** [1] - 7:15
**phrasings** [2] - 49:6, 58:8

**physically** [1] - 59:17, 60:18
**picketing** [2] - 31:7, 49:12
**picture** [1] - 20:8
**place** [2] - 52:10, 56:24
**placement** [1] - 67:5
**places** [1] - 60:25
**plan** [2] - 57:15, 57:16
**planned** [1] - 18:3, 24:22, 25:9
**planning** [2] - 24:14, 42:19
**plans** [2] - 25:10, 34:17
**plants** [1] - 53:3
**plates** [1] - 46:11
**plea** [42] - 28:13, 28:15, 28:20, 29:9, 31:5, 31:14, 31:24, 32:2, 32:16, 32:20, 32:22, 33:3, 33:4, 33:8, 33:9, 33:13, 33:25, 34:4, 35:13, 35:14, 37:23, 38:1, 38:2, 38:3, 38:6, 38:12, 38:14, 38:19, 47:21, 47:24, 48:2, 48:3, 48:4, 48:6, 52:7, 55:15, 60:3, 67:8, 69:11
**plead** [3] - 18:21, 31:6, 32:17
**pleaded** [1] - 3:7
**pled** [2] - 32:4, 32:17
**plus** [3] - 9:2, 12:8, 12:10
**podium** [1] - 2:13
**point** [5] - 10:24, 16:10, 28:25, 38:19, 46:20
**pointed** [1] - 26:15
**points** [1] - 31:8
**police** [10] - 14:19, 14:20, 15:4, 44:14, 44:20, 53:20, 56:21, 59:18, 62:16, 65:7
**policy** [1] - 55:6
**politicians** [3] - 41:23, 43:8, 62:22
**politics** [1] - 54:3
**polls** [1] - 42:24
**poor** [2] - 48:17, 49:19
**portions** [2] - 6:6, 10:5
**Portland** [1] - 43:22
**position** [8] - 18:14, 21:8, 21:24, 30:20, 31:17, 34:10, 35:2, 44:3

**positive** [2] - 40:20, 50:12
**possess** [1] - 67:1
**possession** [2] - 9:11, 61:10, 69:21
**possibly** [1] - 57:7
**post** [3] - 27:16, 50:8, 50:10, 50:12, 59:22
**posted** [2] - 58:6, 65:5
**posters** [1] - 59:20
**postings** [1] - 59:24
**posts** [1] - 43:20
**posture** [1] - 50:3
**potential** [1] - 58:21
**potentially** [1] - 43:2
**practical** [1] - 67:19
**preceding** [2] - 25:6, 25:8
**precise** [1] - 47:9
**precisely** [1] - 56:9
**precluded** [2] - 34:15, 34:18
**prefer** [3] - 39:2, 39:4, 39:7
**preparation** [3] - 15:14, 21:16, 21:19
**prepared** [6] - 15:9, 17:18, 26:9, 57:24, 58:25, 64:17
**preplanning** [10] - 16:12, 21:14, 21:18, 58:20, 60:22, 63:7, 65:9, 65:11
**present** [4] - 35:17, 49:18, 56:23, 56:25
**PRESENT** [1] - 1:20
**presented** [3] - 12:16, 19:3, 55:19
**presentence** [12] - 4:3, 6:6, 7:3, 7:25, 8:14, 8:20, 9:9, 10:6, 10:14, 10:18, 54:13, 68:22
**presenting** [2] - 34:16, 34:24
**president** [1] - 15:16
**President** [3] - 42:13, 42:14, 56:25
**President's** [1] - 57:18
**presidential** [1] - 62:18
**presiding** [1] - 3:22
**presume** [1] - 21:2
**pretrial** [5] - 40:12, 41:6, 41:7, 61:9, 69:22
**Pretrial** [2] - 1:20, 2:6
**pretty** [5] - 17:14, 17:18, 19:5, 25:20, 33:10

**previous** [1] - 16:21
**pride** [1] - 58:4
**primary** [1] - 27:3
**principle** [3] - 31:22, 33:11, 35:12
**print** [1] - 5:21
**printed** [1] - 5:10
**prison** [3] - 41:9, 51:10, 51:14
**Prisons** [1] - 67:15
**private** [1] - 59:16
**Probation** [6] - 1:20, 2:5, 67:21, 67:25, 68:2, 68:24
**probation** [24] - 4:2, 4:4, 8:13, 8:23, 8:25, 9:18, 11:14, 12:8, 12:10, 12:11, 12:12, 30:15, 33:22, 54:13, 61:6, 63:6, 63:17, 64:3, 64:9, 66:4, 67:14, 68:4, 68:6, 68:22
**probationary** [2] - 31:19, 63:20
**probative** [1] - 64:7
**problem** [2] - 44:20, 42:6
**proceed** [4] - 6:1, 6:3, 29:15, 38:25
**proceeded** [1] - 16:24
**proceeding** [1] - 71:1
**proceedings** [4] - 3:13, 3:17, 57:4, 71:7
**Proceedings** [1] - 1:24
**process** [2] - 56:2, 56:4
**produce** [1] - 28:14
**produced** [3] - 1:24, 12:20, 29:7
**proffer** [14] - 18:18, 19:4, 19:6, 19:8, 19:11, 19:12, 19:17, 20:22, 22:7, 22:11, 22:12, 23:17, 24:17, 33:25
**proffers** [1] - 18:19
**program** [1] - 67:20
**progressed** [1] - 12:25
**prohibited** [1] - 3:18
**prohibitions** [1] - 3:18
**prolong** [2] - 56:2, 65:4
**promote** [3] - 54:23, 55:3, 60:15
**promoting** [1] - 43:12
**prompt** [1] - 38:6
**promptly** [1] - 37:23
**properly** [1] - 70:14

**property** [1] - 59:19
**prosecuted** [1] - 61:8
**prosecution** [2] - 37:12, 51:3
**prosecutor** [2] - 34:25, 36:18
**prosecutors** [1] - 35:17
**protect** [4] - 44:23, 45:14, 55:2, 62:5
**protected** [1] - 41:15
**protecting** [2] - 53:20, 61:18
**protection** [2] - 15:24, 16:4
**protest** [1] - 43:22
**protesting** [1] - 62:16
**proud** [1] - 53:2
**prove** [2] - 24:12, 43:13
**provide** [6] - 55:1, 55:12, 56:3, 60:4, 68:4
**provided** [7] - 20:22, 25:3, 25:5, 27:16, 29:11, 30:2, 30:8
**provides** [2] - 55:15, 63:13
**provision** [1] - 29:9
**provisions** [2] - 56:7, 66:1
**PSR** [8] - 7:5, 7:7, 7:15, 7:19, 7:21, 8:4, 10:7, 51:22
**public** [11] - 3:12, 3:15, 14:1, 14:3, 14:5, 14:10, 45:14, 51:2, 51:16, 55:2, 62:5
**publicly** [1] - 40:18
**punished** [1] - 51:13
**punishment** [2] - 51:13, 55:1
**purposes** [5] - 35:24, 36:4, 38:17, 54:20, 54:21
**Pursuant** [1] - 69:1
**pursuant** [4] - 55:5, 55:23, 65:25, 67:11
**put** [8] - 20:23, 30:4, 45:6, 46:18, 46:20, 51:15, 53:22, 60:19
**puts** [1] - 14:21

**Q**

**quandary** [2] - 34:24, 35:1
**questioning** [1] -

47:15
**questions** [6] - 6:23, 29:17, 29:18, 47:9, 51:19, 53:10
**quick** [1] - 47:22
**quickly** [2] - 51:6, 59:11
**quite** [2] - 18:11, 62:1
**quote** [1] - 61:19

**R**

**raise** [1] - 45:17
**raises** [1] - 7:10
**raising** [3] - 18:12, 27:2, 33:5
**rally** [4] - 18:6, 41:14, 46:16, 65:4
**rallying** [1] - 65:1
**range** [5] - 6:14, 11:13, 11:17, 12:7, 63:17
**rather** [2] - 37:19, 40:5
**read** [4] - 7:24, 38:23, 42:25, 61:23
**realize** [1] - 45:10
**really** [5] - 39:7, 40:4, 48:23, 53:4, 53:25
**reason** [6] - 18:15, 18:24, 27:1, 27:3, 36:22, 51:1
**reasons** [2] - 27:3, 37:8
**rebroadcasting** [1] - 3:16
**received** [6] - 4:15, 30:15, 30:19, 31:2, 61:5, 69:10
**recent** [3] - 9:10, 10:22, 61:5
**recognition** [1] - 65:19
**recognize** [3] - 40:7, 44:22, 48:13
**recognized** [1] - 44:4
**recognizes** [2] - 61:20, 63:20
**recognizing** [1] - 30:25
**recommendation** [9] - 4:4, 7:4, 25:17, 26:3, 26:5, 26:7, 26:12, 27:4, 54:14
**recommendations** [2] - 12:6, 35:16
**recommends** [2] - 12:6, 12:11
**reconcile** [2] - 52:13, 52:16
**record** [16] - 2:5, 2:10,

7:23, 11:20, 18:18, 18:19, 19:4, 19:8, 19:12, 19:16, 22:11, 33:25, 35:24, 55:18, 55:19, 69:16
**recorded** [5] - 12:21, 26:16, 26:25, 58:6, 65:6
**recording** [4] - 3:16, 27:13, 28:19, 29:20
**recordings** [1] - 28:14
**records** [1] - 55:11
**redacted** [1] - 47:1
**redactions** [1] - 36:7
**reference** [5] - 5:2, 13:4, 26:18, 35:19, 58:10
**referenced** [2] - 32:3, 32:7
**referencing** [1] - 60:24
**referrals** [2] - 40:11, 40:12
**referring** [1] - 58:14
**reflect** [3] - 17:18, 54:22, 60:14
**Reform** [1] - 65:25
**refrain** [1] - 67:3
**regard** [2] - 20:17, 22:2
**regarding** [5] - 7:6, 56:11, 61:2, 63:12, 63:19
**regardless** [1] - 57:14
**regularly** [1] - 61:13
**regulations** [1] - 67:16
**rehabilitation** [1] - 55:4
**related** [1] - 56:1
**relationship** [1] - 52:19
**relatively** [2] - 52:23, 64:13
**release** [7] - 11:16, 41:7, 61:9, 63:16, 68:6, 68:22, 69:22
**relevant** [1] - 54:16
**reliable** [1] - 52:21
**relied** [1] - 34:10
**religious** [1] - 67:22
**rely** [7] - 25:14, 25:23, 25:24, 26:10, 30:4, 35:4
**relying** [4] - 26:14, 27:5, 36:5, 36:9
**remaining** [3] - 3:8, 11:4, 56:13
**remarkable** [1] - 40:6
**remedy** [3] - 37:5, 60:9, 65:16
**remember** [5] - 21:25,

39:3, 43:4, 46:18, 50:19
**remembered** [2] - 39:5, 39:7
**remind** [1] - 48:19
**reminded** [1] - 3:15
**reminder** [1] - 70:3
**remorse** [6] - 36:13, 36:15, 37:3, 37:10, 38:10, 65:20
**remotely** [1] - 3:13
**removal** [1] - 3:19
**replaced** [1] - 4:7
**report** [14] - 4:3, 4:14, 6:7, 7:3, 7:25, 8:14, 8:21, 9:10, 9:16, 10:6, 10:15, 29:6, 54:14, 68:23
**reported** [2] - 1:24, 43:17
**Reporter** [3] - 1:22, 1:22, 71:17
**reporting** [1] - 39:23
**reports** [2] - 4:12, 38:2
**representation** [1] - 36:19
**represented** [2] - 18:23, 40:2
**representing** [2] - 45:20, 61:17
**request** [2] - 20:24, 69:13
**requested** [1] - 68:5
**requests** [1] - 12:9
**require** [1] - 32:23
**required** [3] - 28:14, 54:17, 56:5
**requirement** [2] - 28:16, 67:20
**requires** [1] - 61:1
**research** [1] - 51:8
**residence** [2] - 67:21, 68:25
**resolve** [1] - 6:8
**respect** [6] - 10:17, 45:16, 46:14, 48:5, 54:24, 60:15
**respects** [1] - 64:13
**response** [2] - 31:11, 32:14
**responsibility** [8] - 11:10, 37:4, 37:23, 38:10, 47:18, 47:22, 65:21
**rest** [1] - 29:22
**Restitution** [1] - 56:6
**restitution** [10] - 9:3, 55:13, 55:14, 55:15, 56:3, 56:7, 56:9, 66:10, 66:11, 67:7

**restricted** [6] - 3:8, 3:20, 11:4, 11:7, 56:13, 67:21
**result** [3] - 3:19, 36:8, 40:25
**resulting** [1] - 11:11
**results** [1] - 11:13
**returned** [1] - 52:18
**reveal** [1] - 43:12
**revelations** [1] - 36:9
**review** [5] - 3:24, 10:8, 25:14, 30:6, 35:24
**reviewed** [8] - 3:24, 4:2, 4:6, 4:11, 4:15, 6:18, 29:6, 29:24
**reviewing** [1] - 54:15
**ride** [1] - 45:9
**rig** [1] - 42:22
**riot** [3] - 18:19, 57:3, 65:5
**rioters** [5] - 23:14, 59:4, 60:20, 64:24, 65:8
**risk** [1] - 41:20
**Robert** [1] - 8:22
**role** [1] - 58:18
**room** [2] - 13:23, 23:15
**Room** [1] - 66:16
**RPR** [3] - 1:22, 71:4, 71:16
**rules** [1] - 67:16

**S**

**sad** [3] - 53:24, 54:2
**sadly** [1] - 23:8
**SAINT** [1] - 71:4
**Saint** [2] - 1:22, 71:16
**SAINT-LOTH** [1] - 71:4
**Saint-Loth** [2] - 1:22, 71:16
**sanctions** [2] - 3:19, 3:21
**sandwich** [2] - 50:22, 50:23
**satisfied** [1] - 8:9
**save** [1] - 42:7
**saving** [3] - 15:9, 42:5, 43:16
**saw** [1] - 32:7
**scaffolding** [1] - 64:24
**school** [2] - 40:16, 50:18
**Schornak** [9] - 8:22, 8:24, 56:17, 57:12, 64:4, 64:8, 64:15, 64:19, 65:15

**Schornak's** [1] - 45:19
**SCHUCK** [1] - 1:20
**Schuck** [1] - 2:6
**scope** [1] - 60:11
**score** [1] - 10:24
**Score** [1] - 10:25
**screeching** [2] - 13:25, 14:23
**sealed** [4] - 4:20, 9:19, 51:21, 54:15
**search** [1] - 13:17
**seated** [5] - 2:8, 2:25, 7:2, 8:18, 70:5
**second** [4] - 6:9, 22:21, 38:23
**seconds** [1] - 12:22
**Section** [15] - 3:9, 11:2, 11:3, 12:3, 54:18, 55:5, 55:24, 56:6, 56:14, 66:1, 66:9, 67:8, 67:11, 69:1, 69:6
**section** [1] - 23:11
**secured** [3] - 7:13, 7:15, 58:22
**see** [11] - 7:9, 18:11, 19:22, 25:12, 28:18, 29:19, 36:21, 41:10, 46:18, 53:25, 62:21
**seeing** [1] - 43:19
**seek** [1] - 40:10
**seem** [1] - 50:4
**seemingly** [1] - 58:14
**sees** [1] - 44:13
**seized** [2] - 28:4, 29:5
**Select** [10] - 36:23, 37:7, 42:16, 43:10, 44:10, 44:25, 45:8, 60:2, 60:10, 65:18
**self** [2] - 12:20
**self-produced** [1] - 12:20
**Senate** [5] - 13:13, 13:15, 13:16, 59:9, 59:17
**sense** [2] - 40:20, 50:15
**sensitive** [1] - 56:24
**sent** [1] - 58:7
**sentence** [21] - 6:22, 13:10, 18:4, 33:17, 54:10, 54:11, 54:18, 54:22, 55:10, 60:14, 60:16, 62:4, 62:9, 63:6, 64:8, 65:24, 68:25, 69:2, 69:8, 69:15
**sentenced** [6] - 8:22, 8:24, 30:18, 50:21, 63:25, 66:3

**sentences** [5] - 30:9,
31:20, 55:9, 63:12,
63:21
**SENTENCING** [1] - 1:8
**sentencing** [60] - 3:6,
3:11, 3:14, 3:23,
3:25, 4:4, 4:7, 4:8,
4:13, 4:15, 4:20,
5:25, 6:3, 6:11, 6:14,
7:4, 7:18, 8:15, 10:8,
10:10, 11:13, 12:5,
17:5, 18:16, 18:25,
19:2, 19:15, 19:19,
19:24, 20:23, 26:3,
26:5, 26:6, 26:12,
26:15, 27:1, 30:2,
30:3, 30:22, 31:16,
35:25, 36:1, 36:5,
36:6, 36:11, 39:14,
45:19, 50:19, 54:12,
54:20, 54:21, 56:2,
56:4, 56:16, 59:25,
60:1, 62:7, 62:22,
65:19, 69:12
**Sentencing** [1] - 65:25
**separate** [1] - 41:24
**September** [4] - 18:1,
22:19, 38:16, 38:17
**serious** [5] - 41:10,
42:5, 42:7, 54:23,
65:11
**seriousness** [3] -
54:22, 60:15, 62:7
**serve** [2] - 64:5, 67:12
**served** [2] - 66:6,
67:13
**service** [3] - 12:9,
12:11, 70:18
**services** [1] - 67:23
**session** [2] - 22:8,
22:12
**set** [4] - 7:7, 10:14,
12:3, 54:17
**seven** [3] - 38:4, 49:5,
59:7
**shall** [7] - 66:12,
66:19, 67:9, 67:13,
68:19, 68:22, 71:10
**shame** [3] - 40:14,
40:21, 51:2
**share** [1] - 68:7
**shared** [1] - 25:13
**shed** [1] - 29:3
**Sherrill** [1] - 66:16
**shop** [1] - 50:22
**short** [7] - 27:16,
29:21, 32:24, 52:23,
57:25, 64:13, 65:5
**shorthand** [1] - 1:24
**shots** [1] - 2:19

**shouting** [1] - 14:19
**show** [2] - 27:6, 53:2
**showed** [3] - 25:9,
30:11, 54:25
**showing** [1] - 57:25
**shown** [2] - 36:15,
37:10
**shows** [1] - 51:9
**sic** [3] - 5:5, 27:4, 40:7
**side** [3] - 10:4, 53:18,
53:19
**sign** [2] - 50:22, 61:11
**signatory** [1] - 71:12
**significance** [2] -
56:19, 60:8
**significant** [11] -
21:10, 21:12, 25:20,
30:1, 38:13, 39:15,
39:21, 40:24, 44:23,
50:5, 61:1
**significantly** [1] -
45:20
**silver** [1] - 40:19
**similar** [4] - 55:11,
55:12, 64:12, 69:22
**similarly** [1] - 32:6
**simple** [1] - 33:10
**simply** [1] - 63:6
**single** [1] - 11:19
**sit** [2] - 60:1, 60:2
**sits** [1] - 31:21
**sitting** [2] - 41:7,
65:18
**situated** [1] - 32:6
**slips** [1] - 5:19
**small** [1] - 41:1
**sniper** [1] - 46:2
**social** [7] - 29:8,
29:12, 43:5, 43:7,
44:4, 59:23, 62:13
**soft** [1] - 46:9
**sold** [1] - 16:2
**someone** [1] - 45:13
**sometimes** [3] - 47:8,
47:14, 52:25
**somewhat** [1] - 59:12
**son** [2] - 53:1, 53:3
**soon** [2] - 50:11, 67:19
**sorry** [5] - 2:25, 5:10,
15:1, 21:11, 41:5
**sort** [3] - 29:23, 51:23,
59:10
**sorts** [2] - 21:1, 41:22
**sought** [1] - 60:9
**sound** [2] - 13:25,
14:23
**source** [2] - 25:3, 25:5
**spaces** [1] - 59:16
**speaking** [1] - 2:16

**special** [6] - 8:25,
11:18, 64:2, 66:5,
66:8, 67:9
**specific** [2] - 7:11,
20:18
**specifically** [1] - 67:25
**spoken** [2] - 16:22,
20:17
**spot** [1] - 61:21
**spouted** [1] - 41:22
**spray** [50] - 15:11,
16:13, 16:14, 16:19,
16:20, 16:23, 18:5,
18:7, 18:9, 19:23,
20:1, 20:8, 20:10,
20:12, 21:15, 21:21,
22:3, 22:4, 22:6,
22:23, 24:4, 24:5,
24:22, 25:11, 25:20,
26:1, 26:2, 27:5,
27:6, 27:8, 29:25,
34:7, 34:14, 34:17,
34:23, 46:4, 46:5,
46:14, 46:19, 46:24,
47:4, 47:19, 57:6,
57:21, 58:23, 58:24,
63:8, 65:9
**spur** [1] - 57:10
**spur-of-the-moment**
[1] - 57:10
**square** [1] - 51:16
**stairs** [3] - 48:20,
48:21, 50:1
**stand** [4] - 5:23, 8:7,
15:17, 50:21
**stand..** [1] - 54:9
**standard** [2] - 66:20,
69:20
**Standing** [1] - 3:16
**start** [7] - 7:1, 12:17,
12:18, 13:9, 24:24,
32:4, 55:14
**starting** [2] - 2:10,
8:21
**starts** [1] - 11:5
**state** [5] - 2:9, 18:14,
52:25, 65:24, 66:24
**statement** [9] - 13:7,
15:7, 15:17, 26:22,
26:24, 26:25, 28:22,
36:14, 37:9
**statements** [2] - 8:3,
55:6
**States** [3] - 2:3, 2:21,
26:17
**states** [1] - 8:21
**STATES** [3] - 1:1, 1:3,
1:9
**status** [1] - 38:2
**statute** [3] - 30:12,

32:4, 56:7
**statutory** [2] - 11:17,
69:3
**stay** [1] - 52:8
**steal** [3] - 42:19,
58:13, 65:3
**stealing** [2] - 60:18,
62:17
**stenographic** [1] -
71:6
**step** [10] - 2:13, 6:4,
6:9, 6:16, 6:21, 7:2,
10:10, 12:1, 37:4
**stepfather** [1] - 4:19
**steps** [2] - 6:3, 65:21
**still** [7] - 3:2, 28:6,
41:19, 41:21, 44:7,
53:21
**stipulations** [1] -
47:25
**stole** [2] - 50:23, 64:22
**stolen** [4] - 41:18,
42:4, 43:13, 59:19
**Stop** [1] - 58:13
**stopped** [1] - 23:14
**store** [2] - 16:3, 50:23
**stories** [2] - 42:18,
42:21
**stormed** [1] - 26:17
**story** [1] - 24:25
**straight** [1] - 64:1
**Street** [2] - 1:12, 1:17
**streets** [1] - 16:2
**stress** [11] - 39:23,
40:2, 40:8, 40:14,
40:21, 41:3, 41:11,
41:12, 44:19, 48:8
**stressed** [1] - 40:7
**stressful** [1] - 40:7
**strictly** [1] - 3:18
**strike** [1] - 22:25
**strong** [3] - 45:22,
50:15, 52:7
**struggled** [1] - 40:4
**stuck** [1] - 45:7
**stuff** [2] - 45:16, 48:7
**style** [1] - 15:10
**subject** [1] - 24:16
**submissions** [1] -
23:3
**submit** [3] - 24:23,
67:4, 67:18
**submitted** [8] - 4:16,
4:20, 5:1, 8:15,
18:16, 18:24, 24:9,
61:22
**substance** [3] - 67:2,
67:4, 67:23
**substances** [1] -
69:21

**subtitle** [1] - 47:2
**subtracted** [1] - 11:9
**succeeded** [1] - 57:3
**successfully** [1] - 9:17
**suffer** [1] - 39:20
**suffered** [2] - 39:21,
40:25
**sufficient** [2] - 54:19,
62:9
**suggest** [1] - 16:15
**suggestion** [1] - 58:16
**suggestions** [1] -
39:25
**suggests** [3] - 7:12,
18:9, 46:21
**sum** [1] - 60:13
**supervised** [2] -
11:16, 63:16
**supervision** [4] -
66:19, 66:21, 66:22,
67:5
**supervisors** [1] -
35:16
**supplement** [6] - 12:2,
18:25, 19:19, 19:23,
19:24, 53:14
**supplemental** [7] -
4:9, 4:20, 5:6, 36:14,
37:9, 38:24, 54:15
**supplementals** [1] -
5:20
**supplemented** [3] -
4:13, 10:8, 55:22
**support** [4] - 15:16,
44:7, 58:3, 61:11
**supporters** [2] -
42:14, 46:13
**supposed** [2] - 20:21,
52:16
**supremacists** [1] -
40:1
**surprise** [1] - 62:19
**surprised** [1] - 18:11
**surrounded** [1] -
51:24
**susceptible** [1] -
41:21
**swept** [1] - 49:24
**swift** [1] - 51:2
**symbol** [1] - 64:25
**system** [3] - 41:4,
42:8, 61:7

**T**

**table** [1] - 32:7
**tacks** [1] - 42:1
**tactical** [8] - 15:6,
18:5, 18:7, 22:22,

57:7, 57:21, 58:23, 64:16
**task** [1] - 57:1
**taunting** [1] - 15:4
**team** [1] - 37:12
**tear** [1] - 23:15
**technology** [1] - 68:1
**teenage** [1] - 57:5
**teenagers** [1] - 52:7
**teleconference** [1] - 3:15
**telephone** [1] - 2:7
**term** [6] - 28:13, 30:19, 31:2, 63:14, 66:3
**terms** [13] - 13:9, 15:20, 21:18, 27:20, 28:5, 29:8, 33:16, 37:22, 47:9, 47:22, 48:14, 60:7
**terrible** [1] - 48:17
**test** [1] - 67:4
**testified** [1] - 37:13
**tests** [1] - 67:6
**THE** [135] - 1:1, 1:8, 1:11, 1:15, 2:2, 2:8, 2:9, 2:13, 2:16, 2:22, 3:1, 3:4, 3:5, 4:24, 5:3, 5:7, 5:12, 5:16, 5:17, 5:22, 5:23, 6:25, 7:1, 7:9, 7:22, 8:2, 8:6, 8:11, 8:12, 8:16, 8:17, 9:7, 9:9, 9:20, 9:23, 9:25, 10:3, 11:23, 11:25, 14:1, 14:14, 14:24, 15:12, 15:22, 16:6, 16:9, 16:11, 17:5, 17:8, 17:14, 17:17, 17:22, 17:25, 19:5, 19:18, 19:22, 20:12, 20:21, 21:1, 21:10, 21:12, 22:5, 22:10, 22:12, 22:14, 22:17, 23:7, 23:9, 23:13, 23:23, 23:25, 24:2, 24:7, 24:16, 24:24, 25:5, 25:12, 25:16, 25:19, 26:6, 27:10, 27:25, 28:8, 28:12, 28:18, 29:1, 29:3, 29:10, 29:14, 29:19, 30:6, 30:25, 32:10, 32:19, 33:15, 34:6, 34:9, 35:1, 35:6, 35:8, 35:23, 36:4, 36:21, 37:15, 37:21, 38:8, 38:20, 38:22, 39:18, 41:2, 42:3, 46:6, 47:1, 48:3,

48:25, 49:2, 51:18, 51:21, 52:2, 52:5, 53:8, 53:11, 53:13, 53:15, 54:6, 54:7, 54:8, 69:18, 70:2, 70:5, 70:10, 70:16, 70:19, 70:21, 70:24
**themselves** [1] - 13:6
**theoretical** [1] - 50:18
**theories** [4] - 41:17, 41:22, 44:5, 62:14
**theory** [1] - 51:9
**therapist** [1] - 40:13
**therapists** [1] - 40:12
**therapy** [1] - 40:13
**thereafter** [1] - 67:6
**therefore** [2] - 10:24, 68:14
**thick** [1] - 15:25
**thinkers** [1] - 62:21
**third** [2] - 6:16, 12:1
**thoughtful** [1] - 61:16
**threatening** [2] - 15:13, 58:15
**three** [7] - 10:18, 23:2, 30:15, 39:3, 61:11, 61:12, 63:18
**tied** [1] - 39:10
**timingwise** [1] - 59:2
**tipped** [1] - 58:2
**Title** [1] - 12:4
**today** [7] - 16:24, 30:19, 36:9, 39:3, 47:11, 61:12, 70:11
**took** [13] - 20:19, 38:18, 40:6, 46:19, 50:13, 52:10, 52:11, 58:2, 58:4, 58:24, 64:23, 65:10, 65:12
**tools** [1] - 21:16
**total** [6] - 9:1, 11:11, 64:10, 66:5, 67:12, 68:10
**totaling** [1] - 64:10
**totally** [1] - 46:2
**toward** [1] - 62:1
**towards** [1] - 10:23
**toxic** [2] - 44:5, 46:2
**traits** [1] - 62:2
**transcript** [4] - 1:24, 71:6, 71:7, 71:11
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 1:24
**trauma** [1] - 44:20
**traveled** [3] - 52:12, 52:14, 57:4
**treated** [2] - 32:6, 35:22
**treatment** [1] - 67:24

**trespass** [3] - 7:13, 11:7, 56:18
**trial** [2] - 32:22, 32:24
**tries** [1] - 39:6
**trip** [3] - 53:5, 58:21, 58:22
**troublesome** [1] - 60:20
**true** [2] - 71:5, 71:6
**Trump** [7] - 42:14, 42:23, 43:8, 44:8, 44:11, 45:9, 46:13
**truth** [2] - 37:17, 41:24
**try** [3] - 14:20, 40:10, 59:20
**trying** [8] - 36:25, 37:1, 44:22, 46:25, 49:18, 60:11, 63:11, 65:15
**turmoil** [1] - 40:22
**turn** [4] - 11:25, 14:3, 14:10, 14:24
**turned** [4] - 27:19, 28:9, 28:21, 60:7
**turning** [1] - 64:25
**twice** [1] - 61:7
**two** [23] - 7:12, 8:25, 9:2, 10:3, 10:6, 10:10, 10:19, 11:6, 11:9, 14:5, 14:6, 14:7, 29:21, 44:15, 57:5, 57:15, 64:9, 64:12, 66:6, 67:1, 67:5, 67:13, 67:19
**two-level** [1] - 7:12
**types** [2] - 55:9, 63:12
**typographical** [1] - 36:2

## U

**U.S** [8] - 1:12, 66:13, 67:20, 67:25, 68:2, 68:7, 68:17, 68:24
**U.S.C** [14] - 3:9, 11:3, 31:7, 54:17, 55:5, 55:23, 56:6, 56:14, 66:1, 66:9, 67:8, 67:11, 69:1, 69:6
**ultimate** [1] - 33:17
**ultimately** [2] - 46:5, 61:8
**unable** [2] - 20:19, 69:12
**unavailable** [1] - 69:8
**unclear** [1] - 57:22
**uncomfortable** [1] - 18:15
**uncritical** [1] - 62:21

**under** [12] - 3:15, 11:3, 11:8, 11:10, 23:16, 23:17, 23:21, 30:12, 31:7, 41:8, 47:2, 56:5
**unfortunate** [1] - 62:2
**unfortunately** [2] - 39:9, 63:3
**union** [1] - 53:2
**UNITED** [3] - 1:1, 1:3, 1:9
**United** [3] - 2:3, 2:21, 26:17
**unlawful** [3] - 56:23, 57:9, 67:3
**unlawfully** [3] - 56:23, 64:20, 67:1
**unless** [1] - 9:13
**unlike** [1] - 63:9
**unmistakable** [1] - 58:17
**unvaccinated** [1] - 2:17
**unveiling** [1] - 43:15
**unwarranted** [5] - 30:21, 31:16, 33:16, 55:10, 63:19
**up** [12] - 6:1, 11:14, 11:15, 28:6, 42:24, 49:25, 53:6, 62:13, 62:14, 63:16, 63:17, 64:23
**updated** [1] - 9:14
**Urkel** [1] - 14:12
**useful** [1] - 64:5

## V

**vaccinated** [1] - 2:14
**variety** [1] - 56:22
**verge** [1] - 48:10
**versus** [7] - 2:3, 31:14, 31:24, 33:13, 35:14, 46:23, 47:13
**vest** [15] - 15:6, 15:10, 16:4, 16:6, 16:7, 18:5, 34:22, 46:3, 46:6, 46:7, 46:9, 57:7, 57:21, 58:23
**vests** [2] - 16:4, 46:11
**via** [1] - 2:7
**Vice** [1] - 56:24
**victim** [2] - 56:3, 66:14
**victim's** [1] - 56:1
**victims** [2] - 55:13, 55:17
**Victims** [1] - 56:5
**video** [34] - 2:7, 4:12, 10:9, 12:18, 12:20,

12:22, 12:23, 12:25, 13:18, 13:20, 13:21, 14:17, 26:16, 27:17, 27:18, 27:22, 27:23, 35:18, 48:14, 48:16, 48:25, 49:16, 50:6, 50:10, 57:25, 58:5, 58:12, 59:22, 59:23, 60:23, 65:6
**videoconference** [1] - 3:17
**videos** [9] - 4:11, 12:16, 27:11, 27:15, 27:22, 29:7, 29:21, 34:1, 46:18
**view** [2] - 38:5, 64:19
**views** [1] - 43:23
**villains** [1] - 49:19
**violation** [3] - 3:9, 3:18, 56:13
**violence** [17] - 15:14, 18:3, 21:16, 21:19, 43:20, 43:21, 44:14, 44:21, 45:23, 46:12, 56:21, 57:24, 58:21, 58:25, 60:18, 60:22, 64:16
**voice** [2] - 12:23, 12:25
**void** [1] - 71:10
**votes** [1] - 42:22
**vs** [1] - 1:4

## W

**waives** [1] - 68:14
**walk** [1] - 52:11
**walking** [2] - 16:1, 48:20
**wander** [1] - 49:13
**Wandrea** [1] - 63:10
**Wanna** [1] - 57:15
**wants** [2] - 32:24, 45:5
**warranted** [2] - 32:20, 64:18
**warrants** [5] - 31:13, 31:24, 33:3, 63:6
**Washington** [14] - 1:6, 15:5, 15:17, 16:2, 16:19, 17:4, 20:16, 46:1, 47:13, 47:19, 58:25, 65:10, 66:17, 68:18
**watched** [1] - 52:22
**watching** [1] - 61:19
**wave** [1] - 59:3
**ways** [2] - 50:2, 50:24
**wear** [2] - 16:1, 46:12
**wearing** [2] - 16:6,

50:22
**week** [2] - 14:5, 57:11
**weeks** [1] - 57:15
**weird** [3] - 14:4, 14:6, 14:8
**well-being** [1] - 39:6
**west** [1] - 59:6
**whereas** [1] - 36:19
**white** [1] - 39:25
**White** [2] - 48:19, 49:19
**whole** [3] - 22:20, 23:11, 29:20
**willing** [1] - 42:7
**window** [1] - 65:7
**wing** [3] - 13:13, 13:16
**wish** [2] - 6:18, 53:14
**witnessed** [1] - 62:8
**woke** [1] - 42:24
**women** [1] - 15:19
**wonder** [1] - 29:21
**word** [1] - 49:5
**wore** [2] - 16:5, 57:20
**worker** [1] - 53:2
**world** [2] - 43:25, 46:3
**wrote** [1] - 70:14

## Y

**year** [10] - 11:16, 40:2, 40:3, 41:9, 50:14, 50:17, 55:21, 63:14, 63:16, 67:14
**years** [7] - 14:7, 42:12, 61:4, 63:18, 66:4
**years'** [3] - 11:14, 12:8, 63:17
**yields** [2] - 33:12, 33:13

## Z

**zero** [2] - 11:13, 12:7